**IN THE SUPREME COURT OF THE STATE OF IDAHO**
Docket Nos. 31659, 39417

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) Boise, November 2014 Term |
| Plaintiff-Respondent, | ) |
| | ) 2015 Opinion No. 29 |
| v. | ) |
| | ) Filed: March 2, 2015 |
| AZAD HAJI ABDULLAH, | ) |
| | ) Stephen W. Kenyon, Clerk |
| Defendant-Appellant | ) |
| _____ | ) |

Appeal from the district court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Cheri C. Copsey, District Judge.

The convictions, sentences, and the order denying post-conviction relief are <u>affirmed.</u>

Sara B. Thomas, Idaho State Appellate Public Defender, Boise, attorney for appellant. Shannon N. Romero argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, attorney for respondent. LaMont Anderson argued.

_____

WALTERS, Justice *pro tem*

On November 19, 2004, a jury found Azad Haji Abdullah guilty of first-degree murder, first-degree arson, three counts of attempted first-degree murder, and felony injury to a child. The case proceeded to sentencing and the jury found the existence of two aggravating circumstances. The jury also found that all the mitigating circumstances when weighed against each aggravating circumstance individually were not sufficiently compelling to make the death penalty unjust. Pursuant to the jury verdicts, the district court entered judgments of conviction and sentenced Abdullah to death for first-degree murder and to a total of eighty years imprisonment for the remaining five convictions. Abdullah sought post-conviction relief. On October 14, 2011, following an evidentiary hearing, the district court dismissed Abdullah's petition for post-conviction relief in its entirety. Abdullah appeals to this Court, including both

1

his direct appeal from the trial and his appeal from the post-conviction proceedings. We affirm the convictions, the sentences, and the order denying post-conviction relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 14, 2002, the grand jury sitting in Ada County indicted Abdullah on one count of murder in the first degree, a felony, Idaho Code sections 18-4001 to -4003; one count of arson in the first degree, a felony, Idaho Code section 18-802; three counts of attempted murder in the first degree, a felony, Idaho Code sections 18-4001 and 18-306; and one count of injury to a child, a felony, Idaho Code section 18-1501(1). The State alleged that on October 5, 2002, Abdullah murdered his wife Angela Abdullah (Angie) in their home and then set fire to the home with two of the children (A.H. and M.A.) and a young friend (S.S.) asleep inside and one of their children (N.A.) in the backyard. On November 18, 2002, the district court arraigned Abdullah, and, on November 26, 2002, Abdullah pled not guilty.

On December 3, 2002, the State filed a notice of its intent to seek the death penalty for the crime of first-degree murder. In this notice, the State identified that it would rely on four aggravating circumstances: (1) the defendant knowingly created a great risk of death to many persons; (2) the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity; (3) by the murder or circumstances surrounding its commission, the defendant exhibited utter disregard for human life; and (4) the defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

The Ada County Public Defender initially represented Abdullah, but, on June 19, 2003, private counsel Kim and Mitchell (Mitch) Toryanski (collectively "the Toryanskis") filed a notice of appearance. The district court granted their motion for substitution of counsel.

On February 23, 2004, the State amended the indictment. The original indictment provided that Abdullah killed Angie by suffocation. The amended indictment provided that Abdullah killed Angie "by suffocating her and/or by acute Prozac (fluoxetine) poisoning from which she died."

The case proceeded to trial in September of 2004. On September 10, the parties began voir dire of the prospective jurors. On September 23, the parties accepted the jury as empaneled and the jurors were sworn. The State gave its opening statement. The defense reserved its opening statement until after the State's presentation of its case-in-chief.

As an appellate court, our function is to examine the evidence, not reweigh it, and we construe all facts and inferences in favor of upholding the district court's decision. *State v. Bush*, 131 Idaho 22, 33, 951 P.2d 1249, 1260 (1997). With this standard in mind, the jury reasonably could have found the following facts based on the evidence presented at trial:[1]

Angie and Abdullah were married in March of 2001. Abdullah is Muslim and a Kurdish refugee from northern Iraq. Angie converted to Islam for Abdullah before they married. Angie had a daughter, A.H., from a previous marriage, and Abdullah had a son, R.A., from a previous marriage. Angie and Abdullah had two sons together, N.A. and M.A. A.H. was nine years old at the time of Angie's death, R.A. was five years old, N.A. was eighteen months old, and M.A. was three weeks old.

Angie and Abdullah's marriage was troubled, and one point of disagreement was Abdullah's religious studies. Abdullah wanted to move the family to South Africa or Saudi Arabia to study Islam, but Angie did not want to move. They also had financial troubles. A financial analyst with the FBI opined that Angie and Abdullah were "living month to month" and borrowing money to make ends meet. Shortly before the birth of M.A., Angie told health professionals she was contemplating divorce. On September 9, 2002, Angie met with an attorney to discuss divorce and other marital issues.

Abdullah, Angie, and their children lived in a home on 2292 North Siesta Way in Boise, Idaho. Angie owned the Siesta residence. In June of 2002, Abdullah offered to sell everything in the residence to a co-worker. In August of 2002, Abdullah tried to sell the residence without Angie's consent.

In response to a co-worker's question as to the differences between American and Kurdish culture, Abdullah told his co-workers it was acceptable to kill one's wife or to have the wife killed in his culture if she cheated on the husband and the husband made an offering to the wife's family. He made this comment in July or August of 2002.

Abdullah and Angie ran a vending machine business part-time. In the summer of 2002, Abdullah stored the vending machines in the garage of the Siesta residence. On August 21, 2002, Abdullah purchased a $50,000 insurance policy in cash to cover the vending machines if destroyed by a fire. Although he was storing the vending machines at home, he was interested in

---

[1] The summary of the evidence presented at trial follows in many respects the district court's outline of the facts in its memorandum decision regarding post-conviction relief.

only fire insurance and not theft insurance. Abdullah was a named insured on Angie's homeowner's policy.

On October 2, 2002, Abdullah told a co-worker that divorce is "extremely frowned upon in Islam, and that it just doesn't happen." He also went shopping at India Emporium that day and received a plastic bag to hold his purchase.

On October 4, 2002, Abdullah drove to Salt Lake City, Utah, with his son R.A. Although Abdullah wanted to take N.A., his favorite child, on the trip, he did not take N.A. He claimed that the purpose of the trip was to get halal meat, which is a meat specially prepared for Muslims under the Islamic dietary guidelines and was not available in Boise. Before Abdullah left for Salt Lake City, he purchased approximately seventeen gallons of gasoline at a Chevron station in Boise. He also made a separate purchase of about five gallons of gasoline for a gas can.

On October 4, 2002, a little before 4:00 p.m., Abdullah went to the Halal Market in Salt Lake City, but he did not buy any halal meat or discuss that kind of purchase with the owner. At approximately 4:15 p.m., Abdullah checked into the Dream Inn in Salt Lake City. At approximately 6:30 p.m., Abdullah purchased two red plastic gas cans from Food 4 Less. At 6:52 p.m., Abdullah purchased at a Halloween store a long black cape that fully covered an adult and a mask that fully covered an adult head. The Abdullah family did not observe Halloween for religious reasons.[2] Abdullah also visited the mosque. At 8:10 p.m., Abdullah purchased twenty-two and a half gallons of gasoline, Cheetos, and coffee at a 7-Eleven in Salt Lake City. Twenty-two and a half gallons was more than the tank capacity of Abdullah's van, which could hold a little more than twenty-one gallons, but not twenty-two gallons. No one saw Abdullah in Salt Lake City from approximately 8:00 p.m. on October 4, 2002, to 7:00 a.m. on October 5, 2002.

At seventy-five to eighty miles per hour, it would take about four and a half hours to drive between Salt Lake City and Boise, approximately 330 miles. Abdullah's van gets a little over twenty-six miles per gallon and takes about thirteen gallons to make the trip.

In Boise, around noon on October 4, 2002, ten-year-old S.S., a friend of A.H., was taken to the Siesta residence by S.S.'s mother to sleep over that night. Abdullah knew S.S. would be staying the night. S.S.'s mother spent about an hour and a half with Angie discussing M.A.'s

---

[2] Imam Khaja Shuab Din testified that some Muslims allow their children to celebrate Halloween, but there would be no reason for adult costumes.

baby shower and testified that Angie seemed normal.[3] Around 6:00 or 6:30 p.m., Angie took A.H., N.A., M.A., and S.S. to Angie's Aunt Charlene Javernick's house in Eagle, Idaho, for dinner. Angie was acting normal, and she seemed relaxed and comfortable, not depressed, sad, or tense. On the way home from dinner, Angie rented a movie for A.H. and S.S. Angie and the children arrived home at approximately 10:30 p.m., and A.H. and S.S. watched the movie in the family room. Around midnight A.H. and S.S. fell asleep in the family room. Before going to sleep, Angie asked A.H. and S.S. to lock the doors. A.H. and S.S. made sure the front door and back door were locked. A.H. and S.S. did not check the door in the master bedroom, which went out to the back porch, or the door to the garage. A.H. and S.S. observed that Angie was wearing a "blue tank top dress" or "dress kind of gown with little purple flowers" for pajamas.

Marjorie Wood, a clerk at a Chevron station in Mountain Home, Idaho, saw Abdullah in the Chevron store a little after midnight on October 5, 2002. Wood identified Abdullah from a photograph for law enforcement on October 11, 2002, and she told law enforcement that she was 100 percent sure Abdullah was in the store.[4]

On October 5, 2002, shortly before 1:54 a.m., S.S. woke up because she felt heat. S.S. saw "fire everywhere." S.S. woke up A.H. by slapping her. A.H. saw fire "[a]ll over the roof" (evidently referring to the ceiling). A.H. and S.S. saw a path through the garage and ran out of the burning home. A.H. and S.S. had a minute or less to respond to the fire before a risk of death.

Edward Kerschensteiner and his wife, who lived across the street from the Siesta residence, were awakened a little before 2:00 a.m. by A.H. and S.S. ringing their doorbell. A.H. and S.S. told Edward that Angie and the other children were still in the house. Brian and Linda Wright, who lived next to the Siesta residence, went with Edward to help search for other individuals in the burning home. Edward kicked down the door to the master bedroom, which was locked, ran into the bedroom, and rescued M.A., who was lying on the bed crying. Brian helped Edward rescue M.A. and then went into the family room with Edward to search for Angie. Neither Edward nor Brian saw N.A. in their search of the home.

M.A. had soot and oily residue around his mouth and nose and on his clothing. If M.A. had not been rescued from the home, there was a very high probability M.A. would have died before the firefighters arrived at the scene.

---

[3] S.S.'s mother had never let S.S. sleep over before because she was uncomfortable with Abdullah.
[4] Wood observed Abdullah talking with two other men with "black beards" in a different language in the store. Wood testified, "They were all the same race," and they left the store "at pretty much the same time."

At approximately 2:00 a.m., the firefighters arrived and initially entered the burning home in rescue mode. The firefighters quickly went into defensive mode, however, due to concerns of flashover, which is when everything in the room reaches ignition temperature and ignites at one time. Shortly after the firefighters retreated from the home through the front door, the living room flashed over. There was a very high probability of fatal injuries to the firefighters if any of them had been in the room when it flashed over.

One firefighter found N.A. in the backyard during a secondary search around the burning home. N.A. was sitting on a large comforter from the master bedroom. N.A. was not covered in soot, did not smell like smoke, and did not have any signs on his body of being in a fire. N.A. could not open the door to the master bedroom or carry the comforter by himself. Due to the intense fire load, N.A. would have been burned if he remained in the backyard.

The firefighters found that the front door was open with no signs of a forced entry, even though A.H. and S.S. had checked the lock before they went to bed.

The firefighters used a thermal imager to scan the Siesta residence and saw a female body, identified as Angie, lying on the bed in the southwest bedroom, which was one of the children's rooms. Angie had no clothing on except a sports bra. A plastic bag was over her head and covered her face. The firefighters observed that her "face was down" and "her back side was up in the air." The body was in a peculiar and unusual position for a fire fatality. A nightgown with flowers on it was found on a bedpost in the master bedroom.

Lance Hart, a senior special agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF), explained that the fire was intentionally set by someone who poured gasoline in the garage, the living room, and the southwest bedroom in which Angie was found. So much gasoline was poured in the garage that the gas water heater pilot light prematurely ignited the fumes and caused the garage to explode before the other gas pours could be linked or ignited. The explosion was so strong that it blew the bottom panel of the garage door off, which allowed A.H. and S.S. to escape. The neighbors in the house behind the Siesta residence had to put water on their roof to prevent their house from catching on fire. The Wrights could feel the heat from outside their home, the paint peeled off their home due to the heat, and the nearby foliage was singed.

Firefighters found a new red plastic gas can in the driveway of the Siesta residence that matched the one Abdullah had purchased in Salt Lake City at Food 4 Less. The gas can was

melted due to the fire, but contained a small amount of gasoline. Law enforcement took the gas can and transferred the remaining gasoline to a vial. The firefighters found a black cape at the scene identical to the one purchased by Abdullah at the Halloween store in Salt Lake City.

On October 5, 2002, in Salt Lake City at approximately 7:00 a.m., Abdullah went to the mosque, stayed for a few minutes, and then returned to the Dream Inn. He told law enforcement that he slept until 10:35 a.m. and then checked out. At 11:36 a.m., Abdullah purchased another sixteen gallons of gasoline at a Maverik gas station in Salt Lake City.[5] He also went to the Halal Market again between 10:00 a.m. and 11:00 a.m., but did not place an order or purchase any meat. Around noon he bought new sandals.

Around 2:00 p.m., Abdullah returned to the mosque. Abdullah then went to lunch with Imam Khaja Shuab Din (Imam Din) at his home and stayed for the next five hours. At 3:30 p.m., Abdullah learned of the fire and Angie's death. Abdullah left his van at Imam Din's house and flew to Boise with R.A. Law enforcement interviewed Abdullah at the airport immediately upon his arrival in Boise.

On October 7, 2002, Abdullah learned law enforcement was going to verify his story. Abdullah called his friend Moctar Ba that morning. Abdullah asked Ba to call Imam Din and ask him to go to a pay phone to call Ba. Abdullah also asked Ba to ask Imam Din to go to Food 4 Less, purchase two gas cans, fill them with gas, and place them in his van, which was still parked at Imam Din's home. Abdullah told Ba that Imam Din's phone was under surveillance. Ba told Abdullah that he would not do as Abdullah requested.

Also on October 7, 2002, Abdullah left a voicemail for Imam Din, asking him to return his phone call, that it was urgent, and that he should use a pay phone and not his home phone. Imam Din purchased a phone card and returned Abdullah's phone call from a pay phone. Abdullah asked him to buy two red plastic gas cans, purchase gasoline, empty the gas cans, and place them in his van. Abdullah told him that he was afraid the police would not believe his story that R.A. did not like the smell of the gas cans so he threw them in the dumpster. Imam Din refused.

When law enforcement took possession of Abdullah's van, it did not contain any gas cans, the cape, or the mask.

---

[5] Other than the drive to Boise and the arson, there was no explanation as to how Abdullah could have used sixteen gallons of gas between 8:00 p.m. on October 4, 2002, and the next morning on October 5, 2002.

During an interview on October 11, 2002, law enforcement observed "a healing-type wound with scabs" on Abdullah's left arm. Law enforcement collected hair samples from both of Abdullah's arms. A forensic scientist with the Idaho State Police laboratory found that the hair samples from both arms showed exposure to high heat.

On October 17, 2002, at law enforcement's request, Imam Din called Abdullah to clarify some questions. In the recorded call, Imam Din asked Abdullah about his activities in Salt Lake City. In particular, Imam Din asked Abdullah about the purchase of the cape and mask, and he told Abdullah that law enforcement had a cape. Abdullah denied purchasing the cape or mask.

DNA from the cape and gas can found at the scene were compared with Abdullah's DNA. The gas can had DNA profiles from more than one individual, and Abdullah was excluded as a major and minor contributor with a combination of three samples obtained from the gas can. The cape had multiple DNA profiles as well. Abdullah was excluded as a major contributor, but could not be excluded as a minor contributor to the cape.

Law enforcement sent gasoline samples to the Southwest Research Institute and Ethyl Corporation for testing. They sent a sample of the gasoline in the gas can from the crime scene and gasoline control samples from the Chevron station in Boise where Abdullah purchased gasoline on October 4, 2002, before leaving for Salt Lake City and the 7-Eleven in Salt Lake City where Abdullah also purchased gasoline on October 4, 2002. In October of 2002, Sinclair Oil Company supplied gasoline to the 7-Eleven in Salt Lake City. The gasoline contained an additive HiTEC 6423.

Melissa Williams, a senior research assistant at Southwest Research Institute, tested the gasoline samples from the crime scene, 7-Eleven, and Chevron for Chevron's fuel marker.[6] Williams found that it was unlikely the gasoline samples from the crime scene and 7-Eleven contained the Chevron marker. The gasoline sample from Chevron tested positive for the Chevron marker.

Dr. William Colucci, a senior research advisor at Ethyl Corporation, explained that Ethyl Corporation (now Afton Chemical) supplies HiTEC 6423 to about forty percent of the national gasoline market. Dr. Colucci tested the gasoline samples from the crime scene, 7-Eleven, and Chevron for HiTEC 6423. He found HiTEC 6423 in the gasoline samples from the crime scene and 7-Eleven. There was no HiTEC 6423 in the Chevron gasoline sample. Dr. Colucci also

---

[6] A fuel marker identifies the fuel, but does not change its properties.

testified that both the gasoline sample from the crime scene and 7-Eleven had the lowest additive concentration (LAC) of HiTEC 6423 with a similar fuel component that made quantifying the LAC difficult.

Dr. Glen Groben, a forensic pathologist with the Ada County Coroner's Office, performed the autopsy of Angie's body on October 5, 2002. He determined Angie died before the fire. During the external examination of the body, Dr. Groben noticed melted plastic on the back of Angie's head. He observed that a strip of plastic went all the way around her neck. The bag was from India Emporium, where Abdullah had been three days before Angie's death and received a similar plastic bag. Dr. Groben did not find any petechial hemorrhages, which would indicate strangulation, or any indicators of blunt force trauma. He also found no signs of defensive wounds. He found that Angie had a full stomach of vegetable matter at the time of death.[7] Due in part to the fact that the first toxicology exam was negative for all tested substances, Dr. Groben determined Angie's manner of death as homicide caused by "asphyxiation due to a plastic bag over the head." He testified that he ruled out suicide because the position of the body was inconsistent with suicide, "there were . . . no drugs on board at that point in time to suggest" suicide "and no one places a bag over their head without drugs on board," and "other things."

In December of 2003, Dr. Groben requested an additional toxicology exam to test for certain antidepressants, including Prozac, the trade name for fluoxetine. He requested the additional exam after receiving a letter from Mitch Toryanski that indicated Angie had a history of depression. Dr. Groben learned that antidepressants such as fluoxetine were not tested in the earlier toxicology exam, although he had believed otherwise when he requested the exam. The additional toxicology exam was positive for fluoxetine in Angie's blood with a potentially lethal concentration. Through additional testing, Dr. Groben learned that a smaller concentration of the metabolite of fluoxetine, norfluoxetine, was present in Angie's blood and gastric contents. This testing indicated to Dr. Groben that Angie was taking fluoxetine at therapeutic levels and subsequently had "an acute increase in [f]luoxetine in the blood and then immediate death, not allowing for any metabolism." Dr. Groben found no indicators of the use of hypodermic needles. He amended his autopsy report to change the cause of death to "acute fluoxetine poisoning associated with asphyxiation due to a bag over the head."

---

[7] It takes approximately an hour and a half for the stomach to empty.

Dr. Ronald Backer, the president and laboratory director of Ameritox Laboratories, testified that an individual would display symptoms of toxicity, such as seizures, sedation, or difficulty breathing, with the level of concentration of fluoxetine found in Angie's blood. He opined that an individual would need to ingest forty to 100 forty-milligram capsules to obtain that level of concentration. Assuming such ingestion, Dr. Backer would expect to find a significant level of concentration of fluoxetine in the gastric contents of that individual. Only a small level of concentration of fluoxetine was found in Angie's gastric contents, however. Dr. Backer explained that the level of concentration of fluoxetine found in Angie's blood could be dissolved in eight ounces of fluid or less and, if ingested on an empty stomach, could more rapidly pass through the stomach into the small intestines. In his opinion, the administration of fluoxetine to Angie had to have occurred before her last meal of vegetable matter due to the low level of concentration of fluoxetine in the gastric contents.

Dr. Edward Barbieri, a forensic toxicologist at National Medical Services, explained that the levels of concentration of fluoxetine and norfluoxetine in Angie's blood and gastric contents indicated therapeutic levels of Prozac taken chronically with an acute administration of a large dose of Prozac superimposed on top of the therapeutic dosage. Dr. Barbieri opined Angie had to have ingested the Prozac after her meal at Aunt Charlene's house, but before her last meal of vegetable matter. Dr. Barbieri explained that an individual would have to ingest thirty to 100 forty-milligram capsules to reach the level of concentration fluoxetine in Angie's blood. He also explained that the ingestion of that many capsules would show up as a mass of gelatinous material in the stomach. Angie's autopsy report contained no finding of gelatinous material in the gastric contents, however. Dr. Barbieri stated that the fluoxetine capsules can be opened, the contents have a slightly bitter taste that can be masked with a sweetener, and ingestion of the contents with a liquid is an effective delivery system. He opined that this was a possible manner of administration in this case. In Dr. Barbieri's opinion, fluoxetine was a contributory factor in Angie's death that may have debilitated her, but it was not a competent cause of her death.

Angie took a therapeutic dose of Prozac in the months prior to her death. Angie's obstetrics-gynecology nurse practitioner recognized no characteristics in Angie to indicate she was suffering from depression to the point of self-harm. Angie's psychiatrist opined that Angie displayed no characteristics of self-harm or suicide. Angie's psychiatry nurse practitioner found

no characteristics of self-harm in Angie. Angie's therapist stated she never found Angie to be someone who was working toward self-harm.

Defense investigator Glen Elam testified for the State regarding a letter he found at the Siesta residence on February 14, 2003, before the crime scene was destroyed. The letter appeared to be written by Angie to Abdullah, and it conveyed Angie's thoughts on their relationship, Islam, and their children. A redacted version of the letter was read to the jury admitted only to show Angie's state of mind and not for the truth. The letter below is the redacted version:[8]

> Azad,
> I have once again found myself devastated by you and your behavior. I felt deep in my heart after you had made the Hajj our lives would be good again. I have lost all faith in that and you. I am writing you because I can't stand to hear more lies and watch you turn everything around and make it look like I am stupid and crazy.
> The hardest part of being with you is the fact that you are such a hypocrite. On the outside you ACT [sic] like such a good Muslim. On the inside you are no better than What [sic] I cannot understand is that no matter what any Muslim in this town or any other sees, Allah, the all knowing and all seeing knows what a hypocrite you are. Now that you have completed the Hajj, the sins that you are repeating are not going to be forgiven. Why do you act like such a good Muslim when deep inside you are everything but one? I became a Muslim to better my life, not to find myself in this situation. How would you feel if I just quit practicing Islam? You would be ashamed and hurt. I am ashamed and hurt. You have two faces and Allah knows them both.
> I KNOW [sic] you did not go to South Africa. Why lie to me about that? Not only did you lie about it, and then you made up all the information about what it was like. On top of that, I was in the hospital trying to keep our baby from coming too early.
> I know you love me. I learned a long time ago that love is not enough. You must have respect, trust, belief, and security. I feel none of these for you. I don't think I ever can. The biggest issue is the children. I don't want my children (including [R.A.]) to be raised by a hypocrite.
> Before you tell me I am crazy and give me more lies, please remember, I do my homework before I confront anyone about anything. I will not tolerate more lies and deceit. I will not forgive anymore. I am finished. There is nothing left in my heart.

On November 9, 2004, the State rested its presentation of evidence, and the defense gave its opening statement. The defense presented testimony from (1) Abdullah's former teacher and close friend Sherry Rogers; (2) Abdullah's cousin Jihad Kurmay (Jihad); (3) Abdullah's cousin Fuad Kurmay; (4) family friend Aida Meta; (5) fellow member of the Islamic Center of Boise

---

[8] Both the redacted and unredacted versions of the letter are in the record, and the Court has reviewed both.

11

Zaid Ahmed-Zaid; (6) realtor and Abdullah's friend Furqan Mehmood (Mehmood); (7) Abdullah's co-worker Brian Holford; (8) Abdullah's sister Farma Abdullah (Farma); (9) human resource manager at Abdullah's former employment Pam Chut; (10) Abdullah's sister-in-law Mischa Harkovich (Harkovich); and (11) Abdullah's acquaintance Rubina Gelel. This testimony generally showed Angie and Abdullah were happily married and Abdullah was a loving and caring father. Some testimony also addressed the vending machine business, the attempted sale of the home, and the items found at the crime scene. For example, Jihad testified that Abdullah wanted him to operate the vending machines in Nashville, Tennessee, but Abdullah would still own the machines. Similarly, Farma testified that Angie was trying to sell the vending machines. In addition, Mehmood discussed his involvement in Abdullah's attempt to sell Angie's home. Finally, Harkovich testified that she went with her husband (Abdullah's brother), Abdullah's father, and Abdullah to examine the crime scene on October 14, 2002. She testified that they found clothing and other items in the garage that they believed to be evidence and she gave those items to law enforcement the following day.

Dr. Groben testified for the defense that Angie had no defensive wounds and showed no signs of strangulation. Clay Ward, a licensed psychologist, opined that Angie had suicidal thoughts and displayed suicide risk factors based on his review of medical and autopsy records. Ashraf Mozayani, chief toxicologist and laboratory director for the Harris County Medical Examiner in Houston, Texas, testified that it was impossible for an individual to have such a high level of concentration of fluoxetine in the blood immediately before death with such a small level of concentration of fluoxetine in the gastric contents. Dr. Mozayani opined that Angie could have been a slow or poor metabolizer, which would explain the different concentration levels. Dr. Mozayani stated the contents inside the Prozac capsules have a very bitter taste that cannot be sweetened. Defense investigator Terry Murphy testified as well. Abdullah elected not to testify. On November 14, 2004, the defense rested.

In the State's rebuttal case, a forensic psychologist opined that there was a very low probability Angie committed suicide on October 4–5, 2002. Similarly, Angie's therapist testified on rebuttal that Angie never talked about suicide and would have never committed suicide because Angie's last husband, A.H.'s father, committed suicide. Her therapist stated, "Angie would have never done that to [A.H.]." Additionally, ATF senior special agent Hart testified that there were no articles of clothing found in the garage. He explained that it was impossible for

clothing to be found there because the firefighters removed all debris and applied water to the concrete floor. If anything remained, Hart explained, it would be charred remains of clothing due to the forty to fifty foot flames and fire temperatures in excess of 2,000 degrees Fahrenheit.

On November 18, 2004, the State and defense gave closing arguments. On November 19, 2004, the jury returned a verdict of guilty on all six counts. The district court ordered the jury to remain sequestered to go immediately into the sentencing phase for first-degree murder.

On November 19, 2004, the State and defense gave opening statements in the sentencing phase. The State presented aggravating evidence from two witnesses: Boise Police Department Detective Tod Littlefield[9] and Steven Bankhead, an inmate at Idaho State Correctional Institution (ISCI). Bankhead provided Littlefield with information significant to his investigation of the Abdullah case. Bankhead testified regarding Abdullah's plan for Bankhead to kill Angie. Bankhead explained that while he was incarcerated in ISCI in late 1999, early 2000, he met Abdullah, who was a volunteer for Islamic studies. According to Bankhead, he and Abdullah had a close relationship. After Bankhead was paroled in August of 2000, Bankhead testified that Abdullah asked him to kill Angie on or about November 1, 2000. Bankhead explained that Abdullah gave him a vial of a chemical to knock Angie unconscious and told him to rape her and cut her throat with a knife, also provided by Abdullah. Bankhead said Abdullah paid him $1,000 in cash to kill Angie. Bankhead testified that he knew he was not going to do it so, after taking methamphetamines, he threw the knife and chemical vial in the trash at the Boise Greyhound bus station and took a bus to Lewiston, Idaho. Bankhead testified that he returned to prison a number of months later.

Abdullah presented mitigating evidence through testimony of (1) Michael Gunter, a professor of political science and expert in the Kurdish situation; (2) Abdullah's father Haji Fetah; (3) Abdullah's brother Dilshad Abdullah; (4) Abdullah's cousin Nichivan Abdullah; (5) Pam Lewis, who participated in a church-sponsored program in 1992 to assist the Abdullah family in adjusting to life in the United States; (6) Jim Rogers, a friend of the Abdullah family; (7) Aaron Irish, a deputy sheriff at the Ada County Jail where Abdullah was housed; (8) Michael

---

[9] Littlefield was the case officer assigned to this case. On September 3, 2004, lead prosecutor Patrick Owen disclosed to the district court and the Toryanskis that he had learned the week prior that prosecutor Erika Klein, the assistant counsel in the case, had an affair with Littlefield during Littlefield's investigation of the case. Owen removed Klein from the case the day after the disclosure. On September 7, 2004, the defense moved for a continuance to inquire into potential misconduct. The district court denied the motion.

Shutz, an inmate at ISCI; and (9) Abdullah's mother Rihan Mustafa. Abdullah did not testify or allocute.

Following Abdullah's mitigation case, the State presented victim impact statements from Angie's mother Evelyn Whittington, her sister Randy Jewett, her stepsister Stephanie Williams, and her cousin Leslie Beck on behalf of A.H.

On November 23, 2004, the State and defense gave closing arguments. Later that day, the jury reached a verdict. The jury found the existence of two aggravating circumstances: (1) the defendant knowingly created a great risk of death to many persons and (2) by the murder or circumstances surrounding its commission, the defendant exhibited utter disregard for human life. The jury was unable to reach a unanimous decision on the two remaining aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity and (2) the defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society. The jury found that all mitigating circumstances when weighed against the great risk aggravator and the utter disregard aggravator individually were not sufficiently compelling to make the death penalty unjust.

On March 4, 2005, the district court held a sentencing hearing for arson, three counts of attempted first-degree murder, and felony injury to a child. The district court sentenced Abdullah to death for first-degree murder, to twenty-five years imprisonment for arson, to fifteen years imprisonment for each count of attempted first-degree murder, and to ten years imprisonment for felony injury to a child, a total of eighty years imprisonment. On March 4, 2005, the district court filed its judgments of conviction and sentences. On March 11, 2005, Abdullah filed a notice of appeal. The district court appointed the State Appellate Public Defender (SAPD) to represent Abdullah on all matters pertaining to the direct appeal and the petition for post-conviction relief.

On April 15, 2005, Abdullah filed his original Post-Conviction Petition. On May 12, 2005, the State answered. The district court held a status conference on June 29, 2005, and the parties agreed that they needed substantially more time to investigate potential post-conviction claims. The district court issued a scheduling order allowing for an extension for Abdullah to file

an amended petition. The district court later granted two motions by Abdullah for extensions.[10] On August 29, 2008, Abdullah filed a Final Amended Petition for Post-Conviction Relief. On March 31, 2009, the State answered and moved for summary disposition. Abdullah requested an evidentiary hearing. The district court ruled an evidentiary hearing was necessary to a number of Abdullah's claims.

An evidentiary hearing was held from September 2, 2010, to September 16, 2010. Mitch and Kim Toryanski, Ada County Public Defender Gus Cahill, defense expert Craig Beaver, Ph.D., and defense investigator Terry Murphy testified. The district court held a final hearing on June 16, 2011.[11] The district court took the matter under advisement on September 23, 2011.

On October 14, 2011, the district court issued a Memorandum Decision Re: Post-Conviction Relief. The district court found all of the witnesses credible and their testimony remarkably consistent on material issues. The district court found Abdullah lacked credibility and was "willing to say whatever he believes in order to suit his needs, regardless of the truth." The district court concluded Abdullah was not entitled to any of the requested post-conviction relief. On October 14, 2011, the district court entered a final judgment dismissing Abdullah's petition.

On November 25, 2011, Abdullah filed a notice of appeal. On January 16, 2014, Abdullah filed his Second Revised Brief with this Court. The State responded with its brief on January 21, 2014. On March 26, 2014, Abdullah replied, and on April 23, 2014, Abdullah filed a supplemental brief.

## II. ISSUES ON APPEAL[12]

---

[10] Based on SAPD's representation that it had no involvement with the trial, the district court found good cause to allow SAPD more than three years to finalize the post-conviction petition. The district court then learned through its review of the material in support of the Final Amended Petition that SAPD provided advice to the Toryanskis before, during, and after trial. The district court found that SAPD had a conflict of interest. The district court appointed outside counsel to advise Abdullah about the conflict. Although Abdullah initially refused to waive the conflict and asked for the appointment of conflict counsel, Abdullah informed the district court approximately one week later that he had changed his mind. Abdullah then knowingly and voluntarily waived the conflict. The district court reappointed SAPD to represent Abdullah.

[11] Prior to the hearing, the district court and the parties learned of the Idaho State Laboratory's issues with lab technician Susan Williams, who had tested certain pieces of evidence in Abdullah's case for the presence of gasoline. Williams breached State lab administrative policies by purchasing 100 grams of gamma-hydroxybutyric acid (GHB, also known as the date rape drug) in excess of the amount allowed by the lab's manual, and she hid her mistake from the yearly auditor. Abdullah filed an additional claim alleging a *Brady* violation by failing to disclose impeachment material. The district court rejected this claim. Abdullah does not appeal this claim to this Court.

[12] This Court recognizes that Abdullah identifies over forty issues on appeal. Our identification of thirty-eight issues in no way indicates that we overlooked or disregarded issues adequately raised on appeal. Rather, in some instances this Court has simply combined two or more issues based on subject matter. We must caution, however, that we

**A.** **GUILT PHASE ISSUES**

1.   Whether the district court abused its discretion by denying Abdullah's requests for funding for an expert to evaluate the DNA evidence.

2.   Whether two allegedly biased jurors resulted in fundamental error during the guilt and penalty phases of trial.

3.   Whether sufficient evidence supported Abdullah's convictions of first-degree murder, first-degree arson, three counts of attempted first-degree murder, and felony injury to a child.

4.   Whether a jury instruction on the definition of "willfully" resulted in fundamental error.

5.   Whether the district court erred by admitting Angie's out-of-court statements.

6.   Whether the district court erred by admitting Abdullah's out-of-court statements.

7.   Whether the district court erred by excluding evidence of Angie's life insurance policy.

8.   Whether the alleged instances of prosecutorial misconduct at trial resulted in fundamental error.

9.   Whether the district court violated Abdullah's constitutional rights by failing to properly swear the bailiff charged with custody of the jury.

10.  Whether the district court violated Abdullah's constitutional rights by failing to record all proceedings.

11.  Whether the district court erred by finding no basis for Abdullah to challenge the grand jury term.

12.  Whether the errors in the aggregate resulted in cumulative error at trial.

**B.** **PENALTY PHASE ISSUES**

13.  Whether this Court's decision in *State v. Dunlap*, 155 Idaho 345, 313 P.3d 1 (2013), violates Idaho Code section 19-2827, the separation of powers doctrine, the Eighth Amendment to the United States Constitution, or the right to due process.

14.  Whether Abdullah was eligible to receive a death sentence in conformity with the ex post facto clause and the right to due process.

---

refuse to consider issues Abdullah attempts to raise in his appeal purely by an incorporation by reference of his petition for post-conviction relief. As we have consistently held numerous times, issues raised on appeal without argument or authority are deemed waived by this Court, and this Court does not search the record for errors. *See, e.g.*, *Murray v. State*, 156 Idaho 159, 168–69, 321 P.3d 709, 718–19 (2014) (waiver of ineffective assistance of counsel claims without legal authority); *State v. Dunlap*, 155 Idaho 345, 362, 313 P.3d 1, 18 (2013) ("we will not scour the record in an effort to find errors not identified by the defendant"). Abdullah cannot incorporate by reference his petition for post-conviction relief to submit any additional issues on appeal other than those raised with sufficient argument and authority. *See, e.g.*, *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999) (only addressing ineffective assistance of counsel claim with argument and authority).

15. Whether Idaho's death penalty violates the Eighth Amendment to the United States Constitution.

16. Whether the district court erred by failing to strike the State's notice of intent to seek the death penalty because the aggravating circumstances were not alleged in the indictment with a finding of probable cause and factual support.

17. Whether the statutory aggravating factors are void for vagueness under the due process clause and the Eighth Amendment's prohibition of cruel and unusual punishment.

18. Whether this Court's limiting construction of the statutory aggravating factors violates the separation of powers doctrine.

19. Whether the district court erred by admitting a victim impact statement from Angie's step-sister.

20. Whether the alleged instance of prosecutorial misconduct during the penalty phase resulted in fundamental error.

21. Whether the district court erred by failing to properly instruct the jury during the penalty phase.

22. Whether the district court erred by limiting Abdullah's right of allocution in violation of his right to due process.

23. Whether the errors in the aggregate resulted in cumulative error during the penalty phase.

## C.   POST-CONVICTION PHASE ISSUES

24. Whether the district court applied the correct standard for Abdullah's ineffective assistance of counsel claims.

25. Whether the district court erred by denying Abdullah's discovery requests for gasoline additive evidence.

26. Whether the district court erred by destroying certain jury questionnaires.

27. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel due to the removal of a letter from the crime scene, stipulation to the letter's admission into evidence, and failure to object when the State disclosed that the defense's investigator discovered the letter.

28. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for failing to investigate, prepare, and present an adequate case in mitigation.

29. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for failing to present an eyewitness identification expert.

30. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for failing to present testimony from a forensic pathologist.

31. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for failing to consult and present a gasoline expert.

32. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for failing to object to the admission of the defense's letter to prosecutors requesting additional testing of Angie's blood.

33. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for delaying opening statement.

34. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for failing to present an alibi defense.

35. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for conceding Abdullah's presence in Boise on the night of the murder.

36. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel regarding his right to testify in the guilt and penalty phases and to allocute.

37. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel during jury selection.

38. Whether the district court erred by dismissing Abdullah's claim of ineffective assistance of counsel for failing to object to defective guilt and penalty phase jury instructions.

## III. STANDARDS OF REVIEW

### A. Abuse of Discretion

The Court determines whether the district court abused its discretion by examining: "(1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason." *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010).

### B. Harmless Error

Under the harmless error standard, the defendant has the initial burden of establishing an error, at which point the State has the burden of proving "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Perry*, 150 Idaho 209, 221, 227, 245 P.3d 961, 973, 979 (2010) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

### C. Fundamental Error

[I]n cases of unobjected to fundamental error: (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to

whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*Perry*, 150 Idaho at 226, 245 P.3d at 978. The burden is on the defendant to prove "there is a reasonable possibility that the error affected the outcome of the trial." *Id.*; *see also State v. Dunlap*, 155 Idaho 345, 361–63, 313 P.3d 1, 17–19 (2013) (applying the harmless error and fundamental error standards from *Perry* to capital cases).

**D.      Post-Conviction Phase**

A post-conviction relief petition initiates a civil, rather than criminal, proceeding. *Clark v. State*, 92 Idaho 827, 830, 452 P.2d 54, 57 (1969). Like the plaintiff in a civil action, the applicant must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based. I.C. § 19-4907; *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990). "An application for post-conviction relief differs from a complaint in an ordinary civil action[.]" *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004) (quoting *Goodwin v. State*, 138 Idaho 269, 271, 61 P.3d 626, 628 (Ct. App. 2002)) (internal quotations omitted). The "application must contain much more than 'a short and plain statement of the claim' that would suffice for a complaint under [Idaho Rule of Civil Procedure (I.R.C.P.)] 8(a)(1)." *Goodwin*, 138 Idaho at 271, 61 P.3d at 628. The application must present or be accompanied by admissible evidence supporting its allegations, or the application will be subject to dismissal. I.C. § 19-4903.

*State v. Yakovac*, 145 Idaho 437, 443–44, 180 P.3d 476, 482–83 (2008) (first alteration in original).

Idaho Code § 19-4906 authorizes summary dismissal of an application for post-conviction relief, either pursuant to motion of a party or upon the trial court's own initiative. Summary dismissal of an application is the procedural equivalent of summary judgment under I.R.C.P. 56. Summary dismissal is permissible only when the applicant's evidence has raised no genuine issue of material fact that, if resolved in the applicant's favor, would entitle the applicant to the relief requested. If such a factual issue is presented, an evidentiary hearing must be conducted. *Gonzales v. State*, 120 Idaho 759, 763, 819 P.2d 1159, 1163 (Ct. App. 1991). However, summary dismissal may be appropriate even where the State does not controvert the applicant's evidence because the court is not required to accept either the applicant's mere conclusory allegations, unsupported by admissible evidence, or the applicant's conclusions of law. *Roman v. State*, 125 Idaho 644, 647, 873 P.2d 898, 901 (Ct. App. 1994).

*State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008).

On the other hand, "[w]hen appellate review of a district court's denial of post-conviction relief follows an evidentiary hearing, rather than a summary dismissal, the evidence must be

'viewed most favorably to the trial court's findings.'" *McKeeth v. State*, 140 Idaho 847, 849, 103 P.3d 460, 462 (2004) (quoting *State v. Mathews*, 133 Idaho 300, 304, 986 P.2d 323, 327 (1999)). "[T]his Court will not disturb the district court's factual findings unless they are clearly erroneous." *McKinney v. State*, 133 Idaho 695, 700, 992 P.2d 144, 149 (1999) (citing I.R.C.P. 52(a)). "This Court exercises free review of the district court's application of the relevant law to the facts." *McKeeth*, 140 Idaho at 849–50, 103 P.3d at 462–63. "Constitutional issues are pure questions of law over which this Court exercises free review." *Estrada v. State*, 143 Idaho 558, 561, 149 P.3d 833, 836 (2006). "If a district court reaches the correct result by an erroneous theory, this Court will affirm the order upon the correct theory." *McKinney*, 133 Idaho at 700, 992 P.2d at 149.

A majority of Abdullah's post-conviction claims involve allegations of ineffective assistance of counsel. "The right to counsel in criminal actions brought by the state of Idaho is guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Idaho State Constitution." *Murray v. State*, 156 Idaho 159, 164, 321 P.3d 709, 714 (2014) (quoting *Booth v. State*, 151 Idaho 612, 617, 262 P.3d 255, 260 (2011)). This Court utilizes the *Strickland* two-prong test to determine whether a defendant in a criminal case received effective assistance of counsel. *Dunlap*, 155 Idaho at 383, 313 P.3d at 39 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). *See also State v. Mathews*, 133 Idaho at 306, 986 P.2d at 329. To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011).

The defendant also must overcome a strong presumption "that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (quoting *Strickland*, 466 U.S. at 690). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Thus, strategic

decisions are "virtually unchallengeable" if made after a "thorough investigation of law and facts relevant to plausible options." *Id.* at 690. Decisions "made after less than complete investigation" are still reasonable to the extent "reasonable professional judgments support the limitations on investigation." *Id.* at 691. Counsel is permitted to develop a strategy "that was reasonable at the time" and may "balance limited resources in accord with effective trial tactics and strategies." *Richter*, 131 S. Ct. at 789.

## IV. ANALYSIS

This opinion is divided into three sections, first examining the guilt phase issues, then the penalty phase issues, and finally the post-conviction phase issues. Upon this Court's review of the issues adequately raised on appeal, we affirm the district court's judgments of conviction and sentences and its dismissal of Abdullah's petition for post-conviction relief.

### A. Guilt Phase Issues

### 1. The district court did not abuse its discretion by denying Abdullah's requests for funding for an expert to evaluate the DNA evidence.

#### a. Facts

Before trial, Abdullah filed an ex parte motion for funding to hire a forensic scientist. He submitted that a forensic scientist was essential to evaluate the State's DNA evidence, including the cape and the gas can found at the crime scene. The district court denied Abdullah's request, explaining that he failed to (1) identify a forensic scientist expert; (2) contend the DNA evidence was tainted or improperly prepared; and (3) explain how the expert would aid in his defense. Abdullah then filed a supplemental ex parte motion for funding to hire a forensic expert in which he identified an expert and the cost. He argued that he sought a corresponding forensic DNA expert as a basic tool of an adequate defense. He also argued that the State would use the DNA evidence as circumstantial proof that he was present at the Siesta residence at the time of the fire. To support his argument, he attached a document by the State's DNA experts that analyzed the DNA found on the gas can and cape. The district court again denied Abdullah's motion, explaining that Abdullah did not contend that the DNA evidence was tainted, mishandled, or improperly prepared. Further, the district court noted that the DNA evidence from the cape and gas can was mostly exculpatory.

At trial, the State's DNA expert testified that samples one, two, and three of the swabs from the gas can handle had a mixture of DNA profiles from more than one individual. Abdullah could not be excluded as a minor contributor of DNA from samples one and two. On number

three, however, the DNA expert obtained a higher concentration of DNA material and excluded Abdullah as a major and minor contributor. The swabs and cuttings from the cape also had a mixture of DNA profiles. Abdullah could not be excluded as a minor contributor from samples one, two, three, and four from the cape. The expert then opined that the probability of randomly selecting an unrelated individual with a DNA profile consistent with the DNA profile from sample one of the cape is 1 in 16,000 in a Middle Eastern population database. When asked by the prosecutor, the expert calculated that one would expect a possibility of ten male individuals in the Boise area, based on a population of 250,000, to match the DNA profile from the first sample from the cape. The prosecutor reiterated the expert's calculation in closing argument.

b.      Standard of Review

"[D]enial of a request for expert or investigative assistance will not be disturbed absent a showing that the trial court abused its discretion by rendering a decision which is clearly erroneous and unsupported by the circumstances of the case." *State v. Olin*, 103 Idaho 391, 395, 648 P.2d 203, 207 (1982).

c.      Analysis

The denial of access to the basic tools of an adequate defense impinges on the defendant's due process right to a fair trial. *Olin*, 103 Idaho at 394, 648 P.2d at 206. "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). However, "[t]he constitution does not require a state to provide expert or investigative assistance merely because a defendant requests it." *Olin*, 103 Idaho at 394, 648 P.2d at 206.

This Court stated in *State v. Dunlap*, 155 Idaho 345, 313 P.3d 1 (2013): "Before authorizing the expenditure of public funds for a particular purpose in an indigent's defense, the trial court must determine whether the funds are necessary in the interest of justice." *Id.* at 382, 313 P.3d at 38 (quoting *State v. Lovelace* (*Lovelace I*), 140 Idaho 53, 65, 90 P.3d 278, 290 (2003)). This Court also stated, "A defendant's request for expert or investigative services should be reviewed in light of all circumstances and be measured against the standard of 'fundamental fairness' embodied in the due process clause." *Id.* at 381–82, 313 P.3d at 37–38 (quoting *Lovelace I*, 140 Idaho at 65, 90 P.3d at 290).

In this case, the district court did not abuse its discretion by denying Abdullah's request for funds for a forensic and DNA expert. There were no allegations that the DNA evidence was improper or tainted or that the testing methods or conclusions were flawed. The DNA evidence was mostly exculpatory—Abdullah was excluded as a major and minor contributor to the gas can and as a major contributor to the cape. In addition, Abdullah does not claim on appeal that the 1 out of 16,000 probability was incorrect. Thus, Abdullah has not shown that the district court's decision was clearly erroneous and unsupported by the circumstances of the case. Based on the record, the district court properly determined within its discretion the funds were not "necessary in the interest of justice." *Dunlap*, 155 Idaho at 382, 313 P.3d at 38.

Abdullah takes great issue with the expert's testimony that possibly ten men in the Boise population matched the DNA on the cape. He submits that this testimony was devastating to his defense. However, even if the expert or the prosecutor misrepresented this calculation,[13] it did not require expert testimony to rebut or explain. The validity of this calculation and its significance was a proper inquiry for cross-examination and could have been adequately addressed in closing argument. *See Harrington v. Richter*, 131 S. Ct. 770, 791 (2011) ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation.") It was not necessary in the interest of justice for the defense to call a forensic or DNA expert to rebut or explain this testimony.

This Court also recognizes that the United States Supreme Court in *Ake* outlined three factors to determine whether the participation of an expert "is important enough to preparation of a defense to require the State to provide an indigent defendant with access." 470 U.S. at 77. The United States Supreme Court delineated these factors in the context of the defense's request for a psychiatrist when the defendant's sanity at the time of the offense was a substantial factor in his

---

[13] Abdullah states that this calculation is the "so-called 'prosecutor's fallacy,'" *McDaniel v. Brown*, 558 U.S. 120, 127 (2010):

> The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. In other words, if a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy. It is further error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of crime-scene DNA. This faulty reasoning may result in an erroneous statement that, based on a random match probability of 1 in 10,000, there is a .01% chance the defendant is innocent or a 99.99% chance the defendant is guilty.

*Id.* at 128 (citation omitted).

defense. *Id.* at 72, 74, 86–87. The three factors are: (1) "the private interest that will be affected by the action of the State"; (2) "the governmental interest that will be affected if the safeguard is to be provided"; and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id.* at 77.

There is little or no substantive difference between the *Ake* standards and this Court's standards in *Olin*, *Lovelace*, and *Dunlap*. *State v. Martin*, 146 Idaho 357, 363, 195 P.3d 716, 722 (Ct. App. 2008), *review denied*. While this Court's precedent and the *Ake* factors articulate the test differently, "each of these cases requires the provision of assistance at public expense where it is necessary for a fair trial and a meaningful opportunity to present a defense, while sifting out requests for services that are not shown to be reasonably necessary for these purposes." *Martin*, 146 Idaho at 363, 195 P.3d at 722. In an abundance of caution, however, we will apply the *Ake* factors here. Based on our application of the *Ake* factors, we conclude that participation of a forensic or DNA expert was not "integral to the building of an effective defense." 470 U.S. at 77. As discussed above, the DNA evidence was not improper, tainted, or the result of flawed testing or conclusions. The expert's testimony of the DNA statistics was not identified as incorrect or a miscalculation. Moreover, the DNA evidence was mostly exculpatory. Thus, while we recognize that "[t]he private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling," the probable value of an additional forensic science or DNA expert and risk of erroneous deprivation due to the State's expert were both minimal to nonexistent in this case. *Id.* at 78–79. Balancing the three factors provided by *Ake*, funds for a forensic science or DNA expert for Abdullah were not important enough to the preparation of a defense to require the State to provide him with access. *Id.* at 77.

Based on the foregoing reasons, the district court did not abuse its discretion by denying funding for a forensic or DNA expert for Abdullah's defense.

## 2.     Abdullah has waived any challenge to two allegedly biased jurors.

Abdullah challenges the district court's failure to excuse sua sponte two jurors for cause: Juror 59 and Juror 83.

The invited error doctrine precludes a criminal defendant from "consciously" inviting district court action and then successfully claiming those actions are erroneous on appeal. *State v. Owsley*, 105 Idaho 836, 837, 673 P.2d 436, 437 (1983). "It has long been the law in Idaho that

24

one may not successfully complain of errors one has acquiesced in or invited. Errors consented to, acquiesced in, or invited are not reversible." *Id.* at 838, 673 P.2d at 438 (citation omitted); *see also State v. Dunlap*, 155 Idaho 345, 379, 313 P.3d 1, 35 (2013) (applying invited error to a capital case). In this case, the doctrine of invited error applies to any assignment of error regarding Juror 59 and Juror 83. During voir dire Abdullah passed for cause on both jurors. He did not use a peremptory challenge on Juror 59 or Juror 83 and again passed for cause on the jury. Abdullah then accepted the jury as empaneled, which included Juror 59 and Juror 83. In short, Abdullah failed to raise any objection to these jurors at any time and allowed these jurors to be empaneled without any reservation. Thus, any error was invited and is not reversible.[14]

Although Abdullah waived this issue on direct appeal, he also challenges these jurors' alleged bias again in the post-conviction phase. For this reason alone, we review the alleged bias of these jurors.

> The Idaho Constitution states that "[t]he right of trial by jury shall remain inviolate." IDAHO CONST. art. I, § 7. That a jury be "impartial," as "guaranteed by the Sixth Amendment of the United States Constitution, is made applicable to the individual states through the Fourteenth Amendment." *State v. Brooks*, 103 Idaho 892, 896, 655 P.2d 99, 103 (Ct. App. 1982). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Id.* "The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1971). Thus, "the Due Process Clause protects a defendant from jurors who are actually incapable of rendering an impartial verdict, based on the evidence and the law." *Peters v. Kiff*, 407 U.S. 493, 501 (1972).

*State v. Moses*, 156 Idaho 855, 862, 332 P.3d 767, 774 (2014) (alteration in original). "The decision whether a juror can render a fair and impartial verdict is directed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Yager*, 139 Idaho 680, 688, 85 P.3d 656, 664 (2004).

---

[14] Other jurisdictions have ruled similarly. *United States v. Ahmad*, 974 F.2d 1163, 1165 (9th Cir. 1992) (any error in court's dismissal of juror for cause invited because counsel approved of dismissal); *Vann v. State*, 880 So. 2d 495, 497–99 (Ala. Crim. App. 2003) (prejudicial statement by juror was invited error because defense counsel agreed with trial court's decision not to question prospective jurors); *State v. Rubio*, 195 P.3d 214, 216–18 (Ariz. Ct. App. 2008) (defendant waived any error in trial court's failure to remove prospective juror for cause because the defendant must use a peremptory strike to remove an objectionable juror "whom the trial court has refused to remove for cause" to preserve the issue for appeal); *People v. Taylor*, 220 P.3d 872, 893–95 (Cal. 2009) ("[W]e adhere to the well-established rule that to preserve a claim a biased juror was improperly permitted to serve, the defense must exhaust its peremptory challenges and object to the jury as sworn."); *State v. Lee*, 128 P.3d 1179, 1182–83 (Utah 2006) (invited error precluded defendant from challenging the jury's composition on appeal because defendant raised no objection to the jurors in trial court); *Jones v. State*, 119 S.W.3d 766, 784 (Tex. Crim. App. 2003) (defense counsel estopped from raising any error in court's discharge of juror because counsel requested discharge).

"[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial . . . so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) (alteration in original) (quoting *Lockhart v. McCree*, 476 U.S. 162, 184 (1986)); *see also State v. Ellington*, 151 Idaho 53, 69, 253 P.3d 727, 743 (2011) ("A juror is presumed to be impartial."). A juror lacks impartiality if actual or implied bias exists, and the Idaho Code provides criminal defendants with the right to strike a biased juror for cause. I.C. §§ 19-2017, -2019, -2020.

The Idaho Code defines "actual bias" as "the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which, in the exercise of a sound discretion on the part of the trier, leads to the inference that he will not act with entire impartiality." I.C. § 19-2019(2). Despite a juror's expression of bias towards a party, "disqualification is not necessarily required." *State v. Hauser*, 143 Idaho 603, 609, 150 P.3d 296, 302 (Ct. App. 2006). A juror does not have to be disqualified "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999) (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). If a juror admits bias, "and gives no unequivocal assurance of the ability to be impartial despite several efforts by the court or counsel to elicit such an assurance," the juror should be disqualified for lacking impartiality. *Hauser*, 143 Idaho at 610, 150 P.3d at 303.

Similar rules regarding juror bias and disqualification apply in capital cases. To determine "when a prospective juror may be excluded for cause because of his or her views on capital punishment," the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). This standard does not require that "a juror's bias be proved with unmistakable clarity" because "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* at 424 (internal quotation marks omitted). "[T]his is why deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426. Certain responses by jurors, however, reflect "directly on that individual's inability to follow the law." *Morgan v. Illinois*, 504 U.S. 719, 735 (1992). "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining . . . dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id.* For example, "[a]ny juror who would

impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." *Id.* "[S]uch jurors—whether they be unalterably in favor of, or opposed to, the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding." *Id.*

With these standards in mind, a summary of the information provided by Juror 59 and Juror 83 follows.

Juror 59 attained a bachelor of science from University of Idaho in 1996 with areas of concentration in criminal justice and sociology. While in college, Juror 59 interned with the Moscow Police Department. At the time of trial, Juror 59 was interviewing and testing with the Boise Police Department, Idaho State Police, and Meridian Police Department. Juror 59 testified that he[15] was intrigued by law enforcement work after a class in high school with a deputy county sheriff and he thought law enforcement would be a rewarding and enjoyable job. Juror 59 tried to get a law enforcement job right out of college, but he could not find a position. He worked as a security officer for a hotel in the past and currently worked as a trainer for Micron. Juror 59 stated in the questionnaire that he would tend to believe the testimony of a law enforcement officer more than most witnesses.

The district court asked Juror 59, "Is there anything about [the internship with the Moscow Police Department] that makes you think that you would favor the prosecution over the defense or vice versa?" and Juror 59 responded, "Oh, no." The district court also asked Juror 59, "Because you're currently . . . trying to become employed by [the various police departments], do you believe that you are going to have to treat their testimony . . . like it is more credible because you are worried about being able to get the job?" and Juror 59 responded, "No." The district court then followed-up with the question, "[I]f they come in, are you going to be able to find that their testimony is not credible if, in fact, you believe it was not credible?" and Juror 59 responded, "I would look at it either way. Not from the point of view of the job, but the person."

Defense counsel asked Juror 59 if he would "tend to believe law enforcement more than other witnesses?" and Juror 59 responded, "I tend to believe them a little more, yes." Defense counsel then asked, "If you were instructed by the judge that you were to consider all witnesses in equal fashion, do you think that's something that you could do?" and Juror 59 responded, "I

---

[15] To preserve anonymity and for sake of clarity, we refer to all jurors with the pronouns "he" or "him."

think, yeah, if I was instructed. I guess the same as going back to the law, you have to put your personal opinions aside."

Juror 59 thought the death penalty "is appropriate in some cases." Juror 59 "generally favor[ed] the death penalty, but [he] would base a decision to impose it on the facts and law in the case." The "facts of the case" would be most important to him when deciding whether a person received a death sentence or life in prison. Juror 59 answered affirmatively when the district court asked if he would be able to follow the district court's instructions and be willing to consider not imposing a death sentence. He also testified that the fact that children were in the house when the fire occurred would not influence his ability to follow the district court's instructions on imposition of the death penalty. He affirmed that he would consider and weigh mitigating circumstances. Defense counsel asked Juror 59 how would the fact that children were present while the murder took place affect his ability to judge the case, and Juror 59 responded: "If the Court instructed that that's one of the aggravating circumstances according to law, then it becomes part of the evidence, but if not, then it's -- then it becomes my opinion on the -- which -
-."

In the questionnaire, Juror 59 disagreed with the premise "Not executing murderers is disrespectful to victims." He disagreed with the propositions that "murder is murder," and understanding motives and circumstances is not important, and it does not matter what kind of childhood a murderer had. He also disagreed with the premise "People who kill should be punished no matter what the circumstances are."

Abdullah highlights certain statements by Juror 59 regarding the death penalty. Juror 59 responded in his questionnaire that he ranked his belief in the death penalty a nine out of ten (ten being the strongest belief and one the least). On the juror questionnaire, Juror 59 (1) agreed executions are necessary to protect the public; (2) disagreed[16] life in prison without the possibility of parole is not a harsh enough penalty for murder; (3) agreed society would be stronger if the death penalty were imposed more often; (4) disagreed only the worst murderers should be executed; (5) strongly disagreed it would be hard to vote to kill someone; and (6) disagreed it is better for society to let some guilty people go free than to risk convicting an innocent person. Juror 59 believed the best argument for the death penalty was "multiple

---

[16] Abdullah stated in his brief that Juror 59 "strongly agreed" that life in prison without the possibility of parole was not a harsh enough penalty for murder, but Juror 59 actually stated in his questionnaire that he "disagreed" with this premise.

homicide or children." Juror 59 testified that "children being a victim" was one of the best arguments for the death penalty.

Juror 83 was the manager of the Laboratory Improvement Section of the Idaho Bureau of Laboratories. He responded in his questionnaire that he ranked his belief in the death penalty nine out of ten. Juror 83 "generally favor[ed] the death penalty, but [he] would base a decision to impose it on the facts and law in the case." He believed the best argument for the death penalty is "life for a life." "Circumstance-Intent" was the most important to Juror 83 in deciding whether to sentence a person to death or life in prison in a murder case. Juror 83 believed the death penalty "is appropriate in certain heinous crimes. Intent to do the act would certainly be required." Juror 83 told the district court he would be willing to consider not imposing the death sentence and "[a]bsolutely" would fairly consider imposing and not imposing the death penalty. He answered "[n]o" when asked if his views on the imposition of the death penalty would prevent or substantially impair him from following the district court's instructions. He was not of the opinion that death was the only appropriate sentence for murder in the first-degree.

In the questionnaire, Juror 83 (1) strongly disagreed murder is murder and understanding the motives and circumstances is not important; (2) disagreed no one convicted of murder should ever be allowed out of prison; (3) disagreed life in prison without the possibility of parole is not a harsh enough penalty for murder; and (4) disagreed people who kill should be punished no matter what the circumstances are. Juror 83 did not feel his views on the death penalty would prevent or substantially impair his ability to view the facts impartially.

Abdullah highlights that Juror 83: (1) strongly agreed "I support the use of the death penalty"; (2) disagreed only the worst murderers should be executed; (3) agreed our society would be stronger if the death penalty were imposed more often; (4) agreed executions are needed to protect the public; (5) agreed someone already convicted of a murder is likely to kill someone else; and (6) agreed it doesn't matter what kind of childhood a murderer had. Abdullah also highlights certain statements made by Juror 83 during voir dire. Juror 83 explained that he ranked his belief in the death penalty at nine out of ten because he believed "it is warranted in heinous situations and that the State of Idaho now has agreed that there is a death penalty warranted, so I agree with that. I think there is a place for the death penalty." He explained his "life for a life" argument as:

29

Well, I feel strongly in justice issues that there needs to be a notion of justice in all that we do and if someone takes someone's life, it is reasonable to expect that their life may be taken for that purpose. And I realize there is a lot of mitigating circumstances and that's why under law we have various levels; first degree, second degree and so forth in which it may not be warranted, but there are some situations that I do believe are heinous enough and with so much malice that it is warranted.

When asked by defense counsel if Juror 83 could wait to hear defense counsel's mitigating facts and circumstances before making a decision, Juror 83 said, "Yes, I believe so."

Contrary to Abdullah's allegations, Juror 59 and Juror 83 had no actual bias. Both jurors stated that they were strongly in favor of the death penalty for specific reasons ("multiple homicide or children" for Juror 59 and "a life for a life," "heinous crimes" for Juror 83), but both jurors also stated that they would base a decision to impose the death penalty on the facts and law in the case. Many other questionnaire and voir dire responses by Juror 59 and Juror 83 showed that they recognized a death sentence was appropriate only in certain limited circumstances as instructed by the district court. In the questionnaire and voir dire, each juror exhibited the ability to "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Hairston*, 133 Idaho at 506, 988 P.2d at 1180 (quoting *Murphy*, 421 U.S. at 800). Neither juror exhibited an unalterable, unwavering view on capital punishment that would prevent him from carrying out his duties in accordance with the law. Based on the record, Juror 59 and Juror 83 were not biased due to their views on the death penalty.

Specific to Juror 59, Abdullah also argues that Juror 59 was biased because he was interviewing for a job with law enforcement and stated in his questionnaire that he found law enforcement officers more credible than other witnesses. When questioned by the district court and defense counsel, however, Juror 59 repeatedly stated he would judge the credibility of a witness, including law enforcement officers, in accordance with the instructions. "Although not always dispositive, the trial judge is entitled to rely on assurances from venire persons concerning partiality or bias." *Yager*, 139 Idaho at 688, 85 P.3d at 664 (citing *Hairston*, 133 Idaho at 506, 988 P.2d at 1180). Based on all the information provided by Juror 59, an inference Juror 59 would act biased due to favoritism toward law enforcement officers is not supported by the record.[17]

---

[17] In addition, Abdullah argues that Juror 59 was biased because there was no jury instruction to counter Juror 59's witness credibility predispositions. To the contrary, Jury Instruction 4 provided in part:

Specific to Juror 83, Abdullah also argues that Juror 83 was biased because Juror 83 mistakenly believed mitigating evidence was presented during the guilt phase, not during the sentencing phase, and his misunderstanding was not corrected by the district court or the parties. According to Abdullah, once Juror 83 found Abdullah guilty of first-degree murder, the juror had already decided the penalty of death. Juror 83's comments do not indicate that Juror 83 would automatically sentence Abdullah to death based on a conviction of first-degree murder. In other parts of Juror 83's questionnaire and in his statements during voir dire, Juror 83 said he would consider not imposing a death sentence, follow the instructions, listen to mitigating circumstances, and did not believe death was the only appropriate sentence for first-degree murder. Based on all the information provided by Juror 83, and the detailed jury instructions, an inference Juror 83 would automatically impose a death sentence for a first-degree murder conviction is not supported by the record.

In summary, we do not review any alleged bias of Juror 59 and Juror 83 on direct appeal due to the invited error doctrine, but we hold for purposes of post-conviction phase issues discussed subsequently herein that Juror 59 and Juror 83 were not biased.

**3. Abdullah's convictions for first-degree murder, first-degree arson, three counts of attempted first-degree murder, and felony injury to a child were supported by substantial evidence.**

Abdullah challenges his six convictions for lack of substantial evidence. We hold that there was substantial evidence upon which any rational trier fact could have found the essential elements of first-degree murder, first-degree arson, three counts of attempted first-degree murder, and felony injury to a child beyond a reasonable doubt.

    a.    <u>Standard of Review</u>

---

Your duties are to determine the facts, to apply the law set forth in my instructions to those facts, and in this way to decide the case. In doing so, you must follow my instructions regardless of your own opinion of what the law is or should be . . . . The law requires that your decision be made solely upon the evidence before you. Neither sympathy nor prejudice should influence you in your deliberations. . . .

In determining the facts, you may consider only the evidence admitted in this trial. . . .

There is no magical formula by which one may evaluate testimony. You bring with you to this courtroom all of the experience and background of your lives. In your everyday affairs you determine for yourselves whom you believe, what you believe, and how much weight you attach to what you are told. The same considerations that you use in your everyday dealings in making these decisions are the considerations which you should apply in your deliberations.

In deciding what you believe, do not make your decision simply because more witnesses may have testified one way than the other. Your role is to think about the testimony of each witness you heard and decide how much you believe of what the witness had to say.

31

The Fourteenth Amendment of the United States Constitution guarantees the right to due process, and the U.S. Supreme Court has held that as a part of that due process, "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). The relevant inquiry is not whether this Court would find the defendant to be guilty beyond a reasonable doubt, but whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

*State v. Adamcik*, 152 Idaho 445, 460, 272 P.3d 417, 432 (2012).

"Thus," when determining whether Abdullah's convictions should be upheld, "the only inquiry for this Court is whether there is substantial evidence upon which a reasonable jury could have found that the State met its burden of proving the essential elements of [each crime] beyond a reasonable doubt." *Id.*

In conducting this analysis, the Court is required to consider the evidence in the light most favorable to the State, and we do not substitute our judgment for that of the jury on issues of witness credibility, weight of the evidence, or reasonable inferences to be drawn from the evidence.

*Id.*

b.      Abdullah's conviction for first-degree murder was supported by substantial evidence.

For the charge of first-degree murder, the State alleged in the indictment that Abdullah "willfully, unlawfully, deliberately, with premeditation, and with malice aforethought," killed Angie "by suffocating her and/or by acute Prozac (fluoxetine) poisoning from which she died." *See* I.C. §§ 18-4001 to -4003. In addition, the State had to prove Angie's death was caused by a criminal act of Abdullah, which may be satisfied solely by circumstantial evidence. *State v. Severson*, 147 Idaho 694, 713, 215 P.3d 414, 433 (2009).

Abdullah argues that the State failed to prove its case beyond a reasonable doubt because the State's theory required proof that Abdullah was responsible for causing Angie's death due to a combination of fluoxetine poisoning and suffocation. According to Abdullah, an integral condition precedent to the suffocation of Angie with the plastic bag was her fluoxetine-induced incapacitation. He argues that the evidence showed Angie ingested fluoxetine before her last meal between 10:00 p.m. and midnight, but he did not arrive in Boise until 1:00 a.m. or later. Therefore, Abdullah asserts that the State offered no evidence to demonstrate that he was

responsible for or connected to Angie's ingestion of fluoxetine. For this reason, Abdullah submits that his first-degree murder conviction was not supported by substantial evidence.[18]

By focusing only on the State's failure to connect Abdullah with Angie's ingestion of fluoxetine, Abdullah ignores that the indictment alleged that Abdullah killed Angie by suffocation "and/or" fluoxetine poisoning. In *Severson*, the State alleged that the defendant killed the victim by "overdosing her, suffocating her, or both." 147 Idaho at 712, 215 P.3d at 432. The Court stated that the fact that the victim may have died from one or two possible causes did not preclude the jury from finding the defendant guilty of murder. *Id.* at 713, 215 P.3d at 433. "[T]he State was not required to prove the specific cause" of the victim's death. *Id.* The Court noted parenthetically: "The state is required only to show a hypothesis that death occurred by criminal agency; it is not required to show a hypothesis of a specific cause of death." *Id.* (quoting *Sheriff, Washoe Cnty. v. Middleton*, 921 P.2d 282, 286 (Nev. 1996)). Upon review of the evidence, the Court in *Severson* concluded that there was substantial and competent evidence to support the jury's conclusion that the defendant was the person who killed the victim by overdosing her, suffocating her, or both. *Id.* at 713–14, 921 P.3d at 433–34. The Court reasoned, "The fact that the State did not provide direct evidence to that effect does not prohibit this conclusion. The evidence produced at trial revealed that it was unlikely that [the victim's] overdose was self-imposed, but there was substantial evidence linking [the defendant] to her murder." *Id.* at 714, 921 P.3d at 434 (footnote omitted) (citation omitted).

In this case, the jury was instructed that the State must prove Abdullah engaged in conduct which caused Angie's death. The jury was provided with substantial evidence to make this finding. The State was not required to prove the specific cause of Angie's death. *Severson*, 147 Idaho at 713, 215 P.3d at 433. Nor was the State required to prove Abdullah administered the fluoxetine to Angie due to the "and/or" language in the indictment. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Abdullah killed Angie by suffocating her with a plastic bag. *Adamcik*, 152 Idaho at 460, 272 P.3d at 432. Like the victim in *Severson*, there was no evidence to indicate Angie "died from natural causes," and "the evidence produced at trial revealed that it was unlikely that [Angie's] overdose was self-imposed," which, in any event, was a determination for the jury. 147 Idaho at 713–14, 215 P.3d at 433–34. Based on the evidence presented at trial, there was substantial evidence upon

---

[18] Abdullah presents no other argument challenging the sufficiency of the evidence for first-degree murder.

which a reasonable jury could have found the State met its burden of proving the essential elements of first-degree murder beyond a reasonable doubt. Therefore, this Court affirms Abdullah's conviction for first-degree murder.

c. <u>Abdullah's conviction for first-degree arson was supported by substantial evidence.</u>

For the charge of first-degree arson, the State alleged in the indictment that Abdullah "willfully and unlawfully by fire or explosion" damaged the Siesta residence. The jury instruction on arson provided that the State had to prove Abdullah "willfully . . . by fire or explosion . . . damaged . . . a dwelling." Idaho's arson statute provides: "Any person who willfully and unlawfully, by fire or explosion, damages . . . [a]ny dwelling, whether occupied or not . . . is guilty of arson in the first degree . . . ." I.C. § 18-802.

Abdullah contends that he is liable only for attempt to commit first-degree arson. He argues that he should have been charged with attempted arson because the evidence showed the gasoline was prematurely ignited by the pilot light from the water heater, not by the human hand. We disagree. The attempt statute does not apply to Abdullah's criminal activity. Under Idaho law, a "person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof" is guilty of attempt to commit the target crime. I.C. § 18-306. Here, Abdullah did not fail in attempting to commit the crime, nor was his attempt prevented or intercepted. His conduct caused the intended result—the damage of a dwelling by fire. I.C. § 18-802. In other words, the fire would not have occurred but for his conduct and the fire was the foreseeable, probable, and intended result of his conduct. Abdullah is liable for the targeted crime of arson, rather than attempt, because his criminal conduct damaged a dwelling by fire.

Abdullah reads Idaho's arson statute narrowly to demand ignition by the human hand. Idaho's arson statute is not that narrow, however. Based on the plain language of the statute, it requires only that a person damages "by fire or explosion" any dwelling. I.C. § 18-802. In contrast to arson statutes in other jurisdictions, Idaho's arson statute does not contain any language referencing that a person "sets fire" or "starts a fire." *Compare* CAL. PENAL CODE § 451 ("A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned . . . any structure, forest land, or property."), *and* OR. REV. STAT. § 164.325 ("A person commits the crime of arson in the first degree if . . . [b]y starting a fire or causing an explosion, the person intentionally damages . . . [p]rotected property of another . . . ."), *with* UTAH CODE ANN. § 76-6-102 ("A person is guilty of arson if . . . the person by means of fire . . .

34

unlawfully and intentionally damages . . . the property of another."), *and* WASH. REV. CODE § 9A.48.020 ("A person is guilty of arson in the first degree if he or she knowingly and maliciously . . . [c]auses a fire or explosion which damages a dwelling . . . ."). Idaho's arson statute requires only that a person willfully cause damage by fire or explosion. Thus, Idaho's arson statute imposes criminal liability not only on individuals that start a fire with the human hand, but also on individuals that cause a fire or explosion through other means.

Abdullah submits that even if he engaged in more than "mere preparation" of the crime by intentionally pouring the gasoline, he cannot be liable for first-degree arson because he did not provide the ignition source. Drawing an analogy to first-degree murder, Abdullah asserts that an intentional stabbing that does not kill the victim surely cannot be considered first-degree murder simply because the stabbing was more than "mere preparation" for the crime. The flaw with Abdullah's analogy, and his argument here, is that he disregards the fact that the intended result occurred. In this case, Abdullah's willful, unlawful conduct damaged a dwelling by fire. Thus, the correct analogy to the crime of first-degree murder also would have to include the intended result: the victim's death. What this analogy makes clear is that the defendant's possible criminal liability is not an issue of attempt, but rather an issue of proximate cause. "An intervening, superseding cause generally refers to an independent act or force that breaks the causal chain between the defendant's culpable act and the victim's injury. The intervening cause becomes the proximate cause of the victim's injury and removes the defendant's act as the proximate cause." *State v. Lampien*, 148 Idaho 367, 374–75, 223 P.3d 750, 757–78 (2009) (citations omitted). The defendant is relieved of criminal liability only if the intervening cause is "an unforeseeable and extraordinary occurrence." *Id.* at 375, 223 P.3d at 758. "The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." *Id.* Based on our interpretation of Idaho's arson statute, we recognize that in subsequent arson prosecutions an instruction on causation may be necessary depending on the facts of the case. Yet in this case Abdullah did not submit any issue as to causation. We will not address whether a causation instruction would have been warranted. *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).[19]

---

[19] Even assuming Abdullah may have been entitled to a jury instruction on proximate cause, any error in the omission of that instruction was harmless. An argument based on proximate cause is "merely one of many ways in

In summary, this Court recognizes that proximate cause could serve to limit criminal liability for arson in some cases. In this case, however, Abdullah raised no such objection to the jury instructions on arson, and he submits no such argument on appeal. Abdullah raises no other challenge to his conviction for first-degree arson, and this Court affirms his arson conviction because it was supported by substantial evidence. Any reasonable jury could have found the State met its burden of proving the essential elements of arson beyond a reasonable doubt.

       d.       <u>Abdullah's convictions for three counts of attempted first-degree murder were supported by substantial evidence.</u>

For the three counts of attempted first-degree murder, the State alleged in the indictment that Abdullah "willfully, unlawfully, deliberately, with premeditation, and with malice aforethought" attempted to kill A.H., M.A., and S.S. "by setting fire" to the Siesta residence while A.H., M.A., and S.S. were "asleep inside." The jury was instructed that State was required to prove Abdullah "did some act which was a step towards committing the crime of Murder in the First Degree" of A.H., M.A., and S.S. and "when doing so" Abdullah "intended to commit that particular crime." The jury also was instructed on the requirements for attempt and the elements of first-degree murder.

Abdullah argues that the evidence supporting his convictions for attempted first-degree murder was insufficient in two respects. First, he argues that the State failed to prove the charges

---

which the defense may attempt to cast doubt on the State's case." *State v. Munoz*, 970 P.2d 143, 147 (N.M. 1998). Here, it is improbable that a rational jury would find that the premature ignition broke the casual chain because ignition is a reasonably foreseeable consequence of a substantial quantity of poured gasoline in an enclosed room with a pilot light. For example, in *People v. Sullivan*, the defendant argued that his counsel was ineffective for failing to request a jury instruction on the issue of causation on a murder charge. 6 N.E.3d 888, 896 (Ill. Ct. App. 2014). The Appellate Court of Illinois held that the defendant could not satisfy the prejudice prong of the two-part test for ineffective assistance of counsel because it was "not reasonably probable" that the jury would have found that the victim's subsequent injuries, which led to the victim's death, broke the casual chain. *Id.* at 898. The court explained, "To be guilty of murder, a defendant's acts are not required to be the sole and immediate cause of death: it is sufficient that the defendant's criminal acts contribute to the victim's death." *Id.* at 897. Thus, "to be a true intervening cause, the victim's death must be unrelated to the criminal act of the defendant." *Id.* at 898. The court determined that the defendant set in motion the chain of events which led to the victim's death. *Id.* Due to the connection between the defendant's actions and the victim's death, the court held that it was not reasonably probable that jury would have found the defendant not liable based on proximate cause. *Id.*

      In this case, the intervening act of ignition by the pilot light was not "unforeseeable and extraordinary" or unrelated to Abdullah's willful, criminal actions. *Lampien*, 148 Idaho at 375, 223 P.3d at 758. To the contrary, Abdullah's willful, criminal actions set in motion the chain of events that directly and irrefutably led to the ignition of the gasoline. Applying either the harmless or fundamental error standard, Abdullah cannot prevail. Beyond a reasonable doubt the absence of a causation instruction did not contribute to the verdict obtained, and there is not a reasonable possibility that the absence of a causation instruction affected the outcome at trial. *See State v. Perry*, 150 Idaho 209, 221, 226–227, 245 P.3d 961, 973, 978–79 (2010). Any reasonable person would foresee the possibility of premature ignition based on the volume of gasoline poured in an enclosed room where a pilot light is located. *Id.* at 374, 223 P.3d at 757.

set forth in the indictment because he did not set fire to the residence. He submits that he only attempted to set fire to the residence before the pilot light prematurely ignited the gasoline. This argument fails for similar reasons as discussed above regarding the arson conviction. Due to Abdullah's willful, criminal conduct in pouring such a large amount of gasoline to cause a premature ignition, any reasonable jury could have found based on the evidence that Abdullah intentionally set fire to the residence in an attempt to kill the children in the home.

Second, Abdullah argues that no evidence supports the conclusion that he had the specific intent to kill A.H., M.A., and S.S. He submits that he was trying to rescue the children in the Siesta residence, evidenced by the fact that N.A. was found in the backyard. As discussed in the following section, Abdullah's intent was a determination for the jury. Any rational jury could conclude that the evidence of Abdullah's removal of N.A. from the residence demonstrated that Abdullah wanted to remove N.A. only. This evidence substantiated, rather than negated, his intent to murder the other children. In this case, there was substantial evidence for a reasonable jury to conclude Abdullah intended for S.S., A.H., and M.A. to die in the burning home. Therefore, this Court affirms Abdullah's three convictions of attempted first-degree murder because any rational trier of fact could conclude the State proved all essential elements beyond a reasonable doubt.

e.   Abdullah's conviction for felony injury to a child was supported by substantial evidence.

For the charge of felony injury to a child, the State alleged in the indictment that Abdullah "did, under circumstances likely to produce great bodily harm or death, commit an injury upon" N.A.

> by unlawfully and willfully causing or permitting the child to be placed in a situation endangering his health or person, while having care and/or custody of the child by setting fire to his residence . . . and fleeing to avoid capture, while leaving the child in the backyard of the burning residence unsupervised.

The statute for this offense provides:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one (1) year, or in the state prison for not less than one (1) year nor more than ten (10) years.

I.C. § 18-1501(1).

Abdullah submits only one challenge to this conviction. He argues that the evidence presented at trial was insufficient to convict him of felony injury to a child because the reasonable inferences from the evidence showed Abdullah moved N.A. from inside the burning home to a position of relative safety at the time of ignition.

> Although a conviction may be based on circumstantial evidence only if the circumstances, as found by the jury, are consistent with the defendant[']s guilt and inconsistent with his innocence, the conclusion of guilt need not necessarily follow from the circumstances in proof, but may be obtained therefrom by probable deductions. A mere possibility of innocence will not render a verdict of guilty a nullity.

*State v. Price*, 93 Idaho 615, 617, 469 P.2d 544, 546 (1970) (footnotes omitted) (internal quotation marks omitted). By arguing that the evidence showed Abdullah was trying to save N.A., Abdullah is simply asking this Court to displace the role of the jury. The mere possibility that Abdullah may have intended to move N.A. from a place of danger to a place of safety does not invalidate his conviction. "[E]ven when circumstantial evidence could be interpreted consistently with a finding of innocence, it will be sufficient to uphold a guilty verdict when it also gives rise to reasonable inferences of guilt." *Severson*, 147 Idaho at 712, 215 P.3d at 432. The evidence showed Abdullah placed an eighteen-month-old child in the backyard of a burning house with a fire so intense it would burn the child if the child was not moved to an area of safety. This evidence was more than sufficient for the jury to reach a conclusion that Abdullah was guilty of the crime charged. "The cumulative effect of this evidence is more than adequate to establish the ultimate fact of guilt. Where, as here, there is competent, substantial, though conflicting, evidence to sustain a jury's verdict, this Court will not disturb the judgment." *Price*, 93 Idaho at 617, 469 P.2d at 546. Abdullah's challenge to his conviction for felony injury to a child fails because there was substantial evidence for a reasonable jury to find Abdullah willfully caused N.A. to be placed in situation that endangered N.A.'s person or health. I.C. § 18-1501. Therefore, this Court affirms Abdullah's conviction for felony injury to a child.

**4.  The jury instruction on the definition of "willfully" did not cause fundamental error at trial.**

Abdullah argues that the district court's instruction to the jury on the definition of "willfully" for the crime of arson caused an error in the jury's determination of guilt for first-degree murder, three counts of attempted first-degree murder, and felony injury to a child.

a.      Facts

The jury initially did not receive an instruction on the definition of "willfully," even though all of the crimes charged had a "willful" element. While deliberating, the jury submitted a question to the district court, asking: "In the instruction No. 20 item #3 can we be given the legal definition of 'willfully.'" Jury Instruction 20 pertained to the elements of arson. The district court conferred with the parties, and they agreed to provide the following definition: "An act is 'wilfull' or done 'wilfully' when done on purpose. One can act wilfully without intending to violate the law, to injure another, or to acquire any advantage." This definition is similar to the Idaho Code's definition of "wilfully," which provides:

> The word "wilfully," when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage.

I.C. § 18-101(1). The jury did not submit any further questions to the district court.

b.      Standard of Review

The Court reviews this issue for fundamental error because Abdullah did not object to the instruction. *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). "Whether jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *State v. Humpherys*, 134 Idaho 657, 659, 8 P.3d 652, 654 (2000). The Court examines the jury instructions "as a whole, not individually, to determine whether the jury was properly and adequately instructed." *State v. Shackelford*, 150 Idaho 355, 373–74, 247 P.3d 528, 600–01 (2010).

c.      Analysis

Abdullah argues that it must be presumed that the jury applied the definition of willful not only to arson, but also to every offense containing a willful element. After asserting this presumption, Abdullah submits argument on why the definition of willful was improper for first-degree murder, attempted first-degree murder, and felony injury to a child.

Abdullah relies on *Brown v. State*, 137 Idaho 529, 50 P.3d 1024 (Ct. App. 2002), to support his assertion: "When a jury receives only one definition, it must be presumed that the jury applied that definition." In *Brown*, the defendant was charged with five counts of grand theft by possession of stolen property, two counts of burglary, and one count of grand theft. 137 Idaho at 532, 50 P.3d at 1027. For one of the burglary charges, the jury instructions were incomplete

39

because they did not include the definition of theft, a crime the defendant allegedly intended to commit during the burglary. *Id.* at 533–34, 50 P.3d at 1028–29. The defendant claimed his counsel was ineffective for failing to object to the incomplete instructions. *Id.* at 533, 50 P.3d at 1028. Due to the missing definition for theft, the Idaho Court of Appeals determined that the instructions failed to comply with "the well-established rule that a jury must be instructed on the State's burden to prove every element of a charged crime." *Id.* at 534, 50 P.3d at 1029. Without deciding whether the defendant's counsel was deficient, the Court of Appeals held that the defendant's ineffective assistance of counsel claim failed because he was not prejudiced by his counsel's performance. *Id.* The jury was provided with all the elements of theft in the instruction of another charge, "theft by possession of stolen property." *Id.* The Court of Appeals reasoned "that the jury followed the only definition of theft they were given," i.e., the jury applied the instruction for theft by possession of stolen property to the theft alleged in the burglary charge. *Id.* For this reason, the Court of Appeals concluded that "the inclusion of additional elements" for theft in the burglary instruction "could not have prejudiced the defendant." *Id.*

Based on *Brown*, Abdullah contends that we must presume the jury applied the only definition of willful they were given to the other charges of first-degree murder, attempted first-degree murder, and felony injury to a child. *Brown* is inapposite to the case at hand. Unlike the theft instruction in *Brown*, the jury was not provided an instruction of willful at the outset of deliberations. Thus, there is no initial presumption as in *Brown* that the jury applied the willful definition to all occurrences of the term.

There is no evidence to support a presumption that the jury applied the willful definition for arson to the remaining charges. The jury specifically requested a definition of willful for arson, and the definition of willful was in response and attached to the jury's question. The nature of the jury's request logically narrows the application of the district court's response to their request. Without any evidence to the contrary, this Court will not assume the jury went beyond the scope of their question to the judge and applied the willful definition for arson to the other offenses.

We conclude that the willful instruction for arson did not alter or affect the other jury instructions for the crimes charged. Abdullah's arguments with respect to the jury instruction for first-degree murder, attempted first-degree murder, and felony injury to a child are premised on this willful definition. No other error in the guilt phase instructions was raised to this Court with

40

adequate argument and authority, and thus Abdullah's challenges to the guilt phase jury instructions fail.

**5.     The district court did not err by admitting Angie's out-of-court statements.**

Abdullah challenges the admission of Angie's out-of-court statements, elicited by the State through the testimony of (1) Angie's obstetrician Dr. Brenda Williams; (2) her nurse practitioner Velma Seabolt; (3) her therapist Gina Wolfe Seybold; and (4) attorney Deborah Kristal.

Abdullah argues that the district court erred by admitting the testimony of Dr. Williams, Seabolt, Seybold, and Kristal. He asserts that this testimony was irrelevant because "Azad did not suggest suicide during the criminal investigation; as a result, the district court erred by admitting evidence purporting to rebut a suicide defense theory during the State's case-in-chief." "Instead," he argues, "Angie's statements were nothing more than prejudicial, inflammatory character evidence having little or no relationship to a state of mind inconsistent with suicide." He further argues that Angie's statements to Kristal were not consistent with suicidal ideation.

a.      Standard of Review

The Court "reviews questions regarding the admissibility of evidence using a mixed standard of review. First, whether the evidence is relevant is a matter of law that is subject to free review." *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010) (citation omitted). "Second," the Court reviews "the district court's determination of whether the probative value of the evidence outweighs its prejudicial effect for an abuse of discretion." *Id.*

b.      Analysis

i.      *Testimony of Dr. Williams, Seabolt, and Seybold*

Dr. Williams, Angie's obstetrician, testified that Angie requested a tubal ligation following the delivery of M.A. Dr. Williams explained that her standard approach is to discuss whether a vasectomy is a more reasonable option because it is less invasive and less expensive, and she believed that she discussed that option with Angie. Dr. Williams testified that Angie responded that "her husband would not have a vasectomy and that she wanted a tubal ligation." Dr. Williams also testified, "It was very clear that Angie had made this decision on her own, that she would undergo sterilization; that not being sterilized, for her, was not an option regardless of her situation." Dr. Williams stated, "Not that I recall," when asked by the prosecutor, "Did the defendant come to attend to his wife after her [tubal ligation]?" Dr. Williams's testimony was

41

admitted pursuant to the hearsay exception in Idaho Rule of Evidence (I.R.E.) 803(4) for medical diagnosis and treatment.

Seabolt was Dr. Williams's primary nurse practitioner and assisted her in Angie's care. During a prenatal visit while Angie was pregnant with M.A., Seabolt testified that she had a conversation with Angie regarding the condition of her marriage. Seabolt explained:

> Angie said that -- it was probably the last trimester, she said that she was going to get a divorce, but she had to stay married until after the pregnancy because she didn't have any health insurance, and she was a housewife at the time so she couldn't afford the children. So she said that she was going to pursue a divorce after the pregnancy.

Seabolt's testimony also was admitted pursuant to the exception in I.R.E. 803(4) for medical diagnosis and treatment.

Seybold was a therapist in private practice, and she had counseled Angie on and off for approximately seven years. She testified to Angie's view of her marriage in the spring of 2002. She explained:

> In the spring of 2002 there had been events that she had experienced with Mr. Abdullah that led her to believe that he was being unfaithful. And she was very concerned about her relationship with him. I think she struggled for a couple of years with issues of infidelity, and I believe toward the last when I saw her there was a concern that he was bringing pornography though the computer ---

Abdullah immediately objected, but only to Seybold's statement that Angie said Abdullah "was bringing pornography through the computer." The district court sustained Abdullah's objection, struck the "last answer" on pornography, and instructed the jury to disregard it.

As to Dr. Williams's testimony of the tubal ligation and vasectomy, there was no error. The transcript reveals that Abdullah did not challenge the relevancy of these statements at trial. Abdullah specifically objected on hearsay grounds. He submitted no argument as to relevancy. Indeed, the district court found that the evidence was relevant and stated on the record "[A]pparently [defense] counsel agrees with me." Abdullah responded, "Well, I have thoroughly read the . . . sections that are relevant, so I can see the Court's point." Further, the district court actually sustained Abdullah's objection in part, finding that the State could not ask Dr. Williams about Angie's general feelings toward sterilization. Finally, we note that Abdullah submits on appeal that Dr. Williams's testimony was not relevant because it was inconsistent with suicide, but the record plainly indicates that the district court found Dr. Williams's testimony relevant on other grounds—for which Abdullah submits no argument. Based on our review of the record, we

conclude that the district court properly determined that Dr. Williams's testimony was relevant and exercised its discretion pursuant to I.R.E. 403. Moreover, we conclude that any challenge as to the admission of Dr. Williams's testimony pursuant to I.R.E. 803(4) is waived. Abdullah provides no argument or authority on this issue. *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

As to Seabolt's testimony of Angie planning to divorce Abdullah after her pregnancy, the transcript again reveals that Abdullah did not object on relevancy or I.R.E. 403 grounds. Instead, he objected on the basis that Seabolt's testimony as to the condition of Angie's marriage was "beyond the scope of treatment" to fall within the hearsay exception in I.R.E. 803(4). On appeal, Abdullah has submitted no argument or authority as to this hearsay exception. Abdullah has waived any issue regarding the admissibility of Seabolt's testimony *See Zichko*, 129 Idaho at 263, 923 P.2d at 970.

As to Seybold's testimony, the transcript again illuminates the real issues discussed by the parties and the court. The record shows that Abdullah only objected to Seybold's statement regarding pornography, which was sustained by the district court. On appeal, Abdullah raises no issue with the district court's ruling on the pornography statement, and he fails to provide any argument to show that Seybold's testimony regarding Abdullah's unfaithfulness was improperly admitted by the district court. Abdullah has waived his appeal of the admissibility of Seybold's testimony. *See Zichko*, 129 Idaho at 263, 923 P.2d at 970.

> ii.     *Testimony of Kristal*

Kristal, an attorney in general practice, met with Angie on September 9, 2002, about four weeks before her death and about one week before she gave birth to M.A.

Immediately prior to Kristal's testimony of Angie's statements during their meeting, Abdullah objected. The district court overruled the objection and discussed its ruling with the parties:

> [THE COURT:] This is -- the statements that are about to be admitted are not testimonial statements that would be -- to which *Crawford* would apply. I want to make it clear that although it appears that the defense is suggesting that what we're talking about with the so-called state of mind exception is 803 subsection 3, then-existing mental, emotional, or physical condition, but that's, in fact, not what we're talking about.
> What we're talking about is out of court statements which, regardless of their truth, imply the -- in this case -- the intention, motive, or a particular state of

43

mind of the person making the declaration. In this case, Ms. Abdullah. That's all they're being offered for.

What I'm going to do is I'm going to allow them because they are being offered only as circumstantial evidence to establish her state of mind in the weeks leading up to her death.

In particular, in this case, they are relevant for several reasons. One of those reasons is, as I understand it, the defense in the case is that Ms. Abdullah committed suicide. And so these statements clearly go to what was going on in her mind at that time. But they also go to what she was thinking about in the weeks leading up to her death.

Before -- before Ms. Kristal will continue her testimony, and we'll go down that path, I'm going to instruct the jury -- I'm going to give them a limiting instruction which indicates they're about to hear testimony about certain statements that may have been made by Ms. Abdullah to her attorney. Those statements are not being offered -- and I'm going to tell them this -- they're not being offered for the truth of the statements made by Ms. Abdullah, but they're being offered solely to establish the state of mind that Ms. Abdullah had in talking to her attorney, and they're not to consider it for any other purpose.

Does either party object to that limiting instruction given?

MS. DUNN [the prosecutor]: No, Your Honor.

MR. TORYANSKI: No objection.

THE COURT: So I'm overruling the objection. We can bring in the jury.

And also, just for the record, I do understand that this is a matter of discretion for the Court, and in making that determination I have also applied a 403 analysis and determined in looking at the probative value of the statements and what they're being offered for, their probative value is not significantly outweighed by any potential substantial prejudice to the defendant, and it's not -- will not be a waste of the jury's time or confuse the issues.[20]

---

[20] The district court had previously ruled on the admissibility of Kristal's testimony before the State called Kristal as a witness. The State wanted to give the district court and Abdullah a "heads up" on their witness. Abdullah objected to Kristal's testimony, arguing that it was not probative because Angie's state of mind did not go to whether Abdullah harmed her or set the Siesta residence on fire and there were no facts showing that Abdullah was aware of her state of mind. The district court ruled:

We have evidence already here, and that I believe was his coworker who testified that divorce was not acceptable, at least in his view, in the Muslim faith and that we -- and if we have evidence that she had actually sought the advice of a lawyer for the -- for a couple of purposes, but one of those purposes was for a divorce, then it seems to me that that is relevant and probative to the -- in my view, anyway, it's probative to potential motive and to the State's contention that he is in fact the person who did this crime. And in this case -- so I do think it's relevant.

I also think that it is nonhearsay because it goes -- it's being offered for state of mind. And I have done a 403 analysis and have found that it is probative, and it's [sic] probative value is not substantially outweighed by the danger of unfair prejudice to the defendant, nor is it likely to confuse the issues or mislead the jury. And it certainly doesn't unduly delay the -- or result in a needless presentation of cumulative evidence. So it seems to me that it is admissible.

And I do understand, again, that rulings of this nature are within the sound discretion of the court. And so unless there is some other problem with this testimony that has not been identified for me, then I'm going to allow this testimony to come in.

Kristal then testified to numerous statements made by Angie during their meeting. Kristal testified that Angie said, "My mom thinks I'm down here getting a divorce, but I'm not sure I'm ready for that, I just want to talk to you about that." Kristal testified that Angie said "she was concerned about the present financial status and what would happen if she got divorced." Kristal stated that Angie also met with her because she wanted to make a formal will "that would cover the child that she was pregnant with and her other son [N.A.]" Kristal explained that Angie had a Muslim will for A.H. According to Kristal's testimony, Angie told her: (1) "her husband wasn't good with money, he wasn't trustworthy with money"; "[b]ills were unpaid"; and "he was just so bad with money"; (2) she had to borrow $3,000 from her credit card to pay back Abdullah's brother after Abdullah used $3,000 from his brother for a trip to Mecca; (3) after experiencing preterm labor in Nashville and being advised by her doctor to go to Boise, Angie had to borrow money from family to return to Boise because Abdullah did not want her to go back or did not have the money; (4) Abdullah had listed her house for sale, although the house was in her name; (5) Abdullah had been accepted for religious studies in Saudi Arabia and South Africa; Angie refused to go to Saudi Arabia; Angie considered South Africa "because they spoke English there," but she "just wasn't sure with the state of her marriage that she wanted to be that far away and that she wanted to do it"; (6) "[s]he was concerned that he would take the children" if there was a divorce; (7) either "my husband isn't a good man or my husband isn't a nice man," and "he's very controlling and he can't be trusted," but there was no physical abuse; (8) Abdullah had an affair with "two girls" when she was pregnant with N.A.; (9) before going forward with the divorce, she was going to wait to have the baby and also contact an elder in the Muslim community to "talk some sense into him" or "save their marriage"; (10) "she wasn't sure that she wanted to go home to her husband that night"; and (11) she had left Abdullah before and he had "made her come back." Abdullah did not object to any of these specific statements.

On cross-examination, Kristal testified that Angie told her: (1) to send the legal bill in care of her mother and to not telephone the house because she did not want Abdullah to know of her visit; (2) Abdullah would take the children out of the United States if they divorced; (3) "he was not the religious person that he portrayed himself to be because in order to go to Mecca, you're not supposed to do it unless you can do it without harming your family"; and (4) Abdullah did not have a driver's license, which showed "how he was irresponsible and didn't think the laws applied to him."

45

We first observe that some of the allegedly inadmissible statements identified by Abdullah in his brief were elicited by the defense on cross-examination. Abdullah cannot complain of any error in out-of-court statements he elicited. *State v. Gleason*, 123 Idaho 62, 66, 844 P.2d 691, 695 (1992) ("Appellant cannot now be heard to denounce testimony that he roused. This constitutes invited error.").

We conclude that Kristal's testimony was relevant. Statements of the declarant-victim's state of mind may be admitted "only after a determination that (1) the declaration is relevant, and (2) the need for and value of such testimony outweighs the possibility of prejudice to the defendant." *State v. Shackelford*, 150 Idaho 355, 364, 247 P.3d 582, 591 (2010) (citing *State v. Garcia*, 102 Idaho 378, 382, 630 P.2d 665, 669 (1981)). The Court has recognized "four well-defined categories in which a declarant-victim's state of mind is relevant because of its relationship to the legal theories presented by the parties." *Id.* The four categories are:

> (1) when the defendant claims self-defense as justification for the killing; (2) when the defendant seeks to build his defense around the fact that the deceased committed suicide[,] evidence introduced which tends to demonstrate that the victim made statements inconsistent with a design to take his or her own life is relevant; (3) when the defendant claims the killing was accidental; and (4) when a specific "mens rea" is in issue.

*Id.* (citing *State v. Goodrich*, 97 Idaho 472, 477 n.7, 546 P.2d 1180, 1185 n.7 (1976)). In regard to the second category of the suicide defense, the Court stated that "where defendant seeks to defend on the ground that the deceased committed suicide, evidence that the victim had made statements inconsistent with a suicidal bent are highly relevant." *Garcia*, 102 Idaho at 382, 630 P.2d at 669 (quoting *United States v. Brown*, 490 F.2d 758, 767 (D.C. Cir. 1973)). Here, Abdullah focuses on the second category, that of a suicide defense. He raises no argument with respect to the other three categories.

In *Shackelford*, the Court held that the district court erred by admitting the victim's out-of-court statements, which were inconsistent with suicide, because the statements were not relevant. 150 Idaho at 363–66, 247 P.3d at 590–93. The Court explained that "to determine whether the statements here were relevant to rebut a defense theory of suicide," the Court first "must determine whether there *was* a defense theory of suicide." *Id.* at 365, 247 P.3d at 592. In that case, the Court determined that the defense "did not present a theory of suicide during the trial itself." *Id.* at 366, 247 P.3d at 593. "Instead, the State offered testimony regarding Shackelford's statements during the initial investigation about suicide, and the defense merely

46

offered testimony to show that any mention Shackelford made of suicide during the initial investigation did not affect the investigation in any way." *Id.* Those statements made during the criminal investigation "were not sufficient to allow rebuttal of a defense theory of suicide." *Id.* at 365–66, 247 P.3d at 592–93. Therefore, the Court held that the district court erred in allowing the State to introduce the victim's out-of-court statements to show a state of mind inconsistent with suicide. *Id.* at 366, 247 P.3d at 593.

Although the evidence was inadmissible in *Shackelford*, the Court limited its holding. We cautioned: "We are not excluding the possibility that a defendant could make statements during a criminal investigation that would create a theory of defense such that the State would find it necessary to offer evidence in their case-in-chief or as rebuttal during trial." *Id.* at 366, 247 P.3d at 593. The Court also stated that "in *State v. Radabaugh*, [93 Idaho 727, 471 P.2d 582 (1970)] this Court did not expressly condition the admission of state of mind evidence on it being offered to rebut a defense theory." *Shackelford*, 150 Idaho at 365, 247 P.3d at 592. Thus, this Court has recognized that other representations by the defendant could open the door for the admission of relevant evidence during the State's case-in-chief regarding the defense's suicide theory.

Limiting our conclusion to the facts here, we conclude that Abdullah made sufficient representations to permit the State to present evidence of Angie's out-of-court statements to show a state of mind inconsistent with suicide. In this case, the district court stated to the parties during one of its rulings on the admissibility of Angie's out-of-court statements that "as I understand it, the defense in the case is that Ms. Abdullah committed suicide." Abdullah voiced no objection to the district court's assessment of his case, and he had represented to the district court earlier in the trial that suicide was a defense. Moreover, Abdullah has provided no evidence to support a finding that he was compelled to present a suicide defense due to the State's preemptive presentation of witnesses to rebut that defense. Abdullah questioned the jurors during voir dire on suicide and questioned the State's witnesses on depression, antidepressant medication, and suicidal ideation. Even though there is no showing that Abdullah explicitly made statements during a criminal investigation to create a suicide defense theory, whether or not Angie committed suicide was a central issue throughout the trial, making it permissible for the State to offer evidence of Angie's state of mind during its case-in-chief. *Shackelford*, 150 Idaho at 366, 247 P.3d at 593. The State may always present evidence which excludes other agents or theories of death. *See* 40A Am. Jur. 2d *Homicide* § 271 ("The state may also present

47

evidence of the victim's character, habits, traits, and relationships to negate theories of suicide, natural death, accidental death, justifiable or excusable homicide, or continuing life in absentia, as part of the circumstantial evidence tending to prove the corpus delicti."). Therefore, based on the facts of this case, the State was permitted to offer evidence in their case-in-chief regarding the defense's suicide theory.

We further reject Abdullah's argument that Angie's out-of-court statements were irrelevant as to whether Angie committed suicide or had suicidal ideations. Angie's out-of-court statements were inconsistent with "a design to take his or her own life" or a "suicidal bent" and thus relevant. *Shackelford*, 150 Idaho at 364, 247 P.3d at 591; *Garcia*, 102 Idaho at 382, 630 P.2d at 669.

We also conclude that the district court properly admitted Angie's out-of-court statements on nonhearsay grounds. Generally, hearsay is inadmissible except as provided by the Idaho Rules of Evidence or by the rules promulgated by this Court. *Shackelford*, 150 Idaho at 364, 247 P.3d at 591; I.R.E. 801, 802. Out-of-court statements of the declarant's state of mind can be offered pursuant to the state of mind exception to the hearsay rule, I.R.E. 803(3),[21] but those statements of state of mind also can be offered for a nonhearsay purpose.

> Offering evidence under the state of mind exception to the hearsay rule is different from offering it for a non-hearsay purpose such as to show the declarant's state of mind, in that the exception to the hearsay rule is invoked when a statement is offered for the truth of the matter asserted and shows the declarant's state of mind, whereas the mere utterance of a statement, without regard to its truth, may indicate circumstantially the declarant's state of mind, and is not hearsay.

23 C.J.S. *Criminal Law* § 1179 (2014). *See also* 2 KENNETH S. BROUN, MCCORMICK ON EVIDENCE §§ 274–275 (7th ed. 2014); 29 AM. JUR. 2d. *Evidence* § 677 (2014). For example, "I hate X" offered under the state of mind exception to the hearsay rule goes to the truth of the matter asserted and the declarant's state of mind. *Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005). In contrast, "I am Napoleon" as non-hearsay goes to the declarant's state of mind, but not to the truth of the matter asserted. *Id.* As explained by the Court in *Radabaugh*:

---

[21] I.R.E. 803(3) provides the following as an exception to the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

> Declarations showing the declarant's then presently existing state of mind are admissible when relevant. If the declaration is offered to evidence the declarant's state of mind circumstantially, the hearsay rule is not encountered. If the declaration is offered for the truth of the fact asserted, as whether the declaration is "I hate X," the declaration is hearsay but is admissible under the state-of-mind exception to the hearsay rule. Since the declaration is admissible in either event, it seems of no practical importance to determine in a given instance whether the declaration offered to show the declarant's existing state of mind is technically hearsay or non-hearsay.

93 Idaho at 731, 471 P.2d at 586 (citation omitted) (quoting RICHARDSON ON EVIDENCE, § 270, pp. 260, 261, 9th ed. (1964)). In this case, the district court limited the admissibility of Angie's statements to the nonhearsay purpose of circumstantially showing her state of mind. The district court clearly ruled that the state of mind hearsay exception in I.R.E. 803(3) did not apply to Angie's statements. For this reason, Abdullah's argument is misplaced by focusing solely on the hearsay exception in I.R.E. 803(3). Based on the record, we conclude that the district court properly admitted Angie's statements as nonhearsay. We also conclude that the district court properly exercised its discretion pursuant to I.R.E. 403.

### iii. Harmless error

Finally, we conclude that any error in the admission of Dr. Williams, Seabolt, Seybold, or Kristal's testimony of Angie's out-of-court statements was harmless. According to Abdullah, this evidence was improperly admitted to show Abdullah was "a bad husband" and to prejudice the jury against him. Assuming *all* of Angie's out-of-court statements were inadmissible, any error beyond a reasonable doubt did not contribute to the verdict obtained based on the overwhelming evidence against Abdullah and the district court's instructions to the jury. *See State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010).

**6. The district court did not err by admitting Abdullah's out-of-court statements.**

a. <u>Facts</u>

Outside the presence of the jury, the State informed the district court that it intended to elicit testimony from Abdullah's former co-worker, Ed Reagles, about a statement made by Abdullah that "in Kurdistan it is not illegal to kill your wife if she is . . . unfaithful to you." Abdullah argued that the statement was not probative and the prejudice vastly outweighed any probative value. The district court admitted Abdullah's statement, explaining that the statement was relevant because "it certainly does go to Mr. Abdullah's state of mind, especially in the months leading up to what occurred in October" and "if the words are accurately reflected that

'we' --- so he's still associating himself with this country . . . it is something that is odd for him to pick out in the months leading up to the fire and death of Ms. Abdullah." Although it was "a very close question," the district court concluded that the probative value was not substantially outweighed by the danger of unfair prejudice.

Reagles told the jury he was driving with Abdullah and a few other co-workers to lunch in the summer of 2002. Another co-worker asked Abdullah about the "differences in cultures." Reagles explained, "And so he [the co-worker] wanted to know, he said, you know, tell me something about, you know, what it's like over there versus here in the United States." Reagles testified that Abdullah said in response "it was legal to kill your spouse where he was from as long as you explained it to his -- or excuse me, the daughter's family and then made an offering of some sort, of money or something." Reagles clarified that Abdullah did not say spouse, but rather "wife." Reagles testified that Abdullah did not explain anything about the "offering" and, to the best of Reagle's recollection, Abdullah did not make any other comments regarding the cultural differences.

On cross-examination, the defense elicited testimony that Abdullah did not (1) "state that he thought it was a good idea"; (2) "state that he agreed with what he said they'd do over there"; (3) "say that he endorsed the idea"; or (4) "express his feeling that that's something that should be adopted in America."

On redirect examination Reagles repeated the statement by Abdullah: "It was, you know, it's okay to kill your wife as long as you -- you know, if she was unfaithful -- as long as you explain to her parents, you know, why and made them an offering." On recross-examination, the defense asked Reagles if Abdullah used the word "unfaithful," and Reagles responded, "Not unfaithful. I'm sorry. The word was . . . [i]f you cheated on your wife or if your wife cheated on you. That was it." He testified that Abdullah did not indicate to him that he felt Angie had been unfaithful.

Another co-worker, Rod Adams, corroborated Reagles's testimony. Adams testified that in July or August of 2002, while driving to lunch with Reagles, Abdullah, and a few other co-workers, Abdullah "mentioned that in his country it was an acceptable practice to murder or have your wife murdered if she did commit adultery." Adams recalled that they were having a conversation about the cultural differences between northern Iraq and America. He explained,

"We are just talking about some cultural differences, and the subject of adultery was brought up." Adams did not remember anything else about the conversation on that topic.

On cross-examination, Adams acknowledged: (1) there was no discussion "about what a wife could do" if her husband committed adultery; (2) Abdullah did not "indicate that he thought that it was a good idea"; (3) Abdullah did not "indicate in any way that he personally adopted . . . this practice"; (4) Abdullah did not "express that he thought that this practice should be implemented here in the United States"; and (5) Abdullah did not "mention his wife at all during this conversation."

b.    Standard of Review

The Court "reviews questions regarding the admissibility of evidence using a mixed standard of review. First, whether the evidence is relevant is a matter of law that is subject to free review." *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010) (citation omitted). "Second," the Court reviews "the district court's determination of whether the probative value of the evidence outweighs its prejudicial effect for an abuse of discretion." *Id.* Due to Abdullah's preservation of this issue with an objection, the Court reviews the admission of Abdullah's statement under the harmless error standard. *Perry*, 150 Idaho at 221, 227, 245 P.3d at 973, 979.

c.    Analysis

Abdullah argues that the district court erred by admitting his statement because it was not relevant. He further argues that the danger of unfair prejudice from Reagles's and Adam's testimony far outweighed its probative value.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. "Whether a fact is 'of consequence' or material is determined by its relationship to the legal theories presented by the parties." *Shackelford*, 150 Idaho at 364, 247 P.3d at 591 (quoting *State v. Yakovac*, 145 Idaho 437, 444, 180 P.3d 476, 483 (2008)). Here, Abdullah was charged with first-degree murder, which requires proof of deliberation, premeditation, willfulness, and malice aforethought. I.C. §§ 18-4001–4003(a). A statement by the defendant regarding an acceptable circumstance to murder the victim makes the existence of that mental state "more probable . . . than it would be without the evidence." I.R.E. 401. Thus, Abdullah's statement was relevant to illustrate his state of mind in the months prior to Angie's

51

death and his motive. There was no error in the admission of Abdullah's statement on relevancy grounds.

I.R.E. 403 requires the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." I.R.E. 403. In this case, Abdullah's statement was prejudicial because it supports an inference that Abdullah believed he could kill his wife without offending those in his community with similar views. However, Abdullah's statement was highly probative for the very same reason. The statement assists the State in proving its case because it goes directly towards Abdullah's state of mind and motive for the murder. "[A]lmost all evidence in a criminal trial is demonstrably admitted to prove the case of the state, and thus results in prejudice to a defendant." *State v. Leavitt*, 116 Idaho 285, 290, 775 P.2d 599, 604 (1989). Hence, "[t]he fact that certain evidence is horrifying and gruesome, is not in and of itself sufficient reason for exclusion." *Id.* Exclusion is necessary only if the probative value is *substantially* outweighed by the danger of unfair prejudice. I.R.E. 403. This balancing test is a discretionary decision for the district court. *State v. Almaraz*, 154 Idaho 584, 591, 301 P.3d 242, 249 (2013). The district court in this case recognized Abdullah's statement was prejudicial, but the probative value was not substantially outweighed by the danger of unfair prejudice. Based on the record, the district court perceived the admission of Abdullah's out-of-court statements as a matter of discretion, acted within the outer boundaries of its discretion and consistently within I.R.E. 403, and reached its decision to admit the statements through an exercise of reason. There was no error. *See Perry*, 150 Idaho at 221, 227, 245 P.3d at 973, 979.

**7.    The district court did not err by excluding evidence of Angie's life insurance policies.**

a.    <u>Facts</u>

Approximately five years before her death and about three years before her marriage to Abdullah, Angie purchased a $500,000 life insurance policy for herself and a $250,000 policy for A.H. Angie kept these policies current until her death. The State filed a motion in limine to exclude this evidence as irrelevant. Abdullah argued the evidence was relevant because (1) it supported the defense theory that Angie committed suicide; (2) it showed Angie was untruthful based on misrepresentations and omissions on the policy applications; and (3) it countered the State's theory that Abdullah murdered Angie to obtain insurance money. As evidence of Angie's untruthfulness on the insurance applications, the district court recognized that Angie was not

testifying and therefore concluded that the evidence was irrelevant and the danger of unfair prejudice substantially outweighed its probative value. As evidence of Angie's suicide, the district court determined that the evidence was irrelevant and prejudicial because "the bare fact" that she had life insurance did not make it more likely that she committed suicide.

Abdullah raised the admissibility of evidence of Angie's life insurance policies again at trial. He argued that the evidence of the policies was relevant to rebut the State's claim that Abdullah had a financial incentive for the murder because Abdullah was not a beneficiary under those policies. He also argued that it was relevant because the State elicited at trial that Angie had taken out a loan on the policy. The district court again concluded that the evidence was irrelevant and the probative value did not outweigh the danger of unfair prejudice, confusing the issues, and waste of time.

b.      Standard of Review

The Court "reviews questions regarding the admissibility of evidence using a mixed standard of review. First, whether the evidence is relevant is a matter of law that is subject to free review." *Shackelford*, 150 Idaho at 363, 247 P.3d at 590 (citation omitted). "Second," the Court reviews "the district court's determination of whether the probative value of the evidence outweighs its prejudicial effect for an abuse of discretion." *Id.* The Court reviews the district court's exclusion of evidence of Angie's life insurance policy under the harmless error standard. *Perry*, 150 Idaho at 221, 227, 245 P.3d at 973, 979.

c.      Analysis

Even if the existence of the life insurance policy was relevant, the district court properly exercised its discretion to determine the probative value was substantially outweighed by the danger of unfair prejudice, confusing the issues, and waste of time. I.R.E. 403. As alleged by Abdullah, the existence of life insurance policies was probative to show Abdullah had less financial incentive for the murder because he was not a beneficiary to Angie's policy. This probative value was minimal in relation to the danger of unfair prejudice, confusing the issues, and waste of time. The life insurance policy evidence did not alter the fact that Abdullah took out the vending machine insurance policies shortly before Angie's death. The life insurance policies were an extraneous piece of information that had little to do with the case. The district court did not err by excluding evidence of Angie's life insurance policies. Further, any error was harmless

because beyond a reasonable doubt any error in the exclusion of Angie's life insurance policy did not contribute to the verdict obtained. *Perry*, 150 Idaho at 221, 227, 245 P.3d at 973, 979.

**8.      The alleged instances of prosecutorial misconduct did not cause fundamental error at trial.**

Abdullah identifies four instances of alleged prosecutorial misconduct. Abdullah argues that these four instances of misconduct individually and cumulatively caused fundamental error and entitle him to a new trial.

a.      Standard of Review

"Where prosecutorial misconduct was not objected to during trial, this Court may only reverse when that misconduct constitutes a fundamental error." *State v. Adamcik*, 152 Idaho 445, 480, 272 P.3d 417, 452 (2012) (citing *Perry*, 150 Idaho at 227, 245 P.3d at 979).

b.      Analysis

"Where a prosecutor attempts to secure a verdict on any factor other than the law as set forth in the jury instructions and the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence, this impacts a defendant's Fourteenth Amendment right to a fair trial." *Perry*, 150 Idaho at 227, 245 P.3d at 979.

> As public officers, prosecutors have a duty to ensure that defendants receive fair trials. *State v. Irwin*, 9 Idaho 35, 43–44, 71 P. 608, 610–11 (1903). In carrying out this duty, a prosecutor must "guard against anything that would prejudice the minds of the jurors, and tend to hinder them from considering only the evidence introduced." *Id.* at 44, 71 P. at 611. A prosecutor must also ensure that the jury receives only competent evidence. *State v. Christiansen*, 144 Idaho 463, 469, 163 P.3d 1175, 1181 (2007).

*State v. Severson*, 147 Idaho 694, 715, 215 P.3d 414, 435 (2009). "However, in reviewing allegations of prosecutorial misconduct the Court must keep in mind the realities of trial. A fair trial is not necessarily a perfect trial." *State v. Ellington*, 151 Idaho 53, 62, 253 P.3d 727, 736 (2011) (citation omitted).

> i.      *The prosecutor's comment on a witness's inability to identify Abdullah at a pretrial proceeding was not misconduct.*

The first alleged error occurred during the prosecutor's reference in closing argument to a judicially-noticed fact from the direct examination of Marjorie Wood, the clerk at the Chevron gas station in Mountain Home. At trial, Wood identified Abdullah as the person she saw inside the Chevron gas station a little after midnight on October 5, 2002, during her shift. She also testified that two police officers showed her a photograph depicting Abdullah during her shift on

54

October 11, 2002, and she had identified the person in the photograph as the same person from October 5, 2002. She testified that she had "[n]o doubt in my mind" and was "100 percent" sure "at the time" the person from the photograph was the same person from October 5, 2002. However, she testified that she was only "80 percent" sure when identifying Abdullah in court as the person from the Chevron gas station on October 5, 2002, because "[i]t's been a long time, a couple of years." Wood then acknowledged that she had testified at pretrial proceedings when Abdullah was not present. Following this testimony, the prosecutor proposed:

> Your Honor, I would ask if you would be willing to take judicial notice of the fact that the defendant had actually been removed from a prior proceeding when Ms. Wood testified approximately a year ago at a time she would have been able to make an identification at a time more recent in her memory to the actual event.

The district court asked if defense counsel objected and counsel responded, "No, Judge." The district court then took "judicial notice of the fact that the last time that Ms. Wood testified in front of this court the defendant had actually been removed from the court at that time." The prosecutor asked the district court to clarify that Abdullah's removal from the court was at the defense's request, but Abdullah objected and the district court said, "I'm not going to respond to that. The fact is that I'll take judicial notice of the fact that the defendant was not present during that testimony when she was here in the courtroom." During closing argument, the prosecutor referenced Wood's testimony, stating:

> There was something about [Abdullah] that struck Marjorie Wood so significantly that she remembered him. When the police came to her store on October 11th, sometime after 11:00 o'clock, put that picture down, she knew who that was. She remembered it. . . . What did he do? She hasn't so much seen a picture of this man in two years. She's been to court before.
>
> You learned in the course of her testimony that on the prior court appearance, not the trial, but some earlier court appearance, the defendant caused himself to be removed from the room so she could not see him and yet here she came two years later. Of course, she can be as certain today as she was two years ago.

Abdullah argues that the prosecutor's closing argument on his absence was prejudicial and akin to comments on his right to remain silent. He also contends that the prosecutor intended to inflame the passion and prejudice of the jury by suggesting Abdullah was absent from the earlier proceeding to hide from Wood.

Abdullah has failed to provide this Court with authority to establish "a due process right to be absent from the prior hearing to avoid a suggestive pretrial identification procedure." The

United States Supreme Court has "held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012) (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)). The United States Supreme Court explained, however, that "the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair." *Id.* at 728. With this caveat, the United States Supreme Court concluded: "The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* Therefore, contrary to Abdullah's argument, the United States Supreme Court precedent stands for a due process right to exclude eyewitness identifications based on a number of factors. *Id.* at 730 (Thomas, J., concurring) ("The Court correctly concludes that its precedents establish a due process right to the pretrial exclusion of an unreliable eyewitness identification only if the identification results from police suggestion."). These cases do not create a due process right to be absent from a potentially unreliable misidentification.

> The right advocated by Abdullah arguably is more in line with the right to remain silent.
>
> The Fifth and Fourteenth Amendments of the U.S. Constitution, as well as Article I, section 13 of the Idaho Constitution, guarantee a criminal defendant the right not to be compelled to testify against himself. U.S. CONST. amends. V, XIV; IDAHO CONST. art. I, § 13. The U.S. Supreme Court has interpreted this right also to bar the prosecution from commenting on a defendant's invocation of that right. *Griffin v. California*, 380 U.S. 609, 613–14 (1965).

*Ellington*, 151 Idaho at 60, 253 P.3d at 734. But unlike the right to remain silent, which is rooted in the Fifth Amendment, Abdullah has failed to point to any authority to establish a constitutional right to be absent at a pretrial proceeding. To the contrary, criminal defendants have "the right to be present at all stages of a criminal proceeding 'if absence could, under some set of circumstances, be harmful.'" *State v. Wood*, 132 Idaho 88, 108, 967 P.2d 702, 722 (1988) (quoting *State v. Crawford*, 99 Idaho 87, 95, 577 P.2d 1135, 1143 (1978)). Without a right to be absent from a proceeding, there is no constitutional basis for the prosecutor to be precluded from commenting on that absence, unless the comment itself is sufficiently egregious to result in fundamental error. *See Perry*, 150 Idaho at 219, 245 P.3d at 971.

The prosecutor's statement was not so egregious as to prejudice the minds of the jurors. The purpose of the prosecutor's statement regarding Abdullah's absence was to bolster Wood's

credibility. Wood acknowledged that she was only eighty percent sure at trial when she identified Abdullah as the person in the gas station on October 5, 2002, even though she had no doubt when she identified him to the police shortly after the crime. To counter an inference by the jury that Wood's confidence in her identification has deteriorated over time, the prosecutor introduced Abdullah's absence at the earlier proceeding to show that Wood had not had an opportunity in over two years to identify Abdullah. The focus of the prosecutor's remarks was not on Abdullah intentionally hiding from a witness to avoid identification. Moreover, Abdullah's argument is a moot point because he conceded in closing argument that he was not contesting that he drove to Boise the night of the alleged crime. Hence, Abdullah now has no reason to challenge Wood's identification of him as the person in the gas station in Mountain Home the night of the alleged crime.

In summary, the prosecutor's comment during closing argument was not misconduct, and thus Abdullah has failed to demonstrate a violation of an unwaived constitutional right under the first prong of the fundamental error standard. Further, even assuming this comment was misconduct, any error was harmless because there is not a reasonable possibility the error affected the outcome of the trial. *Perry*, 150 Idaho at 226, 245 P.3d at 978.

> ii.    *The prosecutor's use of state of mind evidence to prove Abdullah's motive was not misconduct and any error was harmless.*

Regarding the second error, Abdullah argues that the prosecutor relied on evidence admitted to show Angie's state of mind to prove the truth of the matter asserted. When discussing Abdullah's motive for the murder, the prosecutor stated in closing argument:

> We'll first look at motive. It had become clear certainly that Angie was not going abroad with the defendant. That testimony comes from a variety of sources. Certainly by the time she wrote the letter that was read to you aloud . . . she was finished. She certainly was not going to South Africa. When he made up the details of the trip to South Africa, he was supposedly scoping it out as an alternative to Saudi Arabia, and he makes up what it was like there. Doesn't even go . . . . Doesn't go at all . . . . [Y]ou see that knowledge reflected in a letter that Glen Elam read to you which says, "I cannot believe that you made up the details of that trip." It further diminished her trust in him and obviously she isn't going anywhere with him at that point. That's communicated to Deborah Kristal and others.
>
> She wasn't going to let her kids go either. She was already conversing with Deborah Kristal about how to make sure that the defendant did not make remove [sic] her children from the country. She was talking to Deborah Kristal about leaving him. That letter makes it pretty clear. Leaving a marriage is not like living [sic] a building, you are not in it one minute and out the next. It was a

57

process. And for Angie it was a process that was complicated by something that seems pretty simple, health insurance. [M.A.] was a troubled pregnancy as far as her preterm labor. She knew she needed health insurance through the delivery. She communicate [sic] to Dr. Williams and Velma Seabolt that she was going to stay with him until she was through the delivery. Then you found out from Dr. Shaffer that [M.A.] was to the pediatrician six times in his short 18 days before Angie's death.

She may have mentally left that marriage already, but she was going [to] physically stay until she was resolved that [M.A.]'s health was more stable. Again, she was not in one minute and out the next, but she was clearly on her way out.

He needed money. You cannot move to another country for free. . . . Think about back on Stephanie Hobbs, what did the defendant say to her on October 3rd, about 36 hours before his wife died? Words to the effect of, "We don't do divorce." Angie wanted this marriage to end. The defendant had different ideas about how that should happen.

She told Deborah Kristal her one last best hope of turning the defendant around was to go to the Muslim community elders and ask them for help, but as part and parcel of that she has to tell the Muslim community about his failings, about her position that he is a hypocrite, that he was either not a good or nice man. . . . What do you suppose he thought of that?

And, again, when you pull motive away from this interlocking set of factors, you begin to see things pretty clearly.

Under the fundamental error standard, Abdullah had the burden to establish that the prosecutor's comments caused a plain violation of his unwaived constitutional rights. *Perry*, 150 Idaho at 226, 245 P.3d at 978. We are not persuaded that the prosecutor's comments rise to this level of error. First, the prosecutor's statements did not appeal to the passions or prejudices of the jury. Second, the prosecutor's comments primarily reviewed for the jury the evidence of Angie's state of mind presented at trial through witnesses such as Kristal and the health professionals. We recognize that a few of the prosecutor's remarks could be construed as interpreting the evidence in an inaccurate light and inconsistent with the district court's rulings on the scope of this evidence. However, despite these remarks, the prosecutor's comments here in their entirety were not sufficiently egregious to result in fundamental error. *See Perry*, 150 Idaho at 219, 245 P.3d at 971.

Even assuming the prosecutor's statements were improper, any error was harmless. "[I]nappropriate prosecutorial statements may be cured by appropriate instructions by the trial court." *State v. Dunlap*, 155 Idaho 345, 369, 313 P.3d 1, 25 (2013). Here, the district court instructed the jury that certain evidence, such as Angie's out-of-court statements, was admitted for a limited purpose and that the jury could not consider that evidence for any other purpose.

The district court also instructed the jury that the prosecutor's statements during closing argument were not evidence. These instructions cured any error. Further, this closing argument on motive goes towards the State's burden to prove beyond a reasonable doubt that Abdullah committed the murder willfully, deliberately, and with premeditation and malice aforethought, but the jury was presented with overwhelming evidence of Abdullah's intent through other means than the motive. *See* 40A AM. JUR. 2d *Homicide* § 450 (motive is not an element of first-degree murder, but may be relevant to prove intent). Even if the prosecutor engaged in misconduct, the prosecutorial misconduct was harmless because there is not a reasonable possibility the error affected the outcome of the trial due to the overwhelming evidence of guilt. *Perry*, 150 Idaho at 226, 245 P.3d at 978.

> *iii.* *The prosecutor's comments on "the truth" were not misconduct.*

Regarding the third error, Abdullah argues that the prosecutor improperly commented on evidence as the truth in closing argument. In summarizing Wood's identification of Abdullah, the prosecutor stated:

> [Law enforcement said,] "We're doing an investigation. Do you recognize this man?" And [Wood] said, "Yeah, I know him." And she provides the dates. She provides the time. Why? Because it is accurate. It is the truth and he made such an impression on her she could remember it. She was a very no nonsense, unbiased kind of a witness. Nothing to gain by being here. And she remembered him because he was rude. That's consistent with him being in a hurry. He had business in Boise. Putting him here at midnight gave him plenty of time to drive home and set the fire. Plenty of time.

The prosecutor then stated during rebuttal:

> I want to talk to you about fluoxetine and Prozac. . . . You will recall that we learned about that when the defendant's lawyers wrote us and asked us to check for that. . . . We did it and I will tell you that everyone connected with the prosecution of the defendant from myself, Dr. Groben, the police agency were just shocked to find out about the extreme level of Prozac in the blood of Angie Abdullah.

The district court struck this last statement sua sponte and instructed the jury to disregard it. The prosecutor then stated shortly thereafter:

> Now, it got tough to figure out because all of the doctors, all the medical professionals expected to find the significant content of either the pill material, fluoxetine material, the gel capsules in her stomach or GI tract and that's kind of confusing until you figure out it only -- there's only one thing left that would explain it, that if she drank something. Then it would clear her stomach, and, you know, she had to drink it before the last meal because there's nothing in the

59

contents, the stomach was full. If she had taken it with the meal, it would still be there. I'm not a toxicologist, but it is the only explanation that fits the evidence, and therefore, it is the truth.

The district court again struck this last statement sua sponte and instructed the jury to disregard it.

Neither of the prosecutor's remarks on "the truth" was misconduct. In closing argument, the prosecutor may discuss whether "evidence confirms or calls into doubt the credibility of particular witnesses. . . . It is improper, however, for the prosecution to express a personal belief as to the credibility of witnesses, unless the comment is based solely on inferences from evidence presented at trial." *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003) (citation omitted). The first statement of Wood's testimony as "the truth" was not misconduct because it was based solely on inferences presented at trial. The prosecutor was not expressing a personal opinion on Wood's credibility, but inviting the jury to make an inference based on Wood's detailed recollection of her encounter with the person she identified as Abdullah. *See State v. Carson*, 151 Idaho 713, 722, 264 P.3d 54, 63 (2011); *State v. Mendoza*, 151 Idaho 623, 627, 262 P.3d 266, 270 (Ct. App. 2011). The second statement of the toxicologist's explanation as "the truth" was not misconduct for similar reasons. The prosecutor was not vouching for the toxicologist's testimony, but rather emphasizing to the jury that the evidence supported only one explanation for the potentially lethal concentration of fluoxetine in Angie's blood. Therefore, Abdullah has failed to demonstrate a violation of an unwaived constitutional right due to the alleged prosecutorial misconduct.

Moreover, assuming misconduct, any error in the prosecutor's comments on "the truth" was harmless because there is not a reasonable possibility that the error affected the outcome of the trial. *Perry*, 150 Idaho at 226, 245 P.3d at 978. "[P]rosecutorial misconduct during closing arguments will constitute fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded." *Sheahan*, 139 Idaho at 280, 77 P.3d at 969 (quoting *State v. Cortez*, 135 Idaho 561, 565, 21 P.3d 498, 502 (Ct. App. 2001)). Hence, "inappropriate prosecutorial statements may be cured by appropriate instructions by the trial court." *Dunlap*, 155 Idaho at 369, 313 P.3d at 25. In this case, the district court instructed the jury that "[t]he arguments and statements of the attorneys are not evidence." The district court also instructed: "Certain things you have heard or seen are not evidence, including .

. . arguments and statements by lawyers. The lawyers are not witnesses. What they say in their . . . closing arguments . . . is included to help you interpret the evidence, but is not evidence." In addition, the district court charged the jury "[a]s the sole judges of fact" to determine what evidence to believe and the weight of such evidence and to evaluate testimony. "We presume that the jury followed the jury instructions given by the trial court in reaching its verdict." *Carson*, 151 Idaho at 718, 264 P.3d at 59. Due to these instructions, it is not reasonably possible the prosecutor's first statement on "the truth" of Wood's testimony affected the outcome at trial because the multiple jury instructions cured any inappropriate comment. Turning to the prosecutor's second statement on "the truth" of the toxicologist's explanation, it is not reasonably possible this comment affected the outcome due to the jury instructions and the fact that the district court immediately struck the statement and instructed the jury to disregard it. Based on the above reasons, Abdullah has failed to demonstrate fundamental error in the alleged prosecutorial misconduct of commenting on "the truth" of certain evidence.

        *iv.*     *The prosecutor's comment to be "shocked and outraged" was not misconduct.*

Regarding the fourth and final allegation of prosecutorial misconduct, Abdullah argues that the prosecutor appealed to the jury's passion and prejudice by stating during rebuttal:

> You should be shocked and outraged that at the conclusion of this trial in his very last statements, Counsel wants you to believe that his client was here in Boise, did all the things that the State has proven he's done to get himself here and that he drove himself back to Salt Lake City and engaged in no criminal conduct. None.

The prosecutor's statement was in response to the following statement by the defense in closing argument: "Now, let me tell you right up front we are not going to be arguing that Azad did not drive to Boise on the morning of 5 October, 2002."

"Both sides have traditionally been afforded considerable latitude in closing argument to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom." *Sheahan*, 139 Idaho at 280, 77 P.3d at 969. "Despite this wide latitude, 'appeals to emotion, passion or prejudice of the jury through use of inflammatory tactics are impermissible.'" *State v. Parker*, 157 Idaho 132, 146, 334 P.3d 806, 820 (2014) (per curiam) (quoting *Ellington*, 151 Idaho at 62, 253 P.3d at 736). In this case, the prosecutor did not engage in misconduct. The prosecutor's comment on the defense's concession expressed to the jury the improbability based on the evidence that Abdullah was in Boise but did not commit the crime. It also highlighted to the jury that the defense presented no alternative explanation as to

why Abdullah would drive to Boise that night. This was not "inflammatory language seemingly calculated to arouse negative emotions." *State v. Phillips*, 144 Idaho 82, 87, 156 P.3d 583, 588 (Ct. App. 2007). Even assuming that the prosecutor engaged in misconduct, any error was harmless because there is not a reasonable possibility the error affected the outcome of the trial. *Perry*, 150 Idaho at 221, 245 P.3d at 973.

9. **Abdullah's constitutional rights were not violated by the absence of evidence in the record to show the content of the oath given to the bailiff charged with custody of the jury.**

    a.    <u>Facts</u>

After the State and Abdullah gave closing arguments and just prior to sequestration of the jury for deliberations in the guilt phase of trial, the record states:

> THE COURT: At this time we will give the oath to the bailiffs and then we will pick the alternates.
>
>     (Oath given to the bailiffs.)
>
> THE COURT: At this time we will pick the alternates.

Similarly, after closing arguments in the penalty phase and just prior to sequestration of the jury for deliberations, the record states:

> THE COURT: At this time we need to swear the bailiffs.
>
>     (Bailiffs are sworn.)
>
> THE COURT: At this time I would ask the bailiffs to take the jurors to the appropriate -- keep alternates separate at this point, but to take the jurors to the appropriate jury room. . . .

Abdullah argues that the record does not affirmatively show the district court properly swore the bailiffs who took custody of the sequestered jury during the guilt and penalty phases, which violated his right to a fair trial before an impartial jury.

    b.    <u>Standard of Review</u>

The Court exercises free review over constitutional questions and interpretation of a statute. *State v. Glenn*, 156 Idaho 22, 24, 319 P.3d 1191, 1193 (2014); *State v. Rogers*, 144 Idaho 738, 740, 170 P.3d 881, 883 (2007).

    c.    <u>Analysis</u>

In *State v. Rodriguez*, the Court held that "the record must affirmatively show that the bailiff was sworn" because the relevant Idaho statute, Idaho Code section 19-2126, "speaks in

mandatory terms." 93 Idaho 286, 289, 460 P.2d 711, 714 (1969). Idaho Code section 19-2126 provides in part:

> [W]hen first given custody of the jury the officer or bailiff must be sworn to keep the jury together during each recess and adjournment during the trial; to allow no person to speak to or communicate with them, or any of them, nor to do so himself, on any subject connected with the trial, and to return them into court as ordered by the court.[22]

I.C. § 19-2126. This "statutory requirement that the bailiff be sworn to keep the jury together in a murder trial was enacted to guarantee defendant a fair and impartial trial." *Rodriguez*, 93 Idaho at 289, 460 P.2d at 714 (footnote omitted). "Whatever is essential in a criminal proceeding to deprive a person of his liberty must appear of record and nothing is taken by intendment or implication." *Id.* For example, in *Rodriguez* the Court determined that "the mere claim that the oath was given is not sufficient to resolve" whether the bailiff was properly sworn prior to placing the jury in his custody. *Id.* The record in *Rodriguez* provided:

> The Court: Do you remember? Did you swear the Bailiff?
> The Clerk: No, I don't recall and I don't have it in my minutes.
> The Court: I was quite sure that she did. In fact, I was quite sure I could remember what she told him.
> [Rodriguez's counsel] Mr. Reeves: It is our recollection from our notes that there was no swearing until the time of the final submission and may the record show that the Clerk indicates that she does not recall?
> The Court: She says she don't [sic] remember.
> Mr. Reeves: Does the Bailiff perhaps recall whether he was sworn?
> The Court: Do you recall whether we had you sworn when we started?
> The Bailiff: I don't remember whether I was or not. I thought I swore every time the rest did.

*Id.* at 289 n.2, 460 P.2d at 714 n.2. The Court then explained, "A record is constituted of proper and legitimate elements set down in their order; for it is certainly not the law that all the gossip a clerk or prothonotary writes down in his docket, ipso facto becomes the voice of undeniable truth." *Id.* at 289, 460 P.2d at 714 (quoting *Ball v. United States*, 140 U.S. 118, 130 (1891)). The Court concluded that the record in *Rodriguez* did "not reflect that the bailiff was sworn prior to

---

[22] A related statute provides:

> After hearing the charge, the jury may either decide in court or may retire for deliberation. If they do not agree without retiring, an officer must be sworn to keep them together in some private and convenient place, and not permit any person to speak or communicate with them, nor to do so himself, unless by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court.

I.C. § 19-2133.

placing the jury in his custody." *Id.* Although the record did not show that the bailiff was sworn, the Court ultimately held that the error was harmless. *Id.* at 289–90, 460 P.2d at 714–15.

This case is distinguishable from *Rodriguez*. The issue in *Rodriguez* was whether the oath was given at all. In contrast, the record in this case clearly shows that an oath was given to the bailiff. *Rodriguez* was limited to the facts of the case, and its holding does not require in every case that the court reporter transcribe the oath given to the bailiff verbatim. In other words, *Rodriquez* did not create a bright-line rule that the oath must be in the record in its entirety in all criminal cases. In this case, the record complies with Idaho Code section 19-2126 and *Rodriguez* by affirmatively showing the bailiff was sworn. There was no error in the district court's failure to transcribe the specific oath provided to the bailiff in the record.

Moreover, there is no allegation that any error was prejudicial to Abdullah. There is no indication that the bailiff caused the jury to be tainted in some way due to an improper oath. Nor is there any allegation that the jury acted improperly. In a related context, the Court presumes "regularity in the performance of official duties by public officers." *Roberts v. Bd. of Trs., Pocatello, Sch. Dist. No. 25*, 134 Idaho 890, 894, 11 P.3d 1108, 1112 (2000). "Absent evidence to the contrary," public officers "are presumed to have properly carried out the duties of their office." *Farm Bureau Fin. Co. v. Carney*, 100 Idaho 745, 750, 605 P.2d 509, 514 (1980). This presumption can be rebutted by a production of evidence showing that the public officer failed to carry out the duty at issue. *Roberts*, 134 Idaho at 894–95, 605 P.2d at 1112–13. A similar presumption to the swearing of the bailiff is applicable here. Abdullah points to nothing in the record to show that an improper swearing of the bailiff prejudiced his rights at trial. *Rodriguez*, 93 Idaho at 289–90, 460 P.2d at 714–15. Absent evidence to the contrary, this Court presumes the bailiff was properly sworn.

**10.    Abdullah's constitutional rights were not violated by the district court's failure to record the oath given to the bailiff charged with custody of the jury.**

a.    <u>Facts</u>

The swearing of the bailiffs prior to sequestering the jury during their deliberations in the guilt and penalty phase of trial were not recorded and therefore not available as a transcript for Abdullah on appeal. Similar to Abdullah's argument above regarding the court reporter's failure to transcribe the bailiff's oath verbatim, he argues that the district court's failure to record the oath violates his due process right to meaningful appellate review of his trial and sentencing proceedings.

b.  Standard of Review

The Court exercises free review over constitutional questions and interpretation of a statute. *Glenn*, 156 Idaho at 24, 319 P.3d at 1193; *Rogers*, 144 Idaho at 740, 170 P.3d at 883.

c.  Analysis

Idaho Code section 1-1103 provides that the reporter "shall correctly report all oral proceedings had in said court and the testimony taken in all cases tried before said court." I.C. § 1-1103. For death penalty cases, the transcript on appeal "shall include all hearings and proceedings held in the trial court of every nature and description." Idaho Appellate Rule (I.A.R.) 25(e). For indigent defendants, "[t]he State is only required to provide . . . a record on appeal that is sufficient for adequate appellate review of the errors alleged regarding the proceedings below." *State v. Strand*, 137 Idaho 457, 462, 50 P.3d 472, 477 (2002). The State's failure to provide a sufficient record for adequate appellate review may amount to a denial of equal protection and due process. *Griffin v. Illinois*, 315 U.S. 12, 16–19 (1956).

In *State v. Lovelace* (*Lovelace I*), 140 Idaho 53, 90 P.3d 278 (2003), the Court rejected the defendant's claim that "the district court committed reversible error in failing to record all oral proceedings such that they could be transcribed for purposes of appeal." *Id.* at 65, 90 P.3d at 290 (2003). The defendant contended that "the unrecorded proceedings *probably* dealt with appealable issues," but the Court found these contentions to be "nothing more than speculation." *Id.* The Court explained, "It is basic to appellate practice that error will not be presumed, but must be affirmatively shown by an appellant." *Id.* "Furthermore," the Court stated, "error in the abstract does not necessarily rise to the level of constitutional dimension unless and until a defendant properly presents a specific prejudice from such error." *Id.* Thus, because the defendant identified no appealable issues with any specificity, the Court rejected the defendant's claim of reversible error in the failure to record all proceedings. *Id.*

Abdullah's argument is distinguishable from *Lovelace I* in that Abdullah appears to argue that the failure to record the proceedings in and of itself deprives him of due process and the right to appeal. Despite these differences, Abdullah's assignment of error fails for similar reasons as in *Lovelace I*. Abdullah does not allege that any specific prejudice occurred from the failure to record the swearing of the bailiffs. He does not allege that he is unable to raise a specific appealable issue due to the absence of a recording. Nor does he even allege than the unrecorded swearing of the bailiffs "*probably* dealt with appealable issues." *Id.* As noted in the preceding

section, Abdullah points to nothing in the record to show that an improper swearing of the bailiff prejudiced his rights at trial or tainted the jury. There was no error here.

**11.     The district court did not err in rejecting Abdullah's request to view the grand jury selection transcripts.**

    a.    <u>Facts</u>

On June 5, 2012, Abdullah filed a second objection to the record on appeal. He argued that the district court should have added to the record "[a]ny and all documents and/or transcripts relating to the formation and term of the grand jury which indicted Mr. Abdullah." On June 21, 2012, the State responded to Abdullah's objection and requested that the district court deny Abdullah's request.[23]

On August 13, 2012, the district court denied Abdullah's objection, but added to the record three public orders to summon jurors and notice the empaneling of a grand jury Panel A and Panel B. The district court also conducted an in camera review of the grand jury materials and determined that the grand jury was duly empaneled and not expired on the date of Abdullah's indictment. The district court further determined from its review that the indictment was proper. Therefore, the district court found no good cause to release the underlying grand jury proceedings or make them part of the record on appeal, except the three public orders.

    b.    <u>Standard of Review</u>

The Court defers to the district court's factual findings if supported by substantial and competent evidence, but exercises free review over the district court's conclusions of law. *State v. Clark*, 135 Idaho 255, 257, 16 P.3d 931, 933 (2000).

    c.    <u>Analysis</u>

Abdullah requests that this Court vacate the district court's order that denied his request to add grand jury documents to the record on appeal. He further requests that this Court, upon vacating the district court's decision, order the district court to provide the grand jury selection transcripts to him for review and permit supplemental briefing if necessary. Alternatively, he requests that this Court remand this issue to the district court for that court to provide the grand jury selection transcripts.

---

[23] The State also submitted that Abdullah attempted to circumvent the district court's order by filing an objection to the record rather than a motion. On April 6, 2012, the district court learned that the State Appellate Public Defender (SAPD) contacted the Ada County Jury Commissioner by phone to inquire and request grand jury information related to Abdullah's case. The district court filed an order admonishing SAPD and informed them that the only appropriate method to seek grand jury information is by filing a motion with a district judge with notice to the State.

According to Abdullah's brief, he seeks the grand jury selection transcripts to determine whether he has any basis to challenge the grand jury term. He explains that the grand jury documents he has been provided indicate that the grand jury empaneled may not have been the same grand jury that indicted him and thus the grand jury term may have expired prior to his indictment. Abdullah rests his argument on the fact that the court minutes show that the grand jury selection for Grand Jury Panels A and B began at 9:15 a.m. on August 28, 2002, but the three court orders to summon jurors for the panels state that jury selection would begin at 1:30 p.m., not 9:15 a.m. Based on this discrepancy, he asserts that "[t]here is no document showing a relationship between jurors who indicted Azad on November 14, 2002, and jurors impaneled the morning of August 28, 2002."

Pursuant to Article I, Section 8 of the Idaho Constitution, "No person shall be held to answer for any felony . . . unless on presentment or indictment of a grand jury . . . ." IDAHO CONST. art. 1, § 8. "[N]o grand jury shall serve more than six (6) months unless specifically ordered by the court which summoned the grand jury." Idaho Criminal Rule (I.C.R.) 6.8. An indictment is void and the district court lacks subject matter jurisdiction if the grand jury issues an indictment past its six-month term. *State v. Lute*, 150 Idaho 837, 840–41, 252 P.3d 1255, 1258–59 (2011).

"Grand jury proceedings are intended, to the extent possible, to be secret." *In re Petition for Review of Hearing Comm. of Prof'l Conduct Bd. of Idaho State Bar*, 140 Idaho 800, 805, 102 P.3d 1119, 1124 (2004). I.C.R. 6.4 provides, "No other person present in a grand jury proceeding shall disclose to any other person what was said or done in the proceeding, except by order of any court for good cause shown." I.C.R. 6.4(c). Therefore, Abdullah must demonstrate "good cause" for this Court to allow his review of the grand jury selection transcripts.

Abdullah's argument that the grand jury term may have expired is meritless. He submits that there is no document showing a relationship between "jurors who indicted" and "jurors impaneled," but this assertion is incorrect. Although the district court's three public orders indicate that the jurors were to be summoned at 9:15 a.m., the court minutes—which were provided to Abdullah—show that on August 28, 2002, Grand Jury Panel A and B were seated and administered the oath by the judge. The grand jury indictment—also provided to Abdullah—shows that Grand Jury Panel B issued the indictment on November 14, 2002. These facts plainly show that Grand Jury Panel B was properly empaneled and issued an indictment within the six-

month term limit. Based on these facts, Abdullah provides no legal basis for this Court to allow his review of the grand jury selection transcripts. We decline to order the district court to provide Abdullah with the grand jury selection transcripts.

**12.     The alleged errors in the aggregate did not result in cumulative error at trial.**

Abdullah argues that the accumulation of errors deprived him of his constitutional rights to due process and a fair trial before an impartial jury.

"Under the cumulative error doctrine, 'an accumulation of irregularities, each of which might be harmless in itself, may in the aggregate reveal the absence of a fair trial in contravention of the defendant's right to due process.'" *State v. Shackelford*, 150 Idaho 355, 385, 247 P.3d 582, 612 (2010) (quoting *State v. Severson*, 147 Idaho 694, 723, 215 P.3d 414, 443 (2009)). "[A] necessary predicate to the application of the doctrine is a finding of more than one error." *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2010). In this case, Abdullah "has failed to demonstrate at least two errors, a necessary predicate to the application of our cumulative error doctrine." *Id.* at 231, 245 P.3d at 983. This Court affirms Abdullah's judgments of conviction.

**B.     Penalty Phase Issues**

**13.     The Court's decision in *State v. Dunlap*, 155 Idaho 345, 313 P.3d 1 (2013), does not violate Idaho Code section 19-2827, the separation of powers doctrine, the Eighth Amendment to the United States Constitution, or the right to due process.**

In Abdullah's supplemental brief, he submits that this Court should revisit its decision in *Dunlap* regarding the standard of review for unpreserved errors in capital cases. In *Dunlap*, this Court held that the standards of review from *Perry*, a non-capital case, applied to capital cases as well. *Dunlap*, 155 Idaho at 361–63, 313 P.3d at 17–19. This Court stated, "Our reasoning in *Perry* is as applicable in capital cases as in other situations." *Dunlap*, 155 Idaho at 363, 313 P.3d at 19. Applying *Perry*, this Court in *Dunlap* provided the following standards of review:

> [W]hen this Court considers appeals in capital cases, we will consider the issues the defendant has identified, including those claimed errors raised for the first time on appeal. On review of these unpreserved claims, the defendant has the burden of proving that an error occurred and that the error is not harmless, meaning that the defendant must show that there is a reasonable possibility that the defendant would not have been sentenced to death. *See Perry*, 150 Idaho at 226, 245 P.3d at 978. When reviewing alleged errors that were properly preserved by an objection, we apply the harmless error test, which first requires the defendant to demonstrate that there was an error. Then, upon that showing, the

State has the burden of demonstrating beyond a reasonable doubt that the error did not contribute to the death sentence. *Perry*, 150 Idaho at 227, 245 P.3d at 979.

155 Idaho at 363, 313 P.3d at 19.

After this Court issued its opinion in *Dunlap*, the defendant in *Dunlap* petitioned for a rehearing. Among other issues, the defendant specifically requested that this Court reconsider its decision to apply the standards of review outlined in *Perry* to capital cases. This Court denied the defendant's petition.

Abdullah raises nearly identical arguments as the defendant in *Dunlap* regarding the standard of review for unpreserved errors in capital cases. He argues that the application of the fundamental error standard in capital cases (1) disregards the plain language of Idaho Code section 19-2827, which requires the Court to review "all claims of error the defendant raises on appeal" in a capital case, *Dunlap*, 155 Idaho at 362, 313 P.3d at 18; (2) violates separation of powers principles; (3) violates Eighth Amendment and Fourteenth Amendment principles of meaningful appellate review of death sentences; and (4) violates his due process rights. These arguments are similar or identical to those raised by the defendant in *Dunlap* in his reply brief, response to the State's supplemental brief, and brief in support of his petition for rehearing. Thus, this Court has considered these arguments raised by Abdullah numerous times throughout the *Dunlap* case. Upon our reconsideration—again—of these arguments in favor of revisiting the *Dunlap* decision, we are unpersuaded. This Court reaffirms that the standard of review for unpreserved errors in capital cases is the fundamental error standard and the standard of review for preserved errors in capital cases is the harmless error standard.

**14.    Abdullah was eligible to receive a death sentence in conformity with the ex post facto clause and right to due process.**

Abdullah argues that Idaho did not have a valid death penalty statute in effect at the time of the murder. As a result, he contends that his death sentence pursuant to Idaho Code section 19-2515 violates the ex post facto and due process clauses of the Idaho and United States Constitutions.

a.    Standard of Review

Abdullah preserved this issue for appeal, and therefore the harmless error standard applies to the Court's review. *Dunlap*, 155 Idaho at 363, 313 P.3d at 19. Constitutional issues are questions of law subject to free review by the Court. *Murray v. State*, 156 Idaho 159, 164, 321 P.3d 709, 714 (2014). The constitutionality of Idaho's capital sentencing scheme is a question of

law over which the Court exercises free review. *Rhoades v. State*, 149 Idaho 130, 132, 233 P.3d 61, 63 (2010).

    b.    Analysis

Article I, Section 9, Clause 3 and Article I, Section 10, Clause 1 of the United States Constitution and Article I, Section 16 of the Idaho Constitution prohibit ex post facto laws. *Weaver v. Graham*, 450 U.S. 24, 28 & n.8 (1981); *State v. Forbes*, 152 Idaho 849, 852, 275 P.3d 864, 867 (2012).

> The ex post facto clauses prevent the enactment of "any statute [1] which punishes as a crime an act previously committed, which was innocent when done; [2] which makes more burdensome the punishment for a crime, after its commission, or [3] which deprives one charged with crime of any defense available according to law at the time when the act was committed . . . ."

*Forbes*, 152 Idaho at 852, 275 P.3d at 867 (quoting *Wheeler v. Idaho Dept. of Health & Welfare*, 147 Idaho 257, 262, 207 P.3d 988, 993 (2009) (omission in original)); *see also Dobbert v. Florida*, 432 U.S. 282, 292 (1977). "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Weaver*, 450 U.S. at 28–29 (citations omitted).

At issue here is the second category of ex post facto laws, those that make "more burdensome the punishment for a crime, after its commission." *Forbes*, 152 Idaho at 852, 275 P.3d at 867. The ex post facto clause "was intended to secure substantial personal rights against arbitrary and oppressive legislation and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Beazell v. Ohio*, 269 U.S. 167, 171 (1925) (citation omitted). Hence, "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." *Dobbert*, 432 U.S. at 293. In contrast, a substantive change to the law such as an increase in punishment is ex post facto. *State v. Lovelace* (*Lovelace I*), 140 Idaho 53, 69, 90 P.3d 278, 294 (2003) (citing *Hopt v. Utah*, 110 U.S. 574, 580 (1884)).

The change in the law at issue here is the amendments to Idaho Code section 19-2515 to comply with *Ring v. Arizona*, 536 U.S. 584 (2002).

In *Ring*, the United States Supreme Court held, "Capital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589. "The effect of *Ring* was to convert statutory aggravating circumstances relevant to sentencing into 'the functional equivalent

of an element of a greater offense,' which was to be proved to a jury beyond a reasonable doubt." *Lovelace I*, 140 Idaho at 66, 90 P.3d at 291 (quoting *Ring*, 536 U.S. at 609). *Ring* was decided on June 24, 2002, and at that time Idaho's death penalty procedure statute Idaho Code section 19-2515 "required the trial judge to make the factual findings regarding the existence of aggravating circumstance." *Lovelace I*, 140 Idaho at 66, 90 P.3d at 291; *see also* I.C. § 19-2515 (Michie 2002). "*Ring* rendered unconstitutional the sentencing scheme of I.C. § 19-2515 . . . ." *Lovelace I*, 140 Idaho at 66, 90 P.3d at 291.

On February 13, 2003, the legislature amended Idaho Code section 19-2515 to comply with *Ring*. Ch. 19, § 4, 2003 Idaho Sess. Laws 71, 72–74. Pursuant to *Ring*, the jury must find the existence of aggravating circumstances and weigh each aggravating circumstance against all mitigating circumstances to determine whether the imposition of the death penalty would be unjust. *Id.*; *see also* I.C. § 19-2515. The legislature deemed the amendment retroactive, stating:

> This act shall apply to any capital sentencing proceeding occurring after the effective date of this act, including those cases where the murder for which sentence is to be imposed occurred before the effective date of this act and including those cases where a first-degree murder conviction or death sentence occurring before the effective date of this act has been set aside and the case is before the court for retrial or resentencing; provided however, that the provisions of this act relating to mandatory fixed life sentences based upon the finding of a statutory aggravating circumstance apply only to crimes occurring after the effective date of this act and provided further that the provisions of this act relating to notices of intent to seek the death penalty apply only to cases where the entry of a plea occurs after the effective date of this act. No provision of this act shall be construed to invalidate a death sentence that has been imposed prior to the effective date of this act.

Ch. 19, § 6, 2003 Idaho Sess. Laws at 75–76.

Subsequently, in *Schriro v. Summerlin*, the United States Supreme Court held, "*Ring*'s holding is properly classified as procedural." 542 U.S. 348, 353 (2004). The United States Supreme Court explained:

> This holding did not alter the range of conduct [state] law subjected to the death penalty. It could not have; it rested entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize. Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment.

*Id.* As in *Summerlin*, this Court has repeatedly recognized that *Ring* issued a procedural rule. *See, e.g.*, *Rhoades*, 149 Idaho at 139–40, 233 P.3d at 70–71; *Hoffman v. State*, 142 Idaho 27, 29, 121 P.3d 958, 960 (2005).

In a post-*Ring* decision, *Lovelace I*, the Court rejected Lovelace's argument that the imposition of the new death penalty procedures in Idaho Code section 19-2515 violated the ex post facto clause. 140 Idaho at 69–70, 90 P.3d at 294–95. The Court held that the resentencing of the defendant pursuant to directives from *Ring* was purely procedural. *Lovelace I*, 140 Idaho at 69–70, 90 P.3d at 294–95. The Court explained that the new guidelines in Idaho Code section 19-2515 did not place the defendant "in jeopardy of any greater punishment." *Id.* at 70, 90 P.3d at 295 (quoting *State v. Ring*, 65 P.3d 915, 928 (Ariz. 2003)). Nor did the new guidelines alter the aggravating circumstances or the State's burden of proof. *Id.* The Court recognized that Idaho Code section 18-4004 prescribed the punishment of life imprisonment or death for first-degree murder at the time of the commission of the crime. *Id.* at 69, 90 P.3d at 294. "Clearly," the Court explained, "Lovelace had fair warning that death was a possible punishment for first-degree murder." *Id.* Therefore, the Court could not "conclude that the subsequent statute authorized a more onerous punishment than that authorized by the unconstitutional statute." *Id.*

The Court revisited the defendant's ex post facto argument in *State v. Lovelace* (*Lovelace II*), 140 Idaho 73, 77–78, 90 P.3d 298, 302–03, *cert. denied*, 543 U.S. 936 (2004). The Court reaffirmed that the resentencing of the defendant pursuant to the *Ring* directives was purely procedural. *Id.* The Court stated, "The revised death penalty scheme only provides new procedures for determining the aggravating circumstances redefined as the functional equivalent of elements of capital murder of which Lovelace had notice." *Id.* at 78, 90 P.3d at 303. The Court concluded, "Idaho's new sentencing statutes do not place Lovelace in jeopardy of any greater punishment than that prescribed under the superseded statutes. Thus, the newly enacted statutes do not violate the Ex Post Facto Clause." *Id.*

Similar to *Lovelace I* and *II*, the United States Supreme Court confronted an ex post facto issue in *Dobbert*, 432 U.S. 282. Although *Dobbert* was issued before *Ring*, it presented an almost identical issue—whether a state's amendment of its death penalty statute to conform with United States Supreme Court precedent violated the ex post facto clause. *Dobbert*, 432 U.S. at 287–88.

In *Dobbert*, the defendant committed a crime punishable by death. *Id.* at 288. After the commission of the crime, the United States Supreme Court issued an opinion that invalidated the

state's death penalty statute. *Id.* Consequently, the state amended its death penalty statute to comply with the United States Supreme Court's ruling. *Id.* These amendments changed the role of the judge and jury at sentencing,[24] but did not change the possibility of a death sentence for the crime charged. *Id.* at 288–92. The defendant in *Dobbert* first argued that the change in the death penalty statute constituted an ex post facto violation. *Id.* at 292. The United States Supreme Court disagreed, holding that "the change in the statute was clearly procedural." *Id.* at 293. The United States Supreme Court explained, "[N]ot only was the change in the law procedural, it was ameliorative. It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." *Id.* at 294. The United States Supreme Court held, "The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 293–94.

The defendant also argued that there was no valid death penalty in effect at the time of the murder. *Id.* at 297. The United States Supreme Court flatly rejected this argument. *Id.* at 297–98. The United States Supreme Court explained:

> [T]his sophistic argument mocks the substance of the Ex Post Facto Clause. Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.
>
> . . . .
>
> Here the existence of the statute served as an 'operative fact' to warn the petitioner of the penalty which Florida would seek to impose on him if he were

---

[24] Florida's death penalty statute provided that "a person convicted of a capital felony was to be punished by death unless the verdict included a recommendation of mercy by a majority of the jury." *Dobbert*, 432 U.S. at 288. This was held unconstitutional in *Donaldson v. Sack*, 265 So. 2d 499 (Fla. 1972), based on the United States Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). *Dobbert*, 432 U.S. at 288. Florida amended its death penalty statute to provide:

> After a defendant is found guilty of a capital felony, a separate sentencing hearing is held before the trial judge and the trial jury. Any evidence that the judge deems relevant to sentencing may be admitted, and certain evidence relating to aggravating or mitigating circumstances must be admitted. The jury, by a majority vote, then renders an advisory decision, not binding on the court, based upon these aggravating and mitigating circumstances. The court must then also weigh the aggravating and mitigating circumstances. If the court imposes a sentence of death, it must set forth written findings of fact regarding the aggravating and mitigating circumstances. A judgment of conviction and sentence of death is then subject to an automatic, priority review by the Florida Supreme Court.

*Id.* at 290–92. The United States Supreme Court upheld this procedure as constitutional. *Id.* at 289.

convicted of first-degree murder. This was sufficient compliance with the ex post facto provision of the United States Constitution.

*Id.* In summary, the United States Supreme Court rejected the defendant's argument that a change in the procedure itself to impose a death sentence triggered the ex post facto clause. The United States Supreme Court also rejected the defendant's argument that a punishment is invalid simply because the procedure to impose it is invalid.

Abdullah argues that his case is distinguishable from this Court's and the United States Supreme Court's precedent, which we recognize to completely foreclose his assignment of error. Based solely on the date of the crime—October 5, 2002—he contends that the State cannot impose the death penalty. Abdullah explains that at the time of the murder Idaho's death penalty procedure was invalidated by *Ring*, but the legislature had not yet amended Idaho Code section 19-2515 to comply with *Ring*. Without a valid statute to impose the death penalty, he asserts that the death penalty did not exist in Idaho at the time he committed the murder. He also argues that the aggravating circumstances, which he submits to have a unique role in Idaho's death penalty laws to create death-eligible offenses, were therefore void at the time of his offense. We conclude that Abdullah's argument is unavailing.

Abdullah's argument is premised on factual distinction without a difference. The fact that Abdullah committed the crime after *Ring* but before the legislature amended Idaho's death penalty procedural statute does not insulate him from a death sentence. A similar argument was rejected in *State v. Galindo*, 774 N.W.2d 190 (Neb. 2009), *cert. denied*, 559 U.S. 1010 (2010). The same timeline of events occurred in *Galindo* as in the case here: the defendant committed a death-eligible crime after *Ring* invalidated Nebraska's death penalty procedure, but before the Nebraska legislature amended its statute to comply with *Ring*. *Galindo*, 774 N.W.2d at 209–10. The defendant argued that the imposition of the death penalty under the new statute violated the ex post facto clause because "his crimes occurred during a brief moment when there was no death penalty in Nebraska." *Id.* at 212–13. The Nebraska Supreme Court rejected the defendant's argument. The court reasoned:

> [D]espite the fact that there was no constitutional means to carry out a death sentence, the sentence itself was not invalid. Similarly, despite the fact that during the months between *Ring* and [the amendment to the death penalty statute], there was no constitutional procedure to determine death eligibility in a trial for first degree murder, it does not follow that Nebraska law no longer provided for the death penalty as the maximum punishment at the time of [the defendant]'s crimes.

*Id.* at 214. The court concluded, "*Ring* invalidated a particular procedure for determining death eligibility at trial, but it did not invalidate the death penalty." *Id.* at 213.

We hold that *Ring* did not affect the penalties in Idaho for first-degree murder or alter Idaho's aggravating circumstances. "The invalidity of a single provision purely procedural in nature does not automatically invalidate the underlying punishment to which that procedure applies." *Galindo*, 774 N.W.2d at 213. At the time of Abdullah's offense, the death penalty certainly existed as a possible punishment. I.C. § 18-4004 (Michie 2002). In fact, Idaho Code section 18-4004 has prescribed a punishment of death for first-degree murder since its enactment in 1972. Ch. 336, § 1, 1972 Idaho Sess. Laws 844, 928. In addition, the aggravating circumstances were unchanged by *Ring*. The aggravating circumstances have been part of Idaho Code section 19-2515 since 1977. Ch. 154, § 3, 1977 Idaho Sess. Laws 390, 391–93. "Clearly," Abdullah "had fair warning that death was a possible punishment for first-degree murder." *Lovelace I*, 140 Idaho at 69, 90 P.3d at 294. The new procedural changes in Idaho Code section 19-2515 did not place Abdullah "'in jeopardy of any greater punishment than that already imposed under the superseded statutes,' and therefore do not violate the Ex Post Facto Clause." *Id.* at 71, 90 P.3d at 295 (quoting *Ring*, 65 P.3d at 928); *see also Lovelace II*, 140 Idaho at 78, 90 P.3d at 303.

Finally, we address Abdullah's argument that this Court's decision in *State v. Lindquist*, 99 Idaho 766, 589 P.2d 101 (1979), supports his position that Idaho Code section 19-2515 cannot be retroactively applied to him. Abdullah's argument is misplaced. In *Lindquist*, the Court vacated the defendant's death sentence "on the basis that *Woodson v. North Carolina*, 428 U.S. 280 (1976), had effectively invalidated Idaho's then mandatory death penalty" for first-degree murder in Idaho Code section 18-4004. *State v. Creech*, 105 Idaho 362, 374, 670 P.2d 463, 475 (1983) (summarizing *Lindquist*). The Court refused to apply an amended version of Idaho Code section 18-4004 retroactively to the defendant, recognizing that the legislature did not expressly declare the amended version was retroactive. *Lindquist*, 99 Idaho at 768, 589 P.2d at 103. The Court also noted that "a retroactive construction" of the former Idaho Code section 18-4004 "to make it constitutional . . . poses serious ex post facto problems." *Id.* at 770, 589 P.2d at 105. In contrast to *Lindquist*, the statute at issue here is not the statute which prescribes the penalties for first-degree murder. At issue here is only the procedural statute for imposition of the death penalty. Additionally, unlike the statute in *Lindquist*, the new version of Idaho Code section 19-

2515 applied retroactively. Ch. 19, § 6, 2003 Idaho Sess. Laws at 75 ("This act shall apply to any capital sentencing proceeding occurring after the effective date of this act, including those cases where the murder for which sentence is to be imposed occurred before the effective date of this act . . . ."). Therefore, *Lindquist* does not support Abdullah's position.

Based on the above reasons, the imposition of a death sentence does not violate the prohibition of ex post facto laws.[25]

**15.    Idaho's death penalty does not violate the Eighth Amendment to the United States Constitution.**

Abdullah argues that his death sentence amounts to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. In support of this argument, Abdullah explains that "[o]ur evolving standards of decency, which mark our progress as a maturing society, no longer support the death penalty as an acceptable sentencing option." Abdullah relies upon the fact that an increasing number of states have chosen to abolish the death penalty or issued moratoriums on scheduled executions and that public opinion polls indicate, as a society, support for use of the death penalty as a sentencing option is low.

a.    Standard of Review

"The requirements of the Idaho and U.S. Constitutions are questions of law, over which this Court has free review." *State v. Draper*, 151 Idaho 576, 598, 261 P.3d 853, 875 (2011). When examining whether a punishment violates the Eighth Amendment:

> The Court first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against the sentencing practice at issue. *Roper v. Simmons*, 543 U.S. 551, 572 (2005). Next, guided by "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's test, history, meaning, and purpose," *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008), the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution. *Simmons*, 543 U.S. at 572.

*Graham v. Florida*, 560 U.S. 48, 61 (2010); *see also Draper*, 151 Idaho at 598, 261 P.3d at 875 (reciting the same standard).

b.    Analysis

---

[25] Abdullah submits that the imposition of the death penalty violates the ex post facto *and* due process clauses, but provides no sufficient argument or authority on due process. Therefore, any issue as to due process that is separate and distinct from the ex post facto issue is waived. *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

The Eighth Amendment states "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The Eighth Amendment is applicable to the States through the Fourteenth Amendment's Due Process Clause. *Robinson v. California*, 370 U.S. 660, 675 (1962) (Douglas, J., concurring). Article I, Section 6 of the Idaho Constitution also prohibits the imposition of cruel and unusual punishments. IDAHO CONST. art. I, § 6.

This Court has held that Idaho's death penalty statute does not violate the Eighth Amendment. *See State v. Wood*, 132 Idaho 88, 101–03, 967 P.2d 702, 715–17 (1998) (holding Idaho's statutory scheme for consideration of the death penalty constitutional under the Eighth Amendment); *State v. Pizzuto*, 119 Idaho 741–42, 768, 810 P.2d 680, 705–06 (1991) (holding Idaho Code section 19-2515 does not violate the Eighth Amendment), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991). "[T]he punishment of death is not cruel, within the meaning of that word as used in the Constitution." *Baze v. Rees*, 553 U.S. 35, 48 (2008) (plurality opinion) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)). Capital punishment is not prohibited under the United States Constitution, and "the States may enact laws specifying that sanction." *Id.* at 61. "State efforts to implement capital punishment must certainly comply with the Eighth Amendment, but what that Amendment prohibits is wanton exposure to 'objectively intolerable risk,' not simply the possibility of pain." *Id.* at 61–62 (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 & n.9 (1994)).

Here, Abdullah's sole argument rests on the premise that, as a society, support for the use of the death penalty is declining. While Abdullah may have identified a shift in support for imposition of the death penalty, this shift does not provide objective indicia of society's standards, such as legislative enactments or executive action, to allow this Court to determine that there is a national consensus against the death penalty as a sentence for first-degree murder. *Draper*, 151 Idaho at 598–99, 261 P.3d at 875–76. Thirty-two states, the military, and the federal government continue to allow the death penalty as a sentencing option. *See* DEATH PENALTY INFORMATION CENTER, http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited February 23, 2015); Tracy L. Snell, Bureau of Justice Statistics, U.S. Dep't of Justice, *Capital Punishment, 2012–Statistical Tables* (Rev. 2014), *available at* http://www.bjs.gov/content/pub/pdf/cp12st.pdf. As stated by the United States Supreme Court in *Trop v. Dulles*:

77

> Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty.

356 U.S. 86, 99 (1958). "[I]t is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated." *Baze*, 553 U.S. at 53. Therefore, absent some legislative or executive action, a determination by this Court that Idaho's death penalty statute is unconstitutional based on evolving standards of decency and public opinion is unsupported. "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society." *Gregg v. Georgia*, 428 U.S. 153, 175 (1976) (quoting *Dennis v. United States*, 341 U.S. 494, 525 (1951) (Frankfurter, J., concurring in affirmance of judgment)). Abdullah's death sentence is affirmed on the basis that it does not amount to cruel or unusual punishment in violation of the Eighth Amendment to the United States Constitution.

**16.    The district court did not err by failing to strike the State's notice of intent to seek the death penalty.**

    a.    <u>Facts</u>

On November 15, 2002, the State filed an indictment charging Abdullah with first-degree murder, first-degree arson, three counts of attempted first-degree murder, and felony injury to a child. On December 3, 2002, the State filed a notice of intent to seek the death penalty.[26] In this notice, the State provided that it would rely on four statutory aggravating circumstances: (1) the defendant knowingly created a great risk of death to many persons; (2) the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity; (3) by the murder or circumstances surrounding its commission, the defendant exhibited an utter disregard for human life; and (4) the defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.[27] Abdullah moved to strike the State's notice of intent to seek the death penalty, and the district court denied Abdullah's motion. Abdullah appeals the district court's denial of his motion.

    b.    <u>Standard of Review</u>

---

[26] The State subsequently filed an amended indictment.

[27] In 2002, the statute contained ten aggravating circumstances. I.C. § 19-2515(h) (Michie 2002). It now contains eleven. I.C. § 19-2515(9).

"The requirements of the Idaho and U.S. Constitutions are questions of law, over which this Court has free review." *State v. Draper*, 151 Idaho 576, 598, 261 P.3d 853, 875 (2011).

      c.      Analysis

Based on various constitutional and statutory provisions, Abdullah raises a few interrelated challenges to the State's failure to include the statutory aggravating circumstances in the indictment or otherwise provide factual support for the aggravating circumstances. He relies on Article I, Section 8 of the Idaho Constitution, which provides in part, "[n]o person shall be held to answer for any felony or criminal offense of any grade, unless on presentment or indictment of a grand jury or on information of the public prosecutor," and the notice requirement of the Sixth Amendment to the United States Constitution, which states in part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." IDAHO CONST. art. I, § 8; U.S. CONST. amend. VI.[28] He also relies on Idaho Criminal Rule 7(b), which states, "[t]he indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged," and Idaho Code section 19-1409, which states that the indictment "must contain . . . [a] statement of the acts constituting the offense in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended." I.C. § 19-1409; I.C.R. 7(b). He argues that these constitutional and statutory provisions require the State to include the aggravating circumstances in the indictment, subject to a probable cause determination, or to submit a factual basis for each aggravating circumstance in the alternative.

Abdullah's argument is premised on the changes to Idaho's death penalty law due to *Ring*. "In *Ring v. Arizona*, 536 U.S. 584 (2002), the United States Supreme Court held that the Sixth Amendment's jury trial guarantee requires that a jury, not a judge, find an aggravating circumstance necessary for the imposition of the death penalty." *Porter v. State*, 140 Idaho 780, 782, 102 P.3d 1099, 1101 (2004). The *Ring* decision was based solely on the Sixth Amendment right to a jury trial. 536 U.S. at 597 n.4. The United States Supreme Court specifically noted in *Ring* that it did not address "whether notice of a fact that would be used to support a sentence had to be conveyed to the defendant through an indictment versus some other means." *State v. Lovelace* (*Lovelace I*), 140 Idaho 53, 70, 90 P.3d 278, 295 (2003) (quoting *Terrell v. State*, 572

---

[28] "The notice provision of the Sixth Amendment is incorporated within the Due Process Clause of the Fourteenth Amendment and is therefore fully applicable to the states." *Gray v. Raines*, 662 F.2d 569, 571 (9th Cir. 1981).

S.E.2d 595, 602 (Ga. 2002)); *see Ring*, 536 U.S. at 597 n.4 ("Ring does not contend that his indictment was constitutionally defective."); *see also Apprendi v. New Jersey*, 530 U.S. 466, 477 n.3 (2000) ("Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement . . . in the indictment. . . . We thus do not address the indictment question separately today."). Although *Ring* was silent with respect to the indictment issue, "[t]he effect of *Ring* was to convert statutory aggravating circumstances relevant to sentencing into 'the functional equivalent of an element of a greater offense,' which was to be proved to a jury beyond a reasonable doubt." *State v. Shackelford*, 150 Idaho 355, 387, 247 P.3d 582, 614 (2010) (quoting *Ring*, 536 U.S. at 609). Based on this "functional equivalent" language from *Ring*, Abdullah argues that the aggravating circumstances are elements of the offense of first-degree murder and must be included in the indictment.

Although this indictment issue has not been considered by this Court, this Court in *Porter* discussed *Ring* in the context of whether it applied "retroactively to cases that have already become final on direct review." 140 Idaho at 782, 103 P.3d at 1101. In explaining the effect of *Ring* on Idaho's death penalty law, the Court stated:

> Section 19-2515 did not define a separate crime of capital first-degree murder. It merely set forth the procedures that must be followed in order to impose a death sentence, defined the statutory aggravating circumstances, and required that at least one aggravating circumstance be found beyond a reasonable doubt before a defendant could be sentenced to death. Ring *did not elevate those statutory aggravating circumstances into elements of a crime, nor did it create a new crime. Schriro v. Summerlin*, 542 U.S. 348 (2004). Indeed, the United States Supreme Court lacks the authority to enact or amend state legislation. Only our state legislature has that authority, and it did not make the aggravating circumstances elements of the crime. *Ring* merely held that a state cannot impose the death penalty unless its sentencing procedures have the jury, not the judge, determine the existence of a statutory aggravator.

*Porter*, 140 Idaho at 784, 103 P.3d at 1103 (emphasis added). Thus, this Court stated in clear terms that the statutory aggravating circumstances are not elements of a crime.

The Court's discussion of *Ring* in *Porter* forecloses Abdullah's argument, and this outcome is consistent with the majority rule. Due to this "functional equivalent" language from *Ring*, many other jurisdictions have discussed whether *Ring* required the aggravating circumstance "elements" be included in the indictment. Upon review of this issue, the overwhelming majority of states have distinguished between the "functional equivalent of an element" and the actual elements of the offense to hold that the aggravating circumstances do not

need to be alleged in the indictment pursuant to the Fifth Amendment, Sixth Amendment, or Due Process Clause.[29] 5 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 19.3(a) & nn.41–44 (2013); 41 AM. JUR. *Indictments and Informations* § 117 & nn.7–13 (2d ed. 2014); 42 C.J.S. *Indictments* § 172 & nn.16–17 (2014). For example, the Minnesota Supreme Court held that the "[United States Supreme] Court's conclusion that sentencing factors operate as the 'functional equivalent' of elements for purposes of the Sixth Amendment jury trial right does not dictate that such factors are elements for purposes of a Minnesota indictment." *State v. Kendell*, 723 N.W.2d 597, 611 (Minn. 2006) (en banc). The Minnesota Supreme Court explained:

> The right to a jury trial serves a different purpose than the "nature and cause" requirement [in the Sixth Amendment] and the due process notice requirement; the former addresses the adequacy of proof of the offense charged and of the aggravating sentencing factors, while the latter simply provides a defendant notice of the charges.

*Id.* Similarly, in *State v. Siers*, the Washington Supreme Court concluded, "The United States Constitution does not require states to allege aggravating circumstances in local prosecutions. Neither does the Washington Constitution require aggravators to be alleged in an information." 274 P.3d 358, 363–64 (Wash. 2012) (en banc). The Washington Supreme Court highlighted some policy concerns, stating, "In our view, treating aggravators as the functional equivalent of essential elements that must be pleaded in the charging document is harmful to the public interest because it wastes valuable judicial resources and imposes too heavy a burden on the criminal justice system." *Id.* at 364. The analysis of the Kansas Supreme Court in *State v. Scott*, 183 P.3d 801 (Kan. 2008), is also informative. The Kansas Supreme Court recognized that

---

[29] As stated in *Evans v. State*, 886 A.2d 562, 573 (Md. 2005), *cert. denied*, 546 U.S. 1219 (2006):

> Under *Ring*, . . . aggravating factors are no longer regarded as mere sentencing factors, but as matters to be determined by a jury . . . beyond a reasonable doubt, but that does not, ipso facto, mean that they have to be alleged in an indictment. That has been the view expressed by every State court, save New Jersey, that has considered the effect of *Ring* on the indictment issue.

*See also Lewis v. State*, 24 So. 3d 480, 533–35 (Ala. Crim. App.), *aff'd*, 24 So.3d 540 (Ala.), *cert. denied*, 558 U.S. 1078; *McKaney v. Foreman ex rel. Cnty. of Maricopa*, 100 P.3d 18, 20–23 (Ariz. 2004); *Banks v. State*, 842 So. 2d 788, 793 (Fla. 2003); *Jones v. State*, 653 S.E.2d 456, 461–62 (Ga. 2007); *People v. McClain*, 799 N.E.2d 322, 335–36 (Ill. App. Ct. 2003); *Soto v. Commonwealth*, 139 S.W.3d 827, 841–43 (Ky. 2004), *cert. denied*, 544 U.S. 931 (2005); *State v. Kendell*, 723 N.W.2d 597, 611 (Minn. 2006); *Stevens v. State*, 867 So. 2d 219, 226–27 (Miss. 2003), *cert. denied*, 543 U.S. 858 (2004); *State v. Johnson*, 207 S.W.3d 24, 48 (Mo. 2006), *cert. denied*, 550 U.S. 971 (2007); *State v. Hunt*, 582 S.E.2d 593, 602–06 (N.C.), *cert. denied*, 539 U.S. 985 (2003); *Primeaux v. State,* 88 P.3d 893, 899–900 (Okla. Crim. App.), *cert. denied*, 543 U.S. 944 (2004); *State v. Sawatzky*, 125 P.3d 722, 727 (Or. 2005); *State v. Edwards*, 810 A.2d 226, 233–34 (R.I. 2002), *cert. denied*, 538 U.S. 980 (2003); *Moeller v. Weber*, 689 N.W.2d 1, 18–22 (S.D. 2004); *State v. Reid*, 164 S.W.3d 286, 311–12 (Tenn. 2005); *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006); *Morrisette v. Warden of Sussex I State Prison*, 613 S.E.2d 551, 556 (Va. 2005), *cert. denied*, 546 U.S. 1225 (2006); *State v. Siers*, 274 P.3d 358, 363–64 (Wash. 2012).

the Sixth Amendment right to notice of the "nature and cause of the accusation" was applicable to the states and required some form of notice of the aggravating circumstances. *Id.* at 835. However, the Kansas Supreme Court held that this notice requirement did not demand notice of the aggravating circumstances in the indictment. The Sixth Amendment required "only that the defendant be given 'notice and an opportunity to respond.'" *Id.* (quoting *Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992)). The Kansas Supreme Court reviewed its statutory notice procedures, which required the State to notify the defendant of its intent to seek the death penalty within five days of the arraignment and to inform the defendant of the specific aggravating circumstances "prior to the sentencing proceeding," and determined its procedures were "sufficient to give the defendant a meaningful opportunity to respond to the aggravating factors against him or her." *Id.*

We hold that *Ring* did not transform the "functional equivalent" elements of aggravating circumstances to the level of actual elements of an offense to require the State to allege the aggravating circumstances in the indictment or information. Idaho Criminal Rule 7(b) and Idaho Code section 19-1408(2) are therefore inapplicable because those provisions pertain to the facts and allegations that must be stated in an indictment. Similarly, Article I, Section 8 of the Idaho Constitution is inapplicable because it too involves the requirements of an indictment.

Without the designation of aggravating circumstances as elements of a crime, the State's formal notification of the intent to seek the death penalty does not carry the constitutional requirements of an indictment or information.

> Although prosecutions in the federal courts require, under the Fifth Amendment, that aggravators be alleged in an indictment and supported by probable cause, the same requirement is inapplicable to prosecutions in our state courts. . . . Because a state is not required, as a matter of federal constitutional law, to empanel grand juries for purposes of indictment, it would be anomalous for us to require, under the United States Constitution, that a grand jury determine probable cause as a basis for alleging aggravating factors.

*McKaney v. Foreman ex rel. Cnty. of Maricopa*, 100 P.3d 18, 20 (Ariz. 2004) (en banc) (citation omitted). In other words, "[b]ecause the aggravating circumstances are not required to be pleaded in the charging document, it naturally follows that they are not subject to a probable-cause determination." *Maestas v. State*, 275 P.3d 74, 87 (Nev.), *cert. denied*, 133 S. Ct. 275 (2012). Thus, we also hold that there is no constitutional requirement that the State present

evidence demonstrating probable cause for each aggravating circumstance to properly notify the defendant of its intent to seek the death penalty.[30]

We recognize that the Sixth Amendment's "nature and cause" provision and the right to due process impose a notice requirement on the aggravating circumstances, but Idaho's statutory procedures fully satisfy these constitutional protections. The requirements of Idaho Code section 18-4004A provide defendants with adequate notice of the State's intent to seek the death penalty and the aggravating circumstances. "The Sixth Amendment and basic principles of due process guarantee a criminal defendant the fundamental right to be informed of the nature and cause of the accusations against him so that he may have a meaningful opportunity to prepare an adequate defense against every issue raised by those accusations." *Smith v. Lopez*, 731 F.3d 859, 866 (9th Cir. 2013), *rev'd per curiam on other grounds*, 135 S. Ct. 1 (2014). Idaho Code section 18-4004A requires that the State notify the defendant of its intent to seek the death penalty "no later than sixty (60) days after entry of a plea." I.C. § 18-4004A(1). The notice "shall include a listing of the statutory aggravating circumstances that the state will rely on in seeking the death penalty." I.C. § 18-4004A(1). We hold that the requirements in Idaho Code section 18-4004A comport with the Sixth Amendment and due process by notifying the defendant of the nature of the aggravating circumstances and by providing the defendant with a meaningful opportunity to respond and prepare. *See Terrell*, 572 S.E.2d at 602–03 (finding constitutionally sufficient notice of State's intent to seek the death penalty with notice filed several months before trial); *Scott*, 183 P.3d at 835 (holding that notice of intent to seek the death penalty sufficient under the Sixth Amendment); *State v. Hunt*, 582 S.E.2d 593, 604–06 (N.C. 2003) (holding that aggravators do not need to be pled in the indictment because statutory notice and procedures are sufficient under the Sixth Amendment). These notice requirements in Idaho Code section 18-4004A are constitutionally adequate and stand "in lieu of charging them in the information or indictment." *State v. Glass*, 136 S.W.3d 496, 513 (Mo. 2004), *cert. denied*, 543 U.S. 1058 (2005).

Finally, Abdullah argues that due process requires that a defendant be apprised "not only of the name of the offense charged but in general terms of the manner in which it is alleged to

---

[30] Most recently, this Court reached a similar result regarding a non-death eligible crime in *State v. Schall*, 157 Idaho 488, 337 P.3d 647 (2014). In *Schall*, this Court held that Idaho Code section 18-8005(6), which requires that a violation of Idaho's DUI statute be enhanced to a felony in certain circumstances, did not create a separate offense. *Id.* at 492, 337 P.3d at 651. Rather, Idaho Code section 18-8005(6) is an enhancement provision. *Id.* at 492–95, 337 P.3d at 651–54. Relevant here, this Court stated, "The fact that an enhancement provision has serious ramifications for a defendant tells us nothing about whether the Legislature intended to define a new offense or to enhance the penalty associated with a pre-existing offense." *Id.* at 495, 337 P.3d at 654.

have been committed." In *Gray v. Netherland*, however, the United States Supreme Court stated, "A defendant's right to notice of the charges against which he must defend is well established. But a defendant's claim that he has a right to notice of the evidence that the state plans to use to prove the charges stands on quite a different footing." 518 U.S. 152, 167–68 (1996) (citations omitted). "[T]here is no extant constitutional right to advance notice of the evidence to prove such charges in a capital sentencing hearing." *United States v. LeCroy*, 441 F.3d 914, 929 (11th Cir. 2006) (citing *Gray*, 518 U.S. at 166–70). Thus, the State "is not required to provide specific evidence in its notice of intent" to seek the death penalty. *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999).

Consistent with the foregoing, we hold that there is no due process right to be informed of the specific evidence or factual basis underlying each aggravating circumstance alleged by the State. The State's notification of the aggravating circumstances that it will rely upon to seek the death penalty is sufficient to inform the defendant of the "general terms" or basis of each aggravating circumstance. "The nature of the aggravators themselves ensures that defendants will be reasonably apprised of the evidence that could lead to a sentence of death." *Hunt*, 582 S.E.2d at 605. Idaho's statutory aggravating circumstances "are sufficiently distinct that, in almost all cases, it will be apparent to the defendant prior to trial which factors the State will be relying on." *Scott*, 183 P.3d at 835; *see also* I.C. § 19-2515(h) (Michie 2002). "Even in the event there is some ambiguity as to the factors that will be relied on, the State is required to provide the exact factors prior to the penalty phase." *Scott*, 183 P.3d at 835. The State's identification of the four aggravating circumstances in its notice to seek the death penalty was sufficient to notify Abdullah of the facts underlying each aggravating circumstance and satisfy due process.

In conclusion, this Court holds that Article I, Section 8 of the Idaho Constitution, Idaho Criminal Rule 7(b), and Idaho Code section 19-1409(2) do not require that the aggravating circumstances be alleged in the indictment. This Court also holds that compliance with the notice requirements in Idaho Code section 18-4004A is sufficient to satisfy due process and the Sixth Amendment notice requirement. Finally, this Court holds that the State is not required by the due process clause to submit a factual basis for each aggravating circumstance. This Court affirms the district court's denial of Abdullah's motion to strike the State's notice of intent to seek the death penalty.

**17. The statutory aggravating circumstances are not void for vagueness under the Due Process Clause and the Eighth Amendment's prohibition of cruel and unusual punishment.**

Abdullah argues that the four aggravating circumstances alleged by the State are unconstitutionally vague and therefore violate the Due Process Clause and the Eighth Amendment to the United States Constitution.

    a.    <u>Facts</u>

In its notice of intent to seek the death penalty, the State provided that it would rely on four statutory aggravating circumstances: (1) the defendant knowingly created a great risk of death to many persons (great risk aggravator); (2) the murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity (HAC aggravator); (3) by the murder or circumstances surrounding its commission, the defendant exhibited an utter disregard for human life (utter disregard aggravator); and (4) the defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society (propensity aggravator). Abdullah moved for the district court to declare the four aggravating circumstances unconstitutional under the Idaho and United States Constitutions, including the Due Process Clause and the Eighth Amendment. The district court denied Abdullah's motion.

Although the jury was unable to reach a unanimous decision on the HAC and propensity aggravators, the jury found that the State had proven beyond a reasonable doubt the existence of the great risk and utter disregard aggravators. The jury weighed the great risk aggravator and utter disregard aggravator individually against all mitigating circumstances and found that the mitigating circumstances were not sufficiently compelling that the death penalty would be unjust.

    b.    <u>Standard of Review</u>

As a preserved claim of error, the Court employs the harmless error standard to Abdullah's challenges to the aggravating circumstances. *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). "The requirements of the Idaho and U.S. Constitutions are questions of law, over which this Court has free review." *State v. Draper*, 151 Idaho 576, 598, 261 P.3d 853, 875 (2011).

    c.    <u>Analysis</u>

"Our capital punishment doctrine is rooted in the principle that '[t]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be . . . wantonly and . . . freakishly imposed.'" *State v. Card*, 121 Idaho 425, 434, 825 P.2d 1081, 1090 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990) (alteration in original) (omissions in original)). "This principle requires a State to 'channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.'" *Id.* (quoting *Jeffers*, 497 U.S. at 774).

"Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment . . . ." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). These claims "characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*, 408 U.S. 238 (1972)." *Cartwright*, 486 U.S. at 361–62; *see also id.* at 362 ("*Furman* held that Georgia's then-standardless capital punishment statute was being applied in an arbitrary and capricious manner; there was no principled means provided to distinguish those that received the penalty from those that did not."). A claim of vagueness is analyzed by determining whether the challenged aggravating circumstance adequately informs the jury of what it must find in order to impose the death penalty, or whether it leaves the jury with unchanneled discretion to make an arbitrary and capricious decision. *State v. Dunlap*, 125 Idaho 530, 536, 873 P.2d 784, 790 (1993). The aggravating circumstances must be construed to permit the jury to make a principled distinction between those who deserve the death penalty and those who do not. *Card*, 121 Idaho at 434–35, 825 P.2d at 1090–91.

"[W]here the statutory language defining the aggravating circumstance is itself vague, there must be a limiting construction if the state is to meet its constitutional obligation to 'tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.'" *State v. Pizzuto*, 119 Idaho 742, 771, 810 P.2d 680, 709 (1991) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)), *overruled in part on other grounds by Card*, 121 Idaho 425, 825 P.2d 1081.

     *i.   Any challenge to HAC and propensity aggravators is moot.*

The constitutionality of the HAC aggravator and propensity aggravator is moot because the jury did not reach a unanimous decision as to these aggravators. The Court does not decide moot issues. *Hoagland v. Ada Cnty.*, 154 Idaho 900, 912, 303 P.3d 587, 599 (2013). An issue is moot if it "does not present a real and substantial controversy that is capable of being concluded through judicial decree of specific relief" or if "a favorable judicial decision would not result in any relief or the party lacks a legally cognizable interest in the outcome." *Arambarri v. Armstrong*, 152 Idaho 734, 739, 274 P.3d 1249, 1254 (2012) (citations omitted). Without a unanimous decision, these aggravators were not subject to any weighing against the mitigating circumstances to determine whether the death penalty would be unjust. Hence, the HAC and propensity aggravators had no bearing on the jury's decision to sentence Abdullah to death. The Court cannot invalidate his death sentence on factors that in no way influenced the jury's decision. A decision regarding these factors in Abdullah's favor would not result in any relief to Abdullah. Put another way, even if Abdullah could establish that the aggravators were unconstitutionally vague, any constitutional error beyond a reasonable doubt did not contribute to the jury's decision to sentence Abdullah to death. *See Perry*, 150 Idaho at 227, 245 P.3d at 979.

> ii.     *The utter disregard aggravator is not void for vagueness.*

Abdullah argues that the utter disregard aggravator is unconstitutionally vague because the jury sentencing requirement from *Ring v. Arizona*, 536 U.S. 584 (2002), renders the limiting construction of utter disregard inadequate to properly instruct the jury.

The utter disregard aggravator requires a limiting construction to meet constitutional requirements. *State v. Osborn*, 102 Idaho 405, 417–19, 631 P.2d 187, 199–201 (1981). The limiting construction provided by the Court in *Osborn* construes "utter disregard" "to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *Id.* at 419, 631 P.2d at 201. The United States Supreme Court in *Arave v. Creech*, 507 U.S. 463 (1993), reviewed the Court's construction in *Osborn* of the utter disregard aggravator and "held that because this construction 'defines a state of mind that is ascertainable from surrounding facts,' the aggravator was not unconstitutional." *State v. Dunlap*, 155 Idaho 345, 377, 313 P.3d 1, 33 (2014) (quoting *Creech*, 507 U.S. at 471–74). The *Osborn* construction satisfies the Eighth Amendment by

genuinely narrowing the class of persons eligible for the death penalty. *Creech*, 507 U.S. at 474–75.

"In *Creech*, the Court used both 'sentencer' and 'sentencing judge' when referring to the entity that would apply the aggravator to determine a sentence." *Dunlap*, 155 Idaho at 377, 313 P.3d at 33 (quoting *Creech*, 507 U.S. at 474–76). The defendant in *Dunlap* contended "that the *Creech* Court found the *Osborn* construction sufficient only in the context of judge sentencing." *Dunlap*, 155 Idaho at 377, 313 P.3d at 33. The Court rejected the defendant's argument, explaining that "the determination in *Creech* was based upon the U.S. Supreme Court's consideration of the 'ordinary meaning' of the limiting construction that this Court had applied to the statutory language." *Dunlap*, 155 Idaho at 377–78, 313 P.3d at 33–34 (citing *Creech*, 507 U.S. at 472). The United States Supreme Court did not base its determination on any difference between judge and jury sentencing. *Id.* Therefore, the Court held in *Dunlap* "that the utter disregard aggravator is not rendered unconstitutional by the change from judge to jury sentencing." *Id.* at 378, 313 P.3d at 34.

Abdullah raises a similar argument. He argues that this Court's construction of utter disregard is no longer valid because it relied on the fact that judges, who understand and apply narrowing constructions to avoid vague aggravators, would sentence the defendant to death. Abdullah's argument has been foreclosed by *Dunlap*. We reaffirm *Dunlap*'s holding that the utter disregard aggravator with a limiting construction is not void for vagueness under the Eighth Amendment.

In this case, Jury Instruction 46 provided:

> "Exhibited utter disregard for human life," with regard to the murder or the circumstances surrounding its commission, refers to acts or circumstances surrounding the crime that exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer. "Cold-blooded" means marked by absence of warm feeling: without consideration, compunction, or clemency, matter of fact, or emotionless. "Pitiless" means devoid of or unmoved by mercy or compassion. A "cold-blooded, pitiless slayer" refers to a slayer who kills without feeling or sympathy. The utter disregard factor refers to the defendant's lack of conscience regarding killing of another human being.

This instruction "accurately instructed the jury as to this limiting construction" of utter disregard. *Dunlap*, 155 Idaho at 378, 313 P.3d at 34. Abdullah's void for vagueness challenge to the utter disregard aggravator fails.

> iii.     *Any error with regard to the great risk aggravator was harmless.*

Abdullah raises three separate issues with respect to the great risk aggravator. First, he argues that the great risk aggravator itself is unconstitutionally vague. Second, he argues that the district court's jury instruction for the great risk aggravator was a legislative act in violation of separation of powers principles. Finally, he argues that the district court's jury instruction violated his due process rights because it failed to connect the great risk aggravator with the offense of first-degree murder.

It is not necessary for this Court to consider these arguments on appeal. Even if the great risk aggravator is unconstitutional or if the district court's instruction was inadequate, any error was harmless. "In Idaho, the [jury] must weigh each of the aggravating circumstances separately against all of the mitigating circumstances." *State v. Hairston*, 133 Idaho 496, 509–10, 988 P.2d 1170, 1183–84 (1999); *see also* I.C. § 19-2515(c) (Michie 2002); I.C. § 19-2515(3)(b), (7), (8)(a).

> When such an analysis is followed, the invalidation of one or more of the aggravating circumstances has no effect on the validity of the sentence imposed; [the jury] has already determined that any one of the aggravating circumstances standing alone outweighs all the mitigating circumstances, thus justifying the death sentence.

*Hairston*, 133 Idaho at 510, 988 P.2d at 1184. In this case, the jury found that the State had proven beyond a reasonable doubt the existence of two aggravating circumstances: great risk and utter disregard. Weighing each aggravating circumstance individually, the jury found that all mitigating circumstances were not sufficiently compelling that the death penalty would be unjust based on either aggravating circumstance standing alone. Therefore, even if the great risk aggravator was unconstitutionally vague and should not have been submitted to the jury without a limiting construction from the Court, this Court affirms the jury's finding to impose the death penalty based on the utter disregard aggravator. *See id.*; *State v. Wood*, 132 Idaho 88, 105–06, 967 P.2d 702, 719–20 (1998).

**18. This Court's limiting construction of the HAC and utter disregard aggravators does not violate the separation of powers doctrine.**

Abdullah argues that this Court's limiting construction of the HAC aggravator and utter disregard aggravator from *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), and *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), respectively, violates the separation of powers doctrine because the Court's limiting constructions "rewrote" those aggravating circumstances in contravention of the legislature's exclusive power to define the elements of a criminal offense.

Abdullah bases his argument on *Ring v. Arizona*, 536 U.S. 584 (2002), which he contends to have elevated the aggravating circumstances to elements of a crime. However, the Court held that "*Ring* did not elevate those statutory aggravating circumstances into elements of a crime, nor did it create a new crime." *State v. Porter*, 140 Idaho 780, 784, 103 P.3d 1099, 1103 (2004). The aggravating circumstances are only "the functional equivalent" of elements of a crime. *State v. Shackelford*, 150 Idaho 355, 387, 247 P.3d 582, 614 (2010) (discussing *Ring*). As such, the Court's limiting construction of an aggravating circumstance is not constrained by the separation of powers doctrine.

This Court is within its constitutional authority to narrowly construe an aggravating circumstance to avoid an unconstitutionally vague statute. "In charging the jury, the court must state to them all matters of law necessary for their information." I.C. § 19-2132. "[P]ossible infirmity for vagueness may be avoided if the statute is given a limiting judicial construction, consistent with the apparent legislative intent and comporting with constitutional limitations." *State v. Cobb*, 132 Idaho 195, 199, 969 P.2d 244, 248 (1998) (quoting *State v. Richards*, 127 Idaho 31, 38, 896 P.2d 357, 364 (Ct. App. 1995) (discussing a facial vagueness challenge)).

> It is the courts alone that have the power to determine the validity or invalidity of a statute. It is the role of the courts to ascertain and give effect to the intention of the legislature as expressed in the statutes. To apply the principle of statutory interpretation is not a violation of the separation of powers doctrine.

*Neill v. State*, 896 P.2d 537, 555 (Okla. Crim. App. 1994) (citations omitted) (rejecting defendant's claim that the court's narrowing construction of the HAC aggravator violates the separation of powers doctrine), *cert. denied*, 516 U.S. 1080 (1996). *See also State v. Breton*, 824 A.2d 778, 827–28 (Conn.) (reaffirming its holding that the court has the power to define "especially cruel" and the power is not reserved to the legislature), *cert. denied*, 540 U.S. 1055 (2003); *Victorino v. State*, 23 So. 3d 87, 104 (Fla. 2009) (rejecting without discussion the defendant's claim that the court's limiting construction of the HAC aggravator violates the separation of powers). "In choosing between two constructions of a statute, one valid and one constitutionally precarious," the Court may "search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." *State v. Breton*, 562 A.2d 1060, 1066 (Conn. 1989). Therefore, we hold that our limiting construction of an aggravating circumstance to avoid an unconstitutionally vague statute does not violate the separation of powers doctrine.

90

**19.    The district court did not err by admitting a victim impact statement from Angie's step-sister.**

Abdullah argues that the district court erred when it permitted Angie's step-sister Stephanie Williams to offer victim impact testimony during the sentencing proceeding. Abdullah argues that Idaho Code section 19-5306 does not permit step-siblings the opportunity to offer victim impact evidence because they are not immediate family members.

a.      Standard of Review

Abdullah did not object to the admission of Williams's victim impact statement, and therefore this alleged error is subject to the fundamental error standard. *State v. Dunlap*, 155 Idaho 345, 363, 313 P.3d 1, 19 (2013). The interpretation of a statute is a question of law over which this Court exercises free review. *State v. Payne*, 146 Idaho 548, 575, 199 P.3d 123, 150 (2008).

b.      Analysis

Article I, Section 22(6) of the Idaho Constitution and Idaho Code section 19-5306 guarantee victims the right to be heard, upon request, at sentencing. IDAHO CONST. art. I, § 22(6); I.C. § 19-5306(1)(e), (h); *see also Payne*, 146 Idaho at 575, 199 P.3d at 150. A victim may exercise the right to be heard with a victim impact statement at the defendant's sentencing hearing. *State v. Hansen*, 156 Idaho 169, 173, 321 P.3d 719, 723 (2014). In cases of homicide, Idaho Code section 19-5306 limits victim impact statements to immediate family members of the victim. I.C. § 19-5306(3); *Payne*, 146 Idaho at 575, 199 P.3d at 150. "Immediate family members" is not defined in Idaho Code section 19-5306. *Payne*, 146 Idaho at 575, 199 P.3d at 150.

Whether step-siblings are immediate family members entitled to give a victim impact statement is a matter of first impression for this Court. In *Payne*, the Court turned to other definitions of "immediate family members" in the Idaho Code and Black's Law Dictionary to determine the definition for purposes of Idaho Code section 19-5306. The Court explained:

> For instance, in I.C. § 41-1325, "'immediate family member' means a parent, mother-in-law, father-in-law, husband, wife, sister, brother, brother-in-law, sister-in-law, son-in-law, daughter-in-law, or a son or daughter." I.C. § 41-1325(2). Likewise, in I.C. § 44-1601, "'[i]mmediate family member' means the spouse, children, brother, sister, mother or father." Similarly, Black's defines "immediate family member" as: "1. A person's parents, spouse, children, and siblings. 2. A person's parents, spouse, children, and siblings, as well as those of the person's spouse." Black's Law Dictionary 273 (2d Pocket Ed. 2001).

*Payne*, 146 Idaho at 575, 199 P.3d at 150. Thus, the Court indicated that relatives related by marriage, such as in-laws, are immediate family members. It logically follows that siblings related by marriage are also immediate family members. Black's Law Dictionary also supports this determination, which notes in its definition of "immediate family members" that "[s]tepchildren and adopted children are usu[ally] immediate family members." BLACK'S LAW DICTIONARY 721 (10th ed. 2014). Therefore, this Court holds that step-siblings of the victim are immediate family members for purposes of providing a victim impact statement pursuant to Idaho Code section 19-5306. For this reason, the district court did not err when it permitted Williams to read a victim impact statement during the sentencing proceeding.

**20.    The alleged instance of prosecutorial misconduct during the penalty phase did not result in fundamental error.**

Abdullah submits one instance of prosecutorial misconduct during the penalty phase of trial. He argues that this error violated his right to due process, his right to a fair trial, and the equal protection clause.

a.    Facts

During closing argument of the penalty phase, the prosecutor discussed the penalty of death under Islamic law. The transcript provides:

> MR. OWEN [the prosecutor]: You will recall that point in the trial when I examined that Imam from the mosque in Salt Lake City . . . you will recall that in answer to counsel's question, I asked the Imam what is the penalty for murder under Islam--
>
> THE COURT: Counsel, side bar.
>
> (bench conference as follows:)
>
> THE COURT: I know where you're going. Don't go there.
>
> MR. OWEN: I don't think you know.
>
> THE COURT: Are you bringing in the fact that the penalty should be death?
>
> MR. OWEN: With the understanding that that's not the law that we have in this state, that we don't get to execute somebody just because they commit a murder. That's the point.
>
> THE COURT: All right. I didn't want --
>
> MR. OWEN: I'm not going to make that point.
>
> (Back on the record.)
>
> MR. OWEN: You'll recall in response to the question by counsel what the penalty for murder under Islamic law is and the answer was death for death. But we're not

Islamic law. You are obligated to follow the laws of the state as given to you by this Judge. That law is expressed in this instruction that you have. Idaho law has been structured so that the only persons who will eligible [sic] to receive the death penalty are the worst of the worst. That's why you have to find an aggravator. Once you find an aggravator, that's why you have to weigh all of the mitigation against that.

Abdullah did not object to the prosecutor's statement.

> b.        Standard of Review

"Where prosecutorial misconduct was not objected to during trial, this Court may only reverse when that misconduct constitutes a fundamental error." *State v. Adamcik*, 152 Idaho 445, 480, 272 P.3d 417, 452 (2012) (citing *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010)); *see also State v. Dunlap*, 155 Idaho 345, 363, 313 P.3d 1, 19 (2013). The first step in considering Abdullah's claim of prosecutorial misconduct is to determine whether "the alleged conduct actually rises to the level of prosecutorial misconduct." *Dunlap*, 155 Idaho at 368, 313 P.3d at 24.

> c.        Analysis

Abdullah argues that the prosecutor's comment on Islamic law was an attempt to ask the jury to decide the penalty based on factors other than evidence and law. He also contends that the prosecutor's argument undercut the jurors' sense of responsibility for imposing the death penalty. In Abdullah's supplemental brief, he contends that the prosecutor emphasized Islamic law to highlight Abdullah's ethnicity and religion at a time when the American public was hostile towards Iraqis and Muslims due to the September 11 terrorist attacks and subsequent war in Iraq. Abdullah submits that the prosecutor's reference to Islamic law was an appeal to jury prejudice based on religion and ethnicity.

The prosecutor's comment was not misconduct. Prosecutorial misconduct occurs when the prosecutor "attempts to secure a verdict on any factor other than . . . the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence." *Perry*, 150 Idaho at 227, 245 P.3d at 979. It also occurs when the prosecutor "[a]ppeals to emotion, passion or prejudice of the jury through use of inflammatory tactics." *State v. Ellington*, 151 Idaho 53, 62, 253 P.3d 727, 736 (2011) (quoting *State v. Phillips*, 144 Idaho 82, 87, 156 P.3d 583, 588 (Ct. App. 2007)). Neither occurred here. The jury did not learn from the prosecutor that the penalty for murder was death under Islamic law. The defense's cross-examination of a witness during the

guilt phase informed the jury of this penalty.[31] In referencing this evidence presented by the defense, the prosecutor did not ask the jury to draw any negative inferences from that evidence. Rather, the prosecutor noted the evidence and then directed the jury to follow the instructions of the district court. Thus, the prosecutor did not seek the death penalty based on excluded or admissible evidence. Further, the prosecutor did not appeal to emotion, passion, or prejudice of the jury. The prosecutor's reference to Islamic law served to emphasize to the jury to follow the law of Idaho. To reach Abdullah's contention that the prosecutor attempted to capture the general public's alleged animosity towards certain ethnicities and religious groups for the September 11 terrorist attacks would require inference upon inference, all in spite of the instruction to the jury that prejudice should not influence their deliberation. Finally, any error was harmless. Abdullah has failed to show that there is a reasonable possibility the prosecutor's comment on Islamic law affected the outcome of the sentencing phase. *Dunlap*, 155 Idaho at 363, 313 P.3d at 19.

**21.     The district court did not err by failing to properly instruct the jury during the penalty phase.**

Abdullah raises five challenges to the district court's jury instructions during the penalty phase. This Court concludes that there was no error in the district court's jury instructions.

a.     Standard of Review

"Whether jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *State v. Humpherys*, 134 Idaho 657, 659, 8 P.3d 652, 654 (2000). Abdullah did not object to these instructions at trial, and therefore their validity is reviewed under the fundamental error standard. *State v. Dunlap*, 155 Idaho 345, 363, 313 P.3d 1, 19 (2013).

b.     Jury Instruction 47: Definition of "Many Persons"

The district court instructed the jury that "many persons" for the great risk aggravator "means more than four people." This instruction is identical to the instruction requested by Abdullah. Abdullah argues that this definition defined "many" too narrowly. We reject

---

[31] Defense counsel elicited this information during cross-examination of Imam Din. The defense counsel asked on cross-examination, "What does the Islamic faith say about killing a human being?" and Imam Din responded, "It is a major sin and it is -- the person will be punished in the hereafter by being put in the hellfire." Defense counsel then asked, "Does it say anything about punishment here on earth?" and Imam Din responded, "Yes. According to Islamic law, there is death for death, like the Taliban." On redirect, the prosecutor asked, "Did I understand you to state that murder in the Muslim faith is haram?" ("Haram" "is something that is forbidden by God.") Imam Din responded, "Yes."

Abdullah's assignment of error. Abdullah "cannot assert as error on appeal the giving of an instruction which he himself requested." *State v. Draper*, 151 Idaho 576, 589, 261 P.3d 853, 866 (2011) (quoting *State v. Aragon*, 107 Idaho 358, 363, 690 P.2d 293, 298 (1984)).

      c.      Jury Instruction 53: No Definition of "Sufficiently Compelling"

The district court instructed the jury:

> If you find that all the mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust, or you cannot unanimously agree on that issue, then the judge must sentence the Defendant.
> . . . .
> You must each decide for yourself whether all mitigating circumstances presented, when weighed against each statutory aggravating circumstance proven by the State, are sufficiently compelling to make the imposition of the death penalty unjust.

Abdullah argues that the district court's failure to define "sufficiently compelling" is unconstitutional. He explains that "sufficiently compelling" did not inform the jury on how to weigh each aggravating circumstance against the mitigating evidence. This Court recently addressed a similar argument in *Dunlap*, 155 Idaho 345, 313 P.3d 1. The Court explained:

> Dunlap argues that "sufficiently compelling" should have been defined because the jury might have thought that the phrase required some specific amount of mitigation to overcome the aggravating circumstance. We disagree. It is unnecessary to define "sufficiently compelling" because the phrase is comprised of ordinary words that do not require definition.

*Id.* at 365, 313 P.3d at 21. We reaffirm that a definition of "sufficiently compelling" is unnecessary. Therefore, we reject Abdullah's assignment of error.

      d.      Jury Instruction 53: Failure to Instruct Jury on Judge Sentencing

The district court's instruction at issue provided:

> If you find that all the mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust, or you cannot unanimously agree on that issue, then the judge must sentence the Defendant.

Abdullah argues that the district court's instruction was erroneous because the district court should have instructed the jury that the judge would sentence him to life imprisonment if the jury found aggravating circumstances existed but the death penalty would be unjust when weighing each aggravating circumstance against all mitigating circumstances.

At the time of Abdullah's offense, Idaho Code section 18-4004 provided:

> [E]very person guilty of murder of the first degree shall be punished by death or by imprisonment for life, . . . and provided further that whenever the court shall

impose a sentence of life imprisonment, the court shall set forth in its judgment and sentence a minimum period of confinement of not less than ten (10) years during which period of confinement the offender shall not be eligible for parole or discharge or credit or reduction of sentence for good conduct, except for meritorious service.

I.C. § 18-4004 (Michie 2002). As apparent by the statute, the judge could sentence the defendant to life imprisonment with a range of fixed years from ten years to life for the crime of first-degree murder.

On February 13, 2003, the legislature amended Idaho's death penalty statutes to require the judge to sentence the defendant to "a fixed life sentence" if the jury finds "a statutory aggravating circumstance beyond a reasonable doubt but finds that the imposition of the death penalty would be unjust." Ch. 19, § 1, 2003 Idaho Session Laws 71, 71; I.C. § 18-4004 (Michie 2003); I.C. § 18-4004 (2014) (same). The legislature also required that the jury shall be informed accordingly:

(a) If the jury finds that a statutory aggravating circumstance exists and no mitigating circumstances exist which would make the imposition of the death penalty unjust, the defendant will be sentenced to death by the court.
(b) If the jury finds the existence of a statutory aggravating circumstance but finds that the existence of mitigating circumstances makes the imposition of the death penalty unjust or the jury cannot unanimously agree on whether the existence of mitigating circumstances makes the imposition of the death penalty unjust, the defendant will be sentenced to a term of life imprisonment without the possibility of parole; and
(c) If the jury does not find the existence of a statutory aggravating circumstance or if the jury cannot unanimously agree on the existence of a statutory aggravating circumstance, the defendant will be sentenced by the court to a term of life imprisonment with a fixed term of not less than ten (10) years.

Ch. 19, § 1, 2003 Idaho Session Laws at 74; I.C. § 19-2515(7) (Michie 2003); I.C. § 19-2515(7) (2014) (same). Thus, according to the current death penalty laws, the jury must be informed that the court will sentence the defendant to life imprisonment without the possibility of parole if the jury finds the existence of aggravating circumstances, but also finds all mitigating circumstances outweigh each aggravating circumstance.

This fixed life sentence penalty and requirement to inform the jury of the fixed life sentence were not retroactive. The legislature stated: "[T]he provisions of this act relating to mandatory fixed life sentences based upon the finding of a statutory aggravating circumstance apply only to crimes occurring after the effective date of this act [February 13, 2003] . . . ." Ch. 19, § 1, 2003 Idaho Session Laws at 75. Abdullah's crime occurred in October of 2002.

Abdullah contends that the district court had to inform the jury of the possible penalties. He relies on United States Supreme Court case law, but those cases are inapplicable in this context. The United States Supreme Court held in "*Simmons v. South Carolina*, 512 U.S. 154 (1994), that when 'a capital defendant's future dangerousness is at issue, and the *only* sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.'" *Kelly v. South Carolina*, 534 U.S. 246, 248 (2002) (emphasis added) (quoting *Shafer v. South Carolina*, 532 U.S. 36, 39 (2001) (alteration in original)). The United States Supreme Court has made clear that the *Simmons* rule only "comes into play" when the state law provides "no third choice," i.e., the jury has only two sentencing options: death or life imprisonment without the possibility of parole. *Shafer*, 532 U.S. at 51. "*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000).

In this case, due to the date of Abdullah's offense, the jury was not faced with only two sentencing options: death or a fixed life sentence. If the jury found the existence of aggravating circumstances, but all the mitigating circumstances outweighed each aggravating circumstance, life imprisonment without the possibility of parole was not the only alternative sentence. The district court could sentence Abdullah to life imprisonment with a range of fixed years from ten to life. I.C. § 18-4004 (Michie 2002). Therefore, *Simmons* is inapplicable, and Abdullah was not entitled to a jury instruction on the judge's sentencing options in the event that the jury did not recommend a death sentence. *See Collier v. Cockrell*, 300 F.3d 577, 583 (5th Cir.) (*Simmons* provides no support to the defendant's due process challenge because the defendant faced an alternative sentence with the possibility of parole after forty years), *cert. denied*, 537 U.S. 1084 (2002); *State v. Bush*, 942 S.W.2d 489, 503 (Tenn.) ("Since Tennessee is a state in which defendants sentenced to life imprisonment are eligible for parole, *Simmons* does not require that the jury be given information about parole availability."), *cert. denied*, 522 U.S. 953 (1997).

We note that Abdullah's argument implies that he submitted a proper instruction to the district court, which the district court improperly rejected. However, the record proves otherwise. The record shows that Abdullah proposed the following instruction in writing:

> If you find that all the mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust, or you cannot unanimously agree on that issue, then the defendant will be sentenced to life in prison without the possibility of parole.

Then on three separate occasions during the district court's discussions with the parties on jury instructions, Abdullah represented that he wanted the instruction to end with the precise language adopted by the district court: "then the judge must sentence the defendant." This instruction was a correct representation of the law at the time of Abdullah's offense, as discussed above, *and* it was the instruction sought by Abdullah. Abdullah cannot complain that the district court failed to use the erroneous instruction he proposed to the court. There was no error in the district court's instruction.

    e.    Jury Instruction 53: Double-Counting Aggravator Evidence

In regards to the evidence for each aggravating circumstance, Abdullah proposed the following instruction:

> If you find that two or more of the aggravating factors are proven beyond a reasonable doubt by a single aspect of the offense, you are to consider that as supporting only one aggravating factor. For example, the exhibited utter disregard for human life aggravator and knowingly created a great risk of death to many persons may be considered as only being a single aggravating factor.

During oral conference on the jury instructions, the district court informed Abdullah that his proposed instruction was contrary to Idaho law. After further discussion, the district court determined the double-counting instruction would provide: "In determining whether a certain aggravating circumstance exists, you may consider the same evidence you considered to support a different aggravator so long as you find additional aggravating evidence to support a finding of that particular aggravator beyond a reasonable doubt." This rule against double-counting or double-weighing has been consistently upheld by this Court "because we presume that the legislature did not intend to duplicate aggravating circumstances." *Dunlap*, 155 Idaho at 365, 313 P.3d at 21.

Abdullah contends that the district court's instruction in this case was confusing and unclear as to the evidence the jurors could rely on to find multiple aggravating circumstances. We disagree. The district court's instruction properly instructed the jury against double-counting. In fact, the district court modeled its instruction after *State v. Wood*, 132 Idaho 88, 967 P.2d 702 (1998), which stated: "In determining whether a certain aggravating circumstance exists, the sentencing judge may consider the same evidence he considered in relation to a different

aggravator so long as he finds *additional* aggravating evidence to support a finding of that particular aggravator beyond a reasonable doubt." *Id.* at 104, 967 P.2d at 718. We hold that this instruction adequately informs the jury of the applicable law, and therefore Abdullah has failed to establish any error with respect to the double-counting instruction.

Assuming the district court's instruction was in error, any error was harmless. In *Dunlap*, the jury found the existence of three aggravating circumstances, but the jury did not receive a double-counting instruction. 155 Idaho at 365, 313 P.3d at 21. The Court held that "the trial court erred by failing to instruct the jurors that they were required to find independent evidence existed for each aggravator." *Id.* Even so, the Court held that any error was harmless. The Court explained:

> We accept Dunlap's implicit premise that the jury may have relied upon the entirety of the evidence in aggravation as supporting each of the three aggravating circumstances they found to be true. However, we do not accept his explicit premise that we don't know which specific aggravator can be supported by the evidence. To the contrary, the entirety of the evidence in aggravation would support the finding of any of the three aggravating circumstances, as the jury's verdict reflects. Although as a matter of law, the jury could not consider all of the evidence in aggravation as supporting each of the aggravators, this simply means that the verdict cannot stand as to all three aggravators, not that all three aggravators are unsupported by the evidence. Because each of the three aggravators was supported by the entirety of the evidence, at least one remains unaffected by the failure to give the required instruction.

*Id.* Similar to *Dunlap*, at least one of the two aggravating circumstances found by the jury in this case remains unaffected by an erroneous instruction on double-counting. The utter disregard aggravator, standing alone, remains valid and justifies the death sentence, even if the jury found that the same evidence supported it and the great risk aggravator. Therefore, any improper jury instruction on double-counting was harmless error.

f.      Jury Instruction 50, 53, & 58: Duty to Consult & Unanimous Verdict

Finally, Abdullah argues that the district court's instructions did not make clear to the jury it did not have to reach a unanimous verdict in deciding whether all the mitigating evidence made the imposition of the death penalty unjust.

Abdullah takes issue with three jury instructions. First, Jury Instruction 50 provided:

> As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a just verdict. Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to re-examine your own views

and change your opinion if you become convinced that it is wrong. However, you should not change your honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

This instruction was almost identical to Abdullah's proposed instruction.[32] Second, Jury Instruction 53 provided, in relevant part,

> If the State has failed to prove the existence of a statutory aggravating circumstance, you need not deliberate further. Merely notify the bailiff that you are done. The judge must then sentence the defendant.
> If you unanimously find that the State has proven the existence of a statutory aggravating factor, then you must so indicate on the verdict form. You must also then consider whether any mitigating circumstances exist that make the imposition of the death penalty unjust.
> If you find that all the mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust, or you cannot unanimously agree on that issue, then the judge must sentence the Defendant.
> If you find that all mitigating circumstances do not make the imposition of the death penalty unjust, then the defendant will be sentenced to death.
> You must each decide for yourself whether all mitigating circumstances presented, when weighed against each statutory aggravating circumstance proven by the State, are sufficiently compelling to make the imposition of the death penalty unjust. Any finding by you that the mitigating circumstances do or do not make the imposition of the death penalty unjust must be unanimous, but you do not have to unanimously agree upon what mitigating circumstances exist. The existence of mitigating circumstances need not be proven beyond a reasonable doubt. You must each decide for yourself whether mitigating circumstances exist and, if so, then consider them in your individual weighing process.
> Once you have reached a unanimous decision on whether or not all mitigating circumstances, when weighed against each aggravating circumstance, make the imposition of the death penalty unjust, or have concluded that you are unable to reach a unanimous decision on that issue, so indicate on the verdict form and notify the bailiff that you are done.

Like Jury Instruction 50, this instruction was almost identical to Abdullah's proposed instruction.[33] Third, Jury Instruction 58 provided, in relevant part:

---

[32] The only difference between this instruction and Abdullah's proposed instruction is that Abdullah's proposed instruction included "a just and unanimous verdict," rather than "a just verdict" in the first sentence. Abdullah agreed during oral conference on the jury instructions that "it is misleading" to include "unanimous" in this instruction.

[33] Abdullah's proposed instruction had three differences. First, the very first reference to aggravating circumstances stated "*any* statutory aggravating circumstance," rather than "*a* statutory aggravating circumstance." Second, he requested specific language on his possible sentencing options rather than "the judge must sentence the defendant." Third, he requested that the district court include as the last sentence of Jury Instruction 53: "However, regardless of your findings with respect to aggravating and mitigating circumstances, you are never *required* to recommend a sentence of death."

As jurors you have a duty to consult with one another and to deliberate before making your individual decisions. . . .

During your deliberations, you each have a right to re-examine your own views and change your opinion. You should only do so if you are convinced by fair and honest discussion that your original opinion was incorrect based upon the evidence the jury saw and heard during the trial and the law as given you in these instructions.

Consult with one another. Consider each other's views, and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself; but you should do so only after a discussion and consideration of the case with your fellow jurors.

However, none of you should surrender your honest opinion as to the weight or effect of the evidence because a majority of the jury feels otherwise or for the purpose of returning a verdict.

This instruction was almost identical to Idaho Criminal Jury Instruction 204, "Concluding Remarks (How to Deliberate)." The record indicates that the district court proposed this instruction, but Abdullah informed the district court that he had no objection to it.

Abdullah argues that these instructions, taken together, erroneously informed the jurors to be unanimous in deciding whether the mitigating evidence made the death penalty unjust. He relies on *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), in which the United States Supreme Court "held invalid capital sentencing schemes that require juries to disregard mitigating factors not found unanimously." *Beard v. Banks*, 542 U.S. 406, 408 (2004).

We reject Abdullah's challenge to these jury instructions for two reasons. First, any error was invited. Abdullah's argument is premised on Jury Instruction 53, as this instruction specifically informed the jury on how to deliberate on the aggravating and mitigating circumstances. This instruction was proposed by Abdullah, and the district court adopted Abdullah's instruction in all respects related to this assignment of error. Similarly, the district court adopted Abdullah's proposed instruction for Jury Instruction 50 almost verbatim, excluding just two words. Due to Abdullah's proposal of the instructions he now challenges on appeal, he cannot allege any error as to those instructions. *See Draper*, 151 Idaho at 589, 261 P.3d at 866.

Second, even assuming the invited error doctrine does not apply, there was no error in the district court's jury instructions. Abdullah has selected piecemeal phrases of the jury instructions to support his argument. Taken as a whole, however, the instructions clearly inform the jurors that they do not have to unanimously agree on the mitigating evidence and their decision does

101

not have to be unanimous. The instructions also informed the jurors that they must make an individual decision. For example, Jury Instruction 53 instructed the jury to "decide for yourself" whether the mitigating circumstances were sufficiently compelling and to "decide for yourself" whether the mitigating circumstances exist in an individual weighing process. Similarly, Jury Instruction 58 instructed the jury to "consider each other's views, and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment." Moreover, Jury Instruction 55, the verdict form, provided the following option for each aggravator found by the jury: "we are unable to unanimously decide whether or not all mitigating circumstances are sufficiently compelling that the death penalty would be unjust." Additionally, the jury was explicitly informed: "you do not have to unanimously agree upon what mitigating circumstances exist," thus satisfying the rule from *Mills* and *McKoy*. There was no error in these instructions.

## 22. The district court did not limit Abdullah's right of allocution in violation of his right to due process.

Abdullah argues that the district court erred by imposing unreasonable restrictions on the scope of his allocution during the penalty phase in violation of his due process rights, which resulted in a complete denial of his right to allocute.

### a. Facts

The issue of allocution was first raised after the defense rested its mitigation case. While discussing the penalty phase jury instructions, the district court provided its position on allocution for the record. The district court stated that Idaho law established a right to allocute with judge sentencing, but it was not clear whether that right remained with the change to jury sentencing. The district court explained that it would "like to err on the side of protecting the defendant's rights."

The following day the district court took up the issue of allocution. Abdullah told the district court he intended to allocute, and the State opposed any allocution. The district court then reviewed the scope of allocution with Abdullah's counsel. Based on Abdullah's counsel's representations, the district court was concerned that Abdullah would attempt under the guise of allocution to testify without being subject to cross-examination. The district court took a brief recess to allow Abdullah's counsel to discuss the parameters of allocution with him. Following a recess, the district court explained that Abdullah had a right to allocute and to address the jury as a form of mitigation, but the right was limited. Specifically, the district court informed Abdullah

102

that he could not "use allocution as a way to circumvent the traditional rules of evidence and make unsworn statements to the sentencing jury as to matters of fact going to guilt without being subject to cross-examination." The district court also warned Abdullah that any statement could be used against him in further proceedings. In addition, the district court explained that the jury was instructed not to consider unsworn statements. According to the district court, the purpose of allocution was not "to allow him to -- in essence to testify as to factual matters." Abdullah's counsel informed the district court that Abdullah wanted

> to talk about how much his family means to him, his love and respect for his family the -- I guess some overseas trips, explain some overseas trips that he made, the support his family received from other members of the family, his thoughts and feelings throughout this process, and relationships. Not challenging any factual statements made by Mr. Bankhead,[34] but the nature of his relationship with him.

Based on this information, the district court informed the parties that if Abdullah began to discuss factual matters, such as his relationship with Bankhead and the overseas trips, the State could object and the district court would rule accordingly. Abdullah's counsel also indicated that Abdullah wanted to testify, and the district court said it would allow the defense to reopen the mitigation phase to allow Abdullah to testify. The district court warned that it would not allow Abdullah to revisit the guilt phase.

After another recess, Abdullah informed the district court that he wished to testify. Abdullah also told the district court, "I never wanted to give up my right for the guilt phase to testify." The district court explained to Abdullah that he could not reopen the guilt phase, but he could testify regarding Bankhead in the mitigation phase. The district court also explained that Abdullah would be subject to cross-examination. Abdullah was informed by the district court that he could allocute as well, but "allocution is not a substitute for testimony." The district court stated, "It has to be really going to asking the jury to mitigate against the death penalty." The

---

[34] Steven Bankhead testified during the penalty phase. In the end of 1999 and the beginning of 2000, Bankhead met Abdullah in prison while Abdullah was a volunteer for Islamic study. Bankhead was subsequently released from prison in August of 2000, and Abdullah and Bankhead continued to have a close relationship. In November of 2000, while Bankhead was out of prison, Abdullah asked him to kill Angie. Bankhead was to knock Angie unconscious with poison provided by Abdullah, rape her, and then slit her throat with a knife, also provided by Abdullah. Abdullah paid Bankhead $1,000 to kill Angie. Bankhead did not go through with Abdullah's plan and left town instead. A number of months later, Bankhead returned to prison.

district court also stated, "The right to allocute, it is true that -- that there are very few restrictions, but you don't get to go and make factual statements in that allocation."[35]

Following yet another recess, the district court had another colloquy with Abdullah wherein the district court found Abdullah waived his right to testify in the mitigation phase.

After the State presented victim impact evidence, the district court confirmed that Abdullah intended to allocute. The district court told Abdullah:

> You understand, again, that you have the right -- that anything you say in that discussion can be used against you in other proceedings and you also understand that you also -- that it is your decision to allocute and that you really have to -- this allocution should be confined to those matters which have to do with the mitigation of punishment. All right. At this point I'm not allowing any -- what is in effect testimony.

Abdullah stated that he understood. After a recess, the district court told Abdullah it would require his allocution statement to be made in writing for the district court and the parties to review to ensure that he does not "effectively attempt to circumvent the rules of evidence by talking about the guilt phase." The district court also "wanted to make clear that I'm not going to allow statements of fact to be made in the form of allocution."

The district court received Abdullah's written allocution statement and reviewed it with the parties and Abdullah. The district court told Abdullah that it would not allow Abdullah to discuss (1) Angie's wishes for her family ("For her family to accept her as she was and what she was accepted as Muslim"); (2) "things I wish could happen at trial, not blaming anyone"; and (3) any "attack" on Bankhead's testimony. The district court again warned Abdullah not to stray into those areas. Abdullah's counsel requested a short recess to make sure Abdullah understood the district court's parameters.

After the recess, the district court was informed by Abdullah's counsel that he "has changed his mind on allocation." The following colloquy took place:

> THE COURT: Mr. Abdullah, I have indicated to you -- we spent a lot time [sic] on this. You do have the right to allocution and address the jury and that your attorney can't make that decision for you. Now you are indicating that you don't want to allocute; it that correct?

---

[35] Abdullah states in his brief that the district court stated that it would allow the defense to reopen the mitigation phase so Abdullah could testify, but this occurred outside Abdullah's presence. Abdullah contends that the record does not show that the offer to reopen the mitigation phase was made to Abdullah or in his presence. However, the record shows otherwise. This allegation that Abdullah did not know he could reopen the mitigation phase is completely baseless—the record shows that Abdullah was present and discussed with the district court that he could reopen the mitigation phase if he wished to testify.

THE DEFENDANT: Yes.

THE COURT: And you understand that you have the right to do that, but, in effect, what you are doing is waiving the right to allocute to the jury; is that correct?

THE DEFENDANT: Yes, Your Honor, but my reasons start why I'm changing my mind.

THE COURT: Well, I don't know what your reasons are at this time.

THE DEFENDANT: The fact that the trial, you know, I'm not allowed to say anything about the trial or my thinking or feelings and everything else has been mentioned already.

THE COURT: The only thing the Court has prevented you from talking about is your wife's wishes toward her family, which is simply not proper mitigation at all. Furthermore, what happened in the trial could be the subject of an appeal, but is not relevant and not something that the jury has any business making a decision about. So it is not relevant to mitigation. That's the reason the Court has excluded those two items. They have nothing to do with the decision of punishment.

THE DEFENDANT: The fight about Mr. Bankhead, I'm not arguing with you or anything, but I just want to let you know I have been there three years teaching and I never met him one time in prison. So I'm not allowed to mention him.

THE COURT: If you want to testify about that, you can testify, but you chose not to testify after extensive, excruciating discussion with the Court. I'm not going to let you make statements of fact that are not subject to cross-examination. All right. And as far as I know, you have not indicated to me anything about -- all I have told you with respect to Mr. Bankhead to the extent that you try to introduce facts, I'm not allowing you to do that. But if you want to talk about your teaching, because that clearly is mitigation, the fact that you have taught other people about your religion and --

THE DEFENDANT: He never attended any of my classes, your Honor, so I don't know --

THE COURT: Well, I know, but you didn't -- you didn't want to testify about that fact and be subject to cross-examination.

THE DEFENDANT: That's true.

THE COURT: That's true, right?

THE DEFENDANT: Yes.

THE COURT: Okay. And so that was a decision that you made. So I'm not going to allow you to get up and introduce facts that are not subject to cross-examination. That's not what allocution is about. Allocution is about mitigating factors for them to consider, but to the extent that you are introducing facts, they must be made as testimony. Just like every other witness, every other witness has to testify under oath. And that's why the Court told you if you want to testify, and I gave you the opportunity several times this morning to do that so you could

testify and you chose not to after a great deal of discussion. So to this extent if you are still of the opinion you do not want to allocute, I want to know right now; is that true?

THE DEFENDANT: Yes.

THE COURT: That is your decision and not your attorneys' decision?

THE DEFENDANT: Yes.

The district court did not discuss allocution further. Shortly thereafter, the district court gave the jury their instructions and the parties gave closing arguments.

After the jury returned its verdict recommending a sentence of death, but before the district court issued its judgments, the district court issued a written memorandum to reflect its reasoning on the scope of allocution.

b.    Standard of Review

The issue raised by Abdullah on appeal is specific: whether the district court unconstitutionally limited the scope of Abdullah's allocution, which caused him to waive his right to allocute. There is nothing in the record, however, affirmatively showing Abdullah or his counsel opposed the district court's limitations on the scope of allocution. Although the district court engaged in multiple discussions with parties and Abdullah, Abdullah did not submit any legal argument or briefing on the proper scope of allocation to comport with constitutional standards. In addition, Abdullah ultimately decided to waive his right to allocute,[36] and his counsel voiced no objection on the record at that time. Nor did his counsel raise any objection to the district court's scope of allocation at any time. Based on the above reasons, we review this issue for fundamental error.

c.    Analysis

Under the first prong of the fundamental error standard, the defendant must establish that an unwaived constitutional right was violated. *State v. Parton*, 154 Idaho 558, 565, 300 P.3d 1046, 1053 (2013). Pursuant to this fundamental error approach, it is not necessary to discuss the parameters or scope of the right of allocution. Rather, the resolution of this issue depends solely on whether a constitutional right to allocution in fact exists. We hold that there is no constitutional right of allocution. It follows that any limitation by the district court on the scope of Abdullah's allocution did not violate any constitutional right, regardless of whether the district court improperly defined the parameters of Abdullah's allocution.

---

[36] Abdullah makes no argument on appeal that his waiver was not knowing, voluntary, and intelligent.

Black's Law Dictionary defines allocution as:

1. A trial judge's formal address to a convicted defendant, asking whether the defendant wishes to make a statement or to present information in mitigation of the sentence to be imposed . . . 2. An unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in effort to lessen the impending sentence. This statement is not subject to cross-examination . . . .

BLACK'S LAW DICTIONARY 91 (10th ed. 2014). The Delaware Supreme Court has observed the history and modern practice of allocution:

Allocution is a historic common-law right of a defendant in a capital case. At common law, allocution consisted of the court's asking the defendant if he [had] anything to offer why judgment [of death] should not be awarded against him. Allocution provided the accused with the only opportunity to present one of four strictly defined reasons why he should not be executed: (1) he was not the person convicted; (2) he had the benefit of clergy or pardon; (3) he was insane; or (4) if a woman, she was pregnant.

At common law, allocution was essential because the accused was neither permitted to have counsel at trial nor to testify on his or her own behalf. Furthermore, the judge possessed little sentencing discretion because the mandatory punishment for almost all felonies was death. Thus, the defendant's response to the tribunal's invitation to speak had little to do with pleading for leniency but was the defendant's only opportunity to present one of the specific legal defenses which might arrest the proceedings.

. . . .

With the development of modern criminal procedure, such as the right to counsel and the accused's right to testify, the need for common law allocution diminished. Today, it is argued, any defense, including those recognized at common law, can be properly brought up by counsel during the trial. As the trial courts have been granted greater discretion in sentencing, allocution has evolved into a mechanism in which a defendant in a criminal case may express remorse for his crime and plead for leniency.

*Shelton v. State*, 744 A.2d 465, 491–92 (Del. 2000) (alterations in original) (footnotes omitted) (internal quotation marks omitted).

"[T]he opportunity to personally address the sentencer retains both symbolic and practical significance. It may increase for some defendants the perceived equity of the process." 6 WAYNE R. LAFAVE ET AL, CRIMINAL PROCEDURE § 26.4(g) (3d ed. 2013). The New Jersey Supreme Court recognized another purpose of allocution:

Under our system of capital punishment, a jury of men and women forms the essential link between society and the defendant before the court. Each capital

107

jury expresses the collective voice of society in making the individualized determination that a defendant shall live or die. Whatever the Constitution permits, it bespeaks our common humanity that a defendant not be sentenced to death by a jury "which never heard the sound of his voice." *McGautha v. California*, 402 U.S. 183, 220 (1971). . . . It is difficult to sympathize with defendants who have caused so much suffering, but we need not discard our common humanity in the process of decision.

*State v. Zola*, 548 A.2d 1022, 1045–46 (N.J. 1988). Thus, allocution serves two purposes: "it reflects our commonly-held belief that our civilization should afford every defendant an opportunity to ask for mercy" and "it permits a defendant to impress a jury with his or her feelings of remorse." *Shelton*, 744 A.2d at 492 (quoting *State v. DiFrisco*, 645 A.2d 734, 757 (N.J. 1994)).

Idaho Criminal Rule 33 and Idaho Code section 19-2510 establish a procedural, statutory right of allocution. Idaho Criminal Rule 33(a)(1) provides in relevant part: "Before imposing sentence the court . . . shall address the defendant personally to ask if the defendant wishes to make a statement and to present any information in mitigation of punishment." I.C.R. 33(a)(1). Idaho Code section 19-2510 states:

> When the defendant appears for judgment he must be informed by the court, or by the clerk, under its direction, of the nature of the indictment and of his plea, and the verdict if any thereon, and *must be asked whether he has any legal cause to show why judgment should not be pronounced against him.*

I.C. § 19-2510 (emphasis added). These two provisions provide the foundation for the right to allocute in Idaho. The Idaho Criminal Jury Instructions (I.C.J.I.) also recognize a right of allocution. Drafted specifically for capital cases, I.C.J.I. 1709 states:

> The Defendant has the right to personally address you. This is called the "right of allocution." Allocution is not made under oath and is not subject to cross-examination. The law provides that these statements are something that the defendant is allowed to present to you as mitigation. You may consider these statements in your deliberations.

I.C.J.I. 1709 (The Defendant's Right to Allocution, Death Penalty Sentencing Instruction).

The constitutional ties, if any, to the right of allocution have not been explored by this Court. A dissenting opinion by Justice Bistline provides some guidance, however. Justice Bistline referred to allocution as a "basic right," but also stated that the right was granted to the defendant "by statute." *State v. Coutts*, 101 Idaho 110, 114, 609 P.2d 642, 646 (1980) (Bistline, J., dissenting). Justice Bistline made no mention of any constitutional underpinnings to the right. He noted that this right was "established as a part of the Idaho law in the Criminal Practice Act

of 1864." *Id.* The defendant's right of allocution was described as "his right to be asked whether any reason exists why judgment should not be pronounced against him, and to explain mitigating factors to the court." *Id.* Justice Bistline recognized that "it has been suggested that giving the defendant this final opportunity to speak before sentencing is pronounced may have a therapeutic effect rather than helping the trial court exercise a reasoned discretion." *Id.* at 117, 609 P.2d at 649 (citation omitted).

The Court briefly discussed the right of allocution in *State v. Goodrich*, 97 Idaho 472, 546 P.2d 1180 (1976). In *Goodrich*, this Court outlined the proper procedure in the trial court for the defendant to exercise his right to allocute:

> To avoid problems with regard to the right of a defendant under I.C.R. 32(a),[37] a trial judge before sentencing must directly address the defendant, and offer him personally a clear opportunity to make a statement in his own behalf, and to present any information in mitigation of punishment. Affording only the defendant's counsel the right to speak on the accused's behalf does not constitute compliance with this rule.

*Id.* at 480, 546 P.2d at 1188. Again, the Court did not discuss any constitutional basis for allocution.

The Idaho Court of Appeals has explored the right of allocution in some detail. Most recently, the Court of Appeals held that the due process clause does not require that the defendant be afforded the right of allocution. *State v. Hansen*, 154 Idaho 882, 888, 303 P.3d 241, 247 (Ct. App. 2013), *review denied*. The Court of Appeals reasoned:

> Although Idaho appellate courts have stressed the importance of the right of allocution, we have never explicitly held that due process, required under Article I, Section 13, of the Idaho Constitution, requires that a defendant be afforded the right to allocution. Rather, in our jurisprudence, we have depended on [I.C.R.] 33(a), prior precedent, and the role of allocution in the history of Idaho's criminal justice system. We have referenced a criminal defendant's due process rights in regards to sentencing and, within that context, examined other jurisprudence that recognizes that the right of allocution is vital to a defendant's defense. Even where we reference constitutional due process rights of a criminal defendant, we have only gone so far as to acknowledge there is case law that accepts allocution as a constitutional right guaranteed by due process when a defendant *requests* to make a statement and the district court *affirmatively denies* the request.

*Id.* (citations omitted). Based on this reasoning, the Court of Appeals determined that a defendant was unable to meet the first prong of the fundamental error standard based on a claim that the

---

[37] I.C.R. 33(a)(1) was codified at I.C.R. 32(a) at the time of *Goodrich*.

trial court's failure to invite the defendant to make a statement of allocution violated his due process rights. *Id.* at 885, 888, 303 P.3d at 244, 247.

Turning to other jurisdictions, "[m]odern treatment of the right to allocution has varied significantly. In fact, we are surprised by the lack of uniformity among the federal courts and the state jurisdictions that provide a right to allocution." *Shelton*, 744 A.2d at 492.

> On the one hand, several jurisdictions hold that the common-law right of allocution encompasses the right of the defendant to make unsworn statements to the jury that are not subject to cross-examination. Moreover, some states have determined that allocution is a right protected by their state constitutions. . . . A minority of jurisdictions adheres strictly to the common-law right of allocution, in that the court will ask the accused only whether any legal cause exists to show why judgment should not be pronounced against him or her. . . .
>
> On the other hand, several jurisdictions have held that there is no common-law right to allocution. Moreover, the majority of federal courts and state jurisdictions hold that the United States Constitution does not protect the right to allocution.
>
> The federal courts of appeals are split on whether the right of allocution expressly provided by . . . the Federal Rules of Criminal Procedure is a right guaranteed by the Due Process Clause of the Fourteenth Amendment.

*Id.* at 492–494 (footnotes omitted) (citations omitted). In addition, some courts have abolished the right of allocution in capital cases: "[M]ost of the state and federal courts presented with allocution statute language referring to the court and a separate death penalty sentencing provision that is silent on allocution have concluded that a defendant has no statutory right to allocution in front of the death penalty jury." *State v. Stallings*, 163 P.3d 1232, 1237 (Kan. 2007) (citing cases). In contrast, "[s]ome jurisdictions have allowed a defendant to make a statement to the jury, despite the absence of statutory authority," in capital cases. *Id.* at 1238 (citing cases).

Despite this varied treatment, most courts hold that there is no state or federal constitutional right of allocution. Every federal circuit court of appeals, except the Ninth Circuit Court of Appeals, "has held that allocution is not a constitutional right." *State v. Roberts*, 998 N.E.2d 1100, 1121 (Ohio 2013) (citing federal circuit court of appeals cases); *see United States v. Carper*, 24 F.3d 1157, 1159 (9th Cir. 1994) (recognizing case law holding that the due process clause guarantees a right of allocution, but a violation of the right limited to circumstance in which the trial court denies the defendant's affirmative request to speak before sentencing). The majority of state courts agree, holding that there is no constitutional right of allocution. *State v. Colon*, 864 A.2d 666, 794–95, 799 (Conn. 2004) (citing cases and holding accordingly); *Shelton*, 744 A.2d at 493 & n.124 (citing cases); *see* 3 Joseph G. Cook, Constitutional Rights of the

ACCUSED 3d § 21:9 & n.36 (3d ed. 2014) (right of allocution is not a constitutional right); 3 ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE CRIMINAL § 530 & n.33 (4th ed. 2014) (allocution is not a right protected by constitution); 24 C.J.S. *Criminal Law* § 2048 & nn.6–8 (2014) (no separate constitutional right of allocution); *see also State v. Young* 853 P.2d 327, 360 & n.177 (Utah 1993) (citing cases that hold allocution is a statutory right); 6 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 26.4(g) & nn.133–34 (2013) (right to allocution recognized in most jurisdictions by court rule or statute).

In addition, the United States Supreme Court has not recognized a constitutional right of allocution. In *Hill v. United States*, 368 U.S. 424, 425–26, 428 (1962), the United States Supreme Court rejected a petitioner's claim that his constitutional rights were violated by the trial court's failure to comply with the requirements of the federal rule of criminal procedure governing allocution. The United States Supreme Court held:

> The failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus. It is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure.

*Id.* at 428. Although the United States Supreme Court rejected this claim based on the trial court's failure to inquire into the defendant's allocution, the United States Supreme Court expressly reserved for consideration whether a trial court's denial of a petitioner's affirmative request for an opportunity to speak would raise constitutional issues. *Id.* at 429. Subsequently, in *McGautha v. California*, 402 U.S. 183 (1971), the United States Supreme Court recognized that it "has not directly determined whether or to what extent the concept of due process of law requires that a criminal defendant wishing to present evidence or argument presumably relevant to the issues involved in sentencing should be permitted to do so." *Id.* at 218. The United States Supreme Court again expressly reserved for consideration whether "silencing a defendant who wished to speak would rise to that level" of "constitutional dimensions." *Id.* at 218 n.22. The United States Supreme Court still has not addressed the issue.

We agree with the majority rule. We hold that allocution is purely a statutory, procedural right guaranteed by Idaho Criminal Rule 33 and Idaho Code section 19-2510. In other words, the right of allocution is not guaranteed by the due process clauses of the Idaho and United States

Constitutions. The right of allocution derives from the common law and is preserved by statute only.

Abdullah has failed to meet the first prong of the *Perry* analysis based on a claim that his due process rights were violated by the district court's limitations on the scope of his allocution. Further, we conclude that Abdullah's argument fails on the third prong of *Perry* as well. There is not a reasonable possibility any error in the scope of allocution affected the outcome of the proceeding. *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). Based on the evidence presented at trial, it is not reasonably possible that Abdullah's allocution would affect the jury's unanimous finding that all mitigating circumstances when weighed against the utter disregard aggravating factor were not sufficiently compelling to make the death penalty unjust. Therefore, this Court rejects this assignment of error.

**23.  The alleged errors in the aggregate did not result in cumulative error during the penalty phase.**

Abdullah submits that the accumulation of errors deprived him of his constitutional rights to due process and a fair trial before an impartial jury. "When there is an 'accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial,' the cumulative error doctrine requires a reversal of the conviction as the trial has contravened the defendant's right to due process." *State v. Payne*, 146 Idaho 548, 568, 199 P.3d 123, 143 (2008) (quoting *State v. Field*, 144 Idaho 559, 572–73, 165 P.3d 273, 286–87 (2007)). "[A] necessary predicate to the application of the doctrine is a finding of more than one error." *Perry*, 150 Idaho at 230, 245 P.3d at 982. In this case, Abdullah "has failed to demonstrate at least two errors, a necessary predicate to the application of our cumulative error doctrine." *Id.* at 231, 245 P.3d at 983. There was no cumulative error.

**C.  Post-Conviction Phase Issues**

**24.  The district court applied the correct standard for Abdullah's ineffective assistance of counsel claims.**

Abdullah argues that the district court erred by applying a preponderance of the evidence standard to his claims of ineffective assistance of counsel and by failing to consider ABA guidelines for effective assistance of counsel in capital cases.

a.    Facts

Abdullah's petition raised numerous claims of ineffective assistance of counsel by both the Ada County Public Defender and the Toryanskis. In its memorandum decision denying post-

conviction relief, the district court stated that Abdullah needed to "prove by a preponderance of the evidence a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." This statement forms the basis of Abdullah's claim of error.

      b.      <u>Standard of Review</u>

Under the second prong of *Strickland*, the defendant must show a reasonable probability that the outcome of trial would be different but for counsel's deficient performance. *State v. Row*, 131 Idaho 303, 312, 955 P.2d 1082, 1091 (1998). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

      c.      <u>Analysis</u>

In *Strickland*, the United States Supreme Court rejected a preponderance of the evidence standard for demonstrating prejudice when asserting an ineffective assistance of counsel claim. 466 U.S. at 693 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."). The United States Supreme Court explained, "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694.

The United States Supreme Court rejected an assignment of error similar to Abdullah's in *Holland v. Jackson*, 542 U.S. 649 (2004) (per curiam). In *Jackson*, the defendant sought post-conviction relief due to ineffective assistance of counsel. *Id.* at 650. In denying relief, the state court cited to the correct *Strickland* standard, but also stated that in post-conviction proceedings the defendant carries the burden of proving allegations by a preponderance of the evidence. *Id.* at 654. The state court also noted the defendant "failed to carry his burden of proving that the outcome of the trial would probably have been different but for those errors." *Id.* at 654–55 (citation omitted). The United States Supreme Court held that, given the context of these statements, the reference to a "preponderance of the evidence" was generally referring to the state's post-conviction standards and did not demonstrate that the state court applied that standard to the ineffective assistance of counsel claims. *Id.* at 654–55. The United States Supreme Court further explained that "the unadorned word 'probably' is permissible shorthand

113

when the complete *Strickland* standard is elsewhere recited." *Id.* at 655 (citing *Woodford v. Visciotti*, 537 U.S. 19, 23–24 (2002) (per curiam)).

Thus, in the post-conviction phase, the context in which a district court articulates the *Strickland* standard is central to the determination of an error in the standard itself. In this case, the context of the statement in the district court's memorandum decision demonstrates that the district court applied the correct standard. Idaho Criminal Rule 57 provides that a petitioner must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based. I.C.R. 57(c). In its memorandum decision, the district court correctly applied this burden, stating that Abdullah must "prove by a preponderance of the evidence 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Immediately following this statement, the district court properly defined "reasonable probability": "a probability sufficient to undermine confidence in the outcome." Additionally, in the initial paragraph addressing Abdullah's ineffective assistance of counsel claims, the district court stated that to demonstrate prejudice Abdullah must show "there is a reasonable probability that, but for counsel's errors, the result would have been different." The district court reiterated this standard again on the following page. Finally, the district court used the reasonable probability language, absent the preponderance standard, in other instances in its decision. Upon our review of the context of the "preponderance of the evidence" statement, it is clear the district court did not improperly apply the prejudice standard addressed in *Strickland*.

We observe that Abdullah overstates the effect of the district court's "preponderance of the evidence" statement. This statement "does not require that [Abdullah] establish by a preponderance of the evidence that the result would be different, but rather, that [Abdullah] establish by a preponderance of the evidence that there is a reasonable probability that the result would have been different." *Jeremiah v. State*, 73 S.W.3d 857, 858–59 (Mo. Ct. App.), *cert. denied*, 537 U.S. 863 (2002). This is consistent with *Strickland* in the context of a post-conviction proceeding. *Id.* The district court properly applied *Strickland* to evaluate the prejudice prong of Abdullah's ineffective assistance of counsel claims.

Next, the district court accorded appropriate weight to the ABA guidelines. In *Strickland*, the United States Supreme Court stressed that the standard for deficient performance is one of reasonableness and that "[m]ore specific guidelines are not appropriate." 466 U.S. at 688. Likewise, in *Bobby v. Van Hook*, the United States Supreme Court again stated that the ABA

114

guidelines "can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688). In addressing the standard for deficient performance, the United States Supreme Court explained:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland*, 466 U.S. at 688–89.

Here, the district court's memorandum decision demonstrates that its focus was on the prevailing professional norms at the time of trial. Although the district court did not expressly state that it considered the ABA Guidelines, it did not state that it was rejecting them either. In other contexts, this Court has previously declined to adopt ABA Guidelines. *State v. Porter*, 130 Idaho 772, 782, 948 P.2d 127, 137 (1997) (declining to adopt the ABA Guidelines requiring two attorneys be appointed to represent a defendant in a capital case). Given the district court's correct emphasis on the prevailing professional norms at the time of trial, the district court properly applied the correct standards to evaluate the deficiency prong of Abdullah's ineffective assistance of counsel claims.

## 25. The district court did not err by denying Abdullah's discovery requests for gasoline additive evidence.

Abdullah contends that the district court abused its discretion by denying his request to have gasoline samples sent to his post-conviction expert for testing and also by denying his request for the underlying data used by the state's expert.

### a. Facts

At trial, the State presented testimony from Dr. William Colucci, a senior research advisor for Ethyl Corporation. Dr. Colucci testified that gasoline found at the crime scene contained a performance additive, HiTEC 6423, which he also located in a gasoline sample taken from the 7-Eleven store in Salt Lake City where Abdullah purchased gas on October 4, 2002. Dr. Colucci also testified that other businesses produce additives and Ethyl Corporation produces additives other than HiTEC 6423. He indicated that Ethyl supplies around forty percent of the gasoline performance additives in the United States market. Dr. Colucci did not testify that

gasoline with the HiTEC 6423 additive could be purchased in Boise or the surrounding area. While Abdullah did not conduct independent tests to confirm or dispel Dr. Colucci's testing results, Abdullah explored the methodologies employed by Dr. Colucci during cross-examination at trial.

During post-conviction proceedings, Abdullah requested that gas samples from the scene and the Salt Lake City 7-Eleven be given to his expert, John Lentini, for testing to determine if HiTEC 6423 was present. Abdullah also sought the underlying data relied on by Dr. Colucci to reach the conclusions he testified to at trial. Abdullah contended that this evidence was necessary to support his claim that the Toryanskis were ineffective for failing to move to exclude Dr. Colucci's testimony or, in the alternative, for failing to adequately challenge his testimony.

After argument, the district court reserved ruling on the motion until completion of the Toryanskis' depositions. Abdullah subsequently limited his request to the data underlying Dr. Colucci's opinion. The district court indicated that it may not be willing to order the disclosure of such information if it were proprietary. The State agreed to contact Ethyl and check if the underlying data was proprietary information. The State subsequently submitted a response indicating the data was indeed proprietary. Abdullah then renewed his request for the data, and the district court denied this request. Finally, Abdullah filed a motion seeking clarification of the district court's ruling. The district court denied this motion, stating that Abdullah did not have an expert with the requisite knowledge or ability to find the performance additive and therefore any attempt to look for the marker was irrelevant without a qualified expert.

b.      Standard of Review

A district court has discretion to grant discovery in post-conviction proceedings. I.C.R. 57(b); *Hall v. State*, 151 Idaho 42, 45, 253 P.3d 716, 719 (2011). However, discovery is required when a petitioner demonstrates it is necessary to protect his substantial rights. *Hall*, 151 Idaho at 45, 253 P.3d at 719. The petitioner "must identify the specific subject matter where discovery is requested and why discovery as to those matters is necessary to his or her application." *Id.* (quoting *State v. LePage*, 138 Idaho 803, 810, 69 P.3d 1064, 1071 (Ct. App. 2003)). While reasonable discovery may be permitted, the district court should not allow the petitioner to engage in a "[f]ishing expedition." *Murphy v. State*, 143 Idaho 139, 148, 139 P.3d 741, 750 (Ct. App. 2006). "The UPCPA provides a forum for known grievances, not an opportunity to research for grievances." *Id*.

116

c.    Analysis

Initially, Abdullah contends that the district court abused its discretion by denying his request for gasoline samples to be sent to Lentini for testing. However, Abdullah expressly withdrew this portion of his request and sought only the data underlying the conclusions testified to by Dr. Colucci. We "will not review a trial court's alleged error on appeal unless the record discloses an adverse ruling which forms the basis for the assignment of error." *State v. Yakovac*, 145 Idaho 437, 442, 180 P.3d 476, 481 (2008) (quoting *Mallonee v. State*, 139 Idaho 615, 622–23, 84 P.3d 551, 558–59 (2004)). Although the district court, in an abundance of caution, provided a ruling on this issue, Abdullah withdrew his request for the gasoline samples to be sent to Lentini. Thus, the district court's ruling was not necessary and cannot form a basis for appeal.

Even if the district court's gratuitous ruling preserved the issue for appeal, the district court did not abuse its discretion by denying the motion. Abdullah has not alleged or demonstrated that the State's "testing was flawed or that there is new technology that would make current testing more reliable." *Raudebaugh v. State*, 135 Idaho 602, 605, 21 P.3d 924, 927 (2001) (rejecting the argument that where a district court finds deficient performance by trial counsel, discovery should be authorized to permit scientific testing without a showing of "any probability that the independent examination will yield exculpatory evidence"). Abdullah's request for the gasoline samples was speculative. Accordingly, the district court properly refused this request.

Next, Abdullah contends that the district court abused its discretion by failing to grant him access to the data underlying Dr. Colucci's opinion. Abdullah asserts that this information was necessary to assess whether Dr. Colucci's methods were reliable. The State responds that Abdullah's proposed expert Lentini did not have the requisite training and expertise in the subject area.

The record demonstrates that Lentini holds a Bachelor of Arts in Natural Sciences and has taken post-graduate courses in chemistry and criminal investigation. Lentini has extensive experience in fire cause and origin investigations. On the other hand, Dr. Colucci held a Bachelor of Science in biochemistry and a Ph.D. in organic chemistry and has two years of post-doctoral work in pharmaceuticals. Dr. Colucci's expertise, as it pertained to the trial, focused on fuel performance additives and markers. Abdullah has failed to present evidence that Lentini possessed expertise in this area. Abdullah also has failed to establish that Lentini could perform

the requisite tests to uncover the additive. Because the evidence indicates that Abdullah was generally exploring this area in the lower court with the hopes of developing a claim for post-conviction relief, the district court did not abuse its discretion by refusing to order discovery of the data underlying Dr. Colucci's expert opinion. *Murphy*, 143 Idaho at 148, 139 P.3d at 750 ("'Fishing expedition' discovery should not be allowed.").

Finally, Abdullah contends that the restrictions on discovery should be relaxed if the petitioner establishes a prima facie case or the district court orders an evidentiary hearing. He asserts that, in those circumstances, discovery is governed by Idaho Code section 19-4907(a).

Idaho Code section 19-4907(a) of the UPCPA provides, "All rules and statutes applicable in civil proceedings including pre-trial, discovery and appellate procedures are available to the parties." I.C. § 19-4907(a). However, Idaho Criminal Rule 57(b), which also governs post-conviction proceedings, provides, "[T]he provisions for discovery in the Idaho Rules of Civil Procedure *shall not apply* to the proceedings unless and only to the extent ordered by the trial court." I.C.R. 57(b) (emphasis added). "When a statute and rule 'can be reasonably interpreted so that there is no conflict between them, they should be so interpreted rather than interpreted in a way that results in a conflict.'" *State v. Johnson*, 145 Idaho 970, 974, 188 P.3d 912, 916 (2008) (quoting *State v. Currington*, 108 Idaho 539, 543, 700 P.2d 942, 946 (1985) (Bakes, J., dissenting)). "When there is a conflict between a statute and a criminal rule, this Court must determine whether the conflict is one of procedure or one of substance; if the conflict is procedural, the criminal rule will prevail." *Id.*

> Although a clear line of demarcation cannot always be delineated between what is substantive and what is procedural, the following general guidelines provide a useful framework for analysis. Substantive law prescribes norms for societal conduct and punishments for violations thereof. It thus *creates, defines, and regulates primary rights*. In contrast, practice and procedure pertain to the essentially mechanical operations of the courts by which substantive law, rights, and remedies are effectuated.

*State v. Beam*, 121 Idaho 862, 863–64, 828 P.2d 891, 892–93 (1992) (quoting *Currington*, 108 Idaho at 541, 700 P.2d at 944). Here, post-conviction discovery is a practice and procedure that pertains "to the essentially mechanical operations of the courts by which substantive law, rights, and remedies are effectuated." *Id.* (quoting *Currington*, 108 Idaho at 541, 700 P.2d at 944). Thus, the conflict between Idaho Code section 19-4907(a) and Idaho Criminal Rule 57(b) is procedural and Idaho Criminal Rule 57(b) governs. *See Johnson*, 145 Idaho at 974, 188 P.3d at 916; *Beam*,

121 Idaho at 863–64, 828 P.2d at 892–93. Contrary to Abdullah's argument, the discovery restrictions in post-conviction proceedings do not become relaxed upon an evidentiary hearing or establishment of a prima facie case.

The district court correctly perceived the discovery request as a discretionary issue, acted within the outer boundaries of that discretion and consistently with the applicable legal standards, and reached its decision by an exercise of reason. Therefore, the district court did not err by denying Abdullah's requests for gasoline additive evidence.

**26.    The district court did not err by destroying certain jury questionnaires.**

Abdullah argues that the district court's failure to preserve the Toryanskis' copies of the jury questionnaires deprived him of due process, a meaningful right to appeal, and his statutory right to seek post-conviction relief.

a.    Facts

Prior to jury selection, the district court advised the parties and the veniremen that all copies of the completed jury questionnaires would be returned to the district court. The district court also explained that one copy would be retained for court records and all other copies would be destroyed. Abdullah did not object to this process, and the additional questionnaires were so destroyed. In her deposition, Kim Toryanski confirmed that she wrote notes on the questionnaire copies to aid in jury selection, including her impressions about potential jurors.

b.    Standard of Review

"In criminal appeals in which the death penalty was imposed, all documents in the trial court file of every nature, kind and description, except that the presentence investigation report shall be forwarded as an exhibit to the record." I.A.R. 28(b)(2)(O). "In criminal appeals in which the death penalty was imposed the standard transcript shall include all hearings and proceedings held in the trial court of every nature and description." I.A.R. 25(e). For indigent defendants, the State "is only required to provide . . . a record on appeal that is sufficient for adequate appellate review of the errors alleged regarding the proceedings below." *State v. Strand*, 137 Idaho 457, 462, 50 P.3d 472, 477 (2002). The State's failure to provide a sufficient record for adequate appellate review may amount to a denial of equal protection and due process. *Griffin v. Illinois*, 351 U.S. 12, 16–19 (1956). This Court exercises free review over constitutional questions and the interpretation of statutes. *State v. Glenn*, 156 Idaho 22, 24, 319 P.3d 1191, 1193 (2014); *State v. Rogers*, 144 Idaho 738, 740, 170 P.3d 881, 883 (2007).

c.    Analysis

Due to Abdullah's failure to object to the destruction of the questionnaires, the fundamental error standard requires that he demonstrate the alleged error violated an unwaived constitutional right. *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). Accordingly, the initial inquiry is whether Abdullah's right to due process under the Fourteenth Amendment[38] was violated by the failure to maintain defense counsel's copy of the jury questionnaires for appellate review.

Due process requires a record sufficient for adequate appellate review of the alleged errors. *Strand*, 137 Idaho at 462, 50 P.3d at 477. Here, the relevant alleged error is the Toryanskis' ineffective assistance of counsel during jury selection. In support of this error, the record contains the transcript of voir dire, the jury questionnaires and responses (without the Toryanskis' notes), deposition testimony from the Toryanskis, and a preemptory challenge matrix that contains notes made by the Toryanskis regarding their impressions of each juror. This is an adequate record for appellate review of Abdullah's claim of error. Thus, Abdullah failed to demonstrate the destruction of the jury questionnaires violated his right to due process and this claim of error fails to meet the first prong of the fundamental error standard. *Perry*, 150 Idaho at 226, 245 P.3d at 978. As Abdullah failed to satisfy this threshold requirement, Abdullah's claim of error is not reviewable on appeal. *See id.*

**27.    The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel due to the removal of a letter from the crime scene, stipulation to the letter's admission into evidence, and failure to object when the State disclosed that the defense's investigator discovered the letter.**

Abdullah argues that the district court erred in summarily dismissing his claim he was denied effective assistance of counsel with respect to a letter admitted at trial based on three distinct actions: (1) the removal of the letter from the Siesta residence; (2) the Toryanskis' stipulation to admit the letter into evidence; and (3) the Toryanskis' failure to object when the State elicited testimony indicating that the investigator who discovered the letter worked for Abdullah's former defense counsel.

a.    Facts

---

[38] Abdullah also cites to a similar provision of the Idaho Constitution. However, Abdullah has made no showing or any compelling argument regarding how the standards applied by the Idaho Constitution would be applied any differently than those of the United States Constitution. "In absence of such a showing, this Court normally applies federal constitutional standards." *State v. Doe*, 148 Idaho 919, 923 n.1, 231 P.3d 1016, 1020 n.1 (2010). Accordingly, we address this issue under the United States Constitution.

At trial, the investigator Glen Elam, who worked for Abdullah's former counsel Gus Cahill, testified that he went to the Siesta residence to examine the crime scene before it was destroyed.[39] At the residence, Elam located a letter apparently written by Angie to Abdullah wedged between a dresser and a trash can in the master bedroom. The letter conveyed Angie's thoughts on their relationship, religion, and children. It also discussed intimate details of Angie and Abdullah's sexual relationship and contained accusations of infidelity and prejudicial sexual proclivities, which were redacted for the jury. By stipulation, the redacted version of the letter was admitted for a limited purpose to show Angie's state of mind.

During post-conviction proceedings, Cahill testified that he was with Elam at the scene, but he could not remember specifically if he was present when Elam discovered the letter or if Elam showed him the letter while still at the scene. In either event, Cahill testified that Elam told him "pretty early on that he had found something there." Cahill could not recall whether there was any discussion or thought of simply leaving the letter at the scene. Cahill then researched his ethical obligations and ultimately turned the letter over to law enforcement. Cahill also explained that he did consider seeking an in camera review with the court, but he could not recall why he declined to pursue that route.

b.      Standard of Review

The privilege against self-incrimination and the attorney-client privilege apply solely to communicative evidence. *State v. Dillon*, 93 Idaho 698, 710, 471 P.2d 553, 565 (1970). These privileges do not apply to real evidence. *Id.* "An attorney may not act as a depository for criminal evidence, and he may not suppress such evidence." *Id.*; *see also State v. Guthrie*, 631 N.W.2d 190, 194 (S.D. 2001) ("Physical evidence, whether exculpatory or inculpatory, cannot be withheld by a criminal defense attorney.").

c.      Analysis

i.      *The removal of the letter from the Siesta residence was not ineffective assistance of counsel.*

Abdullah contends that Elam's removal of the letter from the Siesta residence constituted ineffective assistance of counsel. He also submits that the district court failed to address this claim. In its memorandum decision, however, the district court stated:

---

[39] The State had previously sent Cahill and co-counsel a message indicating the Siesta residence needed to be demolished.

Abdullah argues if his previous trial counsel had left the letter at the scene, then there would be no duty to disclose the fact of its discovery or its contents to the State. However, while the attorney-client privilege protects any communication between a defendant and his counsel regarding the location of evidence, once the evidence is in counsel's possession he is still obligated to provide it to the prosecution under state law. . . .

Here, Abdullah's original trial counsel, Gus Cahill, testified that the existence of the letter and its location were not known to defense counsel prior to their final inspection of the Siesta residence. Thus, there was no communication protected by the attorney-client privilege. Once Elam discovered the letter and took it from the scene, defense counsel were in possession of evidence and became obligated to disclose the letter under [Idaho Rule of Professional Conduct] 3.4 and pursuant to discovery. Therefore, appointed counsel's disclosure of the letter to the State is not a basis for ineffective assistance of counsel with respect to either counsel.

Thus, the district court reviewed and then rejected this argument, concluding that Cahill was obligated to turn it over to the State once the letter was in his possession. We recognize that the district court may have in part erroneously based its decision on Idaho Code section 18-2603, Idaho Rule of Professional Conduct 3.4, and the Idaho Criminal Rules addressing discovery. Those statutes and rules likely do not apply to this situation.[40] "Where the lower court reaches

---

[40] Idaho Code Section 18-2603 provides:

Every person who, knowing that any book, paper, record, instrument in writing, or other object, matter or thing, is about to be produced, used or discovered as evidence upon any trial, proceeding, inquiry, or investigation whatever, authorized by law, wilfully destroys, alters or conceals the same, with intent thereby to prevent it from being produced, used or discovered, is guilty of a misdemeanor, unless the trial, proceeding, inquiry or investigation is criminal in nature and involves a felony offense, in which case said person is guilty of a felony and subject to a maximum fine of ten thousand dollars ($10,000) and a maximum sentence of five (5) years in prison.

This statute likely does not apply to the instant facts because the first element—the individual "knew that an object was about to be produced, used, or discovered as evidence in any legally authorized trial, proceeding, inquiry, or investigation"—probably is not met. *See State v. Peteja*, 139 Idaho 607, 610, 83 P.3d 781, 784 (Ct. App. 2003) (stating the elements of Idaho Code section 18-2603). Furthermore, Idaho Rule of Professional Conduct 3.4(a) prohibits an attorney from *unlawfully* obstructing "another party's access to evidence" and *unlawfully* altering, destroying, or concealing "a document or other material having potential evidentiary value." Thus, this Rule hinges upon unlawful conduct, which did not occur here.

Lastly, Idaho Criminal Rule 16(c)(1) provides:

(c) Disclosure of Evidence by the Defendant Upon Written Request. Except as otherwise hereinafter provided in this rule, the defendant shall at any time following the filing of charges against the defendant, upon written request by the prosecuting attorney, disclose the following information, evidence and material to the prosecuting attorney, which shall not be filed with the court, unless otherwise noted.

(1) Documents and Tangible Objects. Upon written request of the prosecuting attorney, the defendant shall permit the prosecutor to inspect and copy or photograph books, papers, documents, photographs, tangible objects or copies or portions thereof,

the correct result by an erroneous theory, however, this Court will affirm the order on the correct theory." *Row v. State*, 135 Idaho 573, 579, 21 P.3d 895, 901 (2001). In addition, the district court also premised its decision on the absence of attorney-client privilege. As discussed below, we agree with the district court's determination that no ineffective assistance of counsel occurred in the removal of the letter from the crime scene.

Abdullah's argument relies on *People v. Meredith*, 631 P.2d 46 (Cal. 1981). In *Meredith*, the defendant was convicted of first-degree murder and first-degree robbery. *Id.* at 48. Prior to trial, an investigator for the defense removed the victim's wallet from a location where the defendant previously told his attorney it would be. *Id.* The defendant's attorney subsequently turned the wallet over to police. *Id.* On appeal, the defendant argued that California Evidence Code section 954[41] barred testimony concerning the location of the wallet. *Id.* at 50. The California Supreme Court held:

> We therefore conclude that whenever defense counsel removes or alters evidence, the statutory privilege does not bar revelation of the original location or condition of the evidence in question. We thus view the defense decision to remove evidence as a tactical choice. If defense counsel leaves the evidence where he discovers it, his observations derived from privileged communications are insulated from revelation. If, however, counsel chooses to remove evidence to examine or test it, the original location and condition of that evidence loses the protection of the privilege.

*Id.* at 54 (footnote omitted). Thus, *Meredith* involved the discovery of evidence based on a privileged communication. *Id.* In contrast, the case here did not involve any communication from Abdullah regarding the letter. We are not persuaded that a defense attorney can provide ineffective assistance of counsel by disclosing to the State accusatory evidence discovered as the result of a happenstance discovery by a defense investigator without any communication from the defendant. Furthermore, whether disclosure of the letter was required by rule or statute

---

which are within the possession, custody or control of the defendant, and which the defendant intends to introduce in evidence at the trial.

In order for this rule to apply, the defendant must intend to introduce the evidence at trial. Here, there was no indication that Abdullah intended to introduce the letter at trial. Indeed, due to the damaging and prejudicial nature of the unredacted version, it is highly unlikely Abdullah would have offered it at trial. Thus, the district court's reasoning appears to have been in error in part.

[41] California Evidence Code section 954 provides in pertinent part, "[T]he client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ." Idaho Rule of Evidence 502(b) likewise provides, "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services . . . ."

presented a complex legal issue neither Cahill nor Elam could be expected to understand in full at the Siesta residence. Removing the letter and subsequently performing the necessary research was not deficient performance. This Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

Along the same lines as Abdullah's challenge to Cahill's removal of the letter, Abdullah argues that Cahill's failure to move for an in camera review of the letter prior to disclosing it constituted ineffective assistance of counsel. Abdullah fails to cite any authority in support of this contention, and this argument is waived. *See State v. Zichko,* 129 Idaho 259, 263, 923 P.2d 966, 970 (1996). Further, his argument presents a novel legal theory, and this Court "will generally not find deficient performance" in such circumstances. *Schoger v. State*, 148 Idaho 622, 630, 226 P.3d 1269, 1277 (2010). In addition, "[w]here the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the [*Strickland*] test." *State v. Payne*, 146 Idaho 548, 562, 199 P.3d 123, 137 (2008) (second alteration in original) (quoting *Sanchez v. State*, 127 Idaho 709, 713, 905 P.2d 642, 646 (Ct. App. 1995)). Once the letter had been removed from the scene (and the Siesta residence subsequently destroyed), it is highly likely that the district court would have ordered disclosure to the State. *See Dillon*, 93 Idaho at 710, 471 P.2d at 565 ("An attorney may not act as a depository for criminal evidence . . . ."). This Court rejects this assignment of error. *See also Rubin v. State*, 602 A.2d 677, 686–87 (Md. 1992) (collecting cases holding that a defense attorney may not conceal physical evidence and must turn over such evidence to the prosecution).

> *ii.     The Toryanskis' stipulation to admit a redacted version of the letter was not ineffective assistance of counsel.*

Next, Abdullah argues that the Toryanskis provided ineffective assistance of counsel by stipulating to the admission of the redacted letter. Specifically, Abdullah contends that the State was not able to meet the foundational elements to have the letter admitted at trial and thus the Toryanskis provided deficient performance in stipulating to its admission.

Tactical and strategic decisions by trial counsel will not be second-guessed and "cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective review." *State v. Shackelford*, 150 Idaho 355, 382–83, 247 P.3d 582, 609–10 (2010). In the absence of evidence that a strategic decision was "the product of inadequate preparation or

ignorance of the relevant law," this Court will not find deficient performance. *Johnson v. State*, 156 Idaho 7, 11, 319 P.3d 491, 495 (2014); *State v. Dunlap*, 155 Idaho 345, 384, 313 P.3d 1, 40 (2013).

As a condition precedent to the admissibility of a document, an offering party must present "evidence sufficient to support a finding that the matter in question is what its proponent claims." I.R.E. 901(a). When seeking to admit a writing, which is not self-authenticating, a party must provide proof of its genuineness separate from the writing itself before it is admissible. *Idaho First Nat'l Bank v. Wells*, 100 Idaho 256, 262, 596 P.2d 429, 435 (1979). "The purported signature or recital of authorship on the face of a writing will not be accepted as sufficient preliminary proof of authenticity for the admission of a writing in evidence." *Id.* Idaho Code section 9-405 provides that a writing can be authenticated in the following ways: (1) by anyone who saw the writing executed; (2) by evidence of genuineness of the handwriting of the maker; or (3) by a subscribing witness. I.C. § 9-405.

In post-conviction proceedings, the petitioner has the burden to demonstrate error. In this case, there is no evidence that the decision to stipulate was the product of inadequate preparation or ignorance of the law. Decisions by trial counsel are presumed to be made "in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. By stipulating to the admission of the redacted letter, the Toryanskis effectively excluded highly prejudicial information, such as Abdullah's sexual proclivities. Through a stipulation the Toryanskis were able to control precisely what information was excluded and avoid the risk and uncertainty of the admission of certain extremely unfavorable portions of the letter. In addition, the letter provided support for a suicide defense. Thus, the stipulation was a strategic decision by the Toryanskis and not the result of inadequate preparation or ignorance of relevant law. *See Johnson*, 156 Idaho at 11, 319 P.3d at 495. The Toryanskis' stipulation was not deficient performance.

> iii. *The Toryanskis' failure to object when the State disclosed that the investigator who discovered the letter worked for defense counsel was not ineffective assistance of counsel.*

Finally, Abdullah argues that the Toryanskis provided ineffective assistance by failing to object when the State revealed Elam was acting as an investigator for Cahill when Elam discovered the letter. Specifically, Abdullah contends that this testimony implied the defense was gathering evidence against their own client or Elam learned about the letter through conversations with Abdullah. In turn, this implied Abdullah knew about the letter. Abdullah also

speculates that the jurors could have assumed former counsel ceased representing Abdullah after discovering the letter because the letter led his counsel to believe Abdullah was guilty.

In support of this argument, Abdullah relies on cases from other jurisdictions which stand for the proposition that the source of evidence located by defense counsel via a privileged communication and then turned over to the State cannot be disclosed to the jury. *Meredith*, 631 P.2d at 54 n.8 ("In offering the evidence, the prosecution should present the information in a manner which avoids revealing the content of attorney-client communications or the original source of the information."); *Anderson v. State*, 297 So. 2d 871, 875 (Fla. Dist. Ct. App. 1974) (holding that to meaningfully preserve the privilege, the State could not introduce evidence that the State received incriminating physical evidence from defendant's attorney); *People v. Nash*, 313 N.W.2d 307, 314 (Mich. Ct. App. 1981) (no violation of defendant's attorney-client privilege in requiring attorney to relinquish physical evidence, but testimony that evidence obtained pursuant to search of attorney's office violated privilege because infers the defendant gave evidence to attorney); *Commonwealth v. Stenhach*, 514 A.2d 114, 123 (Pa. Super Ct. 1986) (stating where physical evidence, obtained by the defense from a privileged communication from the defendant, is turned over to the State by the defense, the State cannot disclose to the finder of fact the source of the evidence); *State v. Olwell*, 394 P.2d 681, 685 (Wash. 1964) (where State received incriminating evidence from defense counsel, the prosecution "should take extreme precautions to make certain that the source of the evidence is not disclosed in the presence of the jury" to preserve the attorney-client privilege). However, these cases are inapposite because in this case the letter was not discovered as the result of a privileged communication. The letter was revealed to defense counsel by an investigator without any communication from Abdullah. "If the location of the real evidence was revealed to defense counsel by a non-client third party, then the attorney-client privilege does not prohibit the State from proving, even through testimony from the attorney or the attorney's agent, where and how the evidence was located." *Rubin*, 602 A.2d at 687. Therefore, the attorney-client privilege did not prohibit the State from introducing evidence regarding where and how the letter was located. Thus, the State's question to Elam was not improper and the Toryanskis did not render deficient performance by failing to object. *State v. Yakovac*, 145 Idaho 437, 445, 180 P.3d 476, 484 (2008) (attorney not required to object to admissible evidence).

Finally, even if Abdullah established deficient performance on any of the above claims, he has failed to establish a reasonable probability of a different result. Upon admission of the letter, the district court informed the jury it was admitted only for the purpose to show Angie's state of mind and directed the jury not to consider it for any other purpose. Furthermore, the redacted letter omitted highly prejudicial portions and formed a basis for Abdullah's suicide defense, which Kim Toryanski referenced in her closing argument. Lastly, the prejudice Abdullah asserts from the State revealing Elam discovered the letter is highly speculative and unfounded. The district court's limiting instruction to consider the letter for only Angie's state of mind would have prevented the jury from making such attenuated assumptions. *See State v. Hedger*, 115 Idaho 598, 601, 768 P.2d 1331, 1334 (1989) (it is presumed a jury obeys a court's curative instruction). Therefore, Abdullah has failed to establish either prong of the *Strickland* two-part test, and this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**28.     The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel due to counsel's failure to investigate, prepare, and present an adequate case in mitigation.**

a.     Facts

Numerous witnesses testified on Abdullah's behalf in the penalty phase. First, the Toryanskis called Dr. Michael Gunter, an expert in Kurdish history. Dr. Gunter testified that the Kurds are a separate ethnic group in the Middle East and they do not have their own independent state. Dr. Gunter explained that the Kurds desire cultural, political, and social autonomy. However, the nations where the Kurds reside (Turkey, Iraq, Iran, and Syria) will not provide those conditions. Dr. Gunter then testified about Koreme, a village in northern Iraq where Abdullah was raised. Saddam Hussein, in conjunction with the Anfal campaign, destroyed Koreme in the late 1980s. The Anfal campaign involved the genocide of the Kurdish people and the destruction of their villages. During this period, attacks from the Iraqi Army forced villagers from Koreme to flee into the mountains and live in caves. When some villagers went back to retrieve belongings, the Iraqi Army summarily executed them. The district court recognized this testimony to be "moving" and "very powerful."

Abdullah's father, Haji Fetah, also testified about the Anfal campaign and Saddam Hussein's systematic destruction of his family's village and the Kurdish people. Fetah explained that he was imprisoned for fighting in opposition to the Iraqi Army. Fetah also noted that Musheer, Abdullah's older brother, is mentally handicapped. As a result of these circumstances, Abdullah assumed a leadership role in the family, acting as the head of the household and looking after the family. Abdullah helped smuggle his family out of Iraq.

Abdullah's brother, Dilshad, also testified about life in northern Iraq. Dilshad stated that helicopters would often come to bomb their homes. Other times, the helicopters would observe them and leave, only for soldiers to return later and burn their homes. Dilshad also established the family's agrarian lifestyle. Dilshad recounted one occurrence where the Iraqi Army removed their father's cousin from the village, tortured him with electricity by applying it to his "private parts," and returned him to the village paralyzed. Further, Dilshad testified to the brutal killing of their uncle, who was shot to death by Iraqi soldiers while he prayed. Dilshad explained in graphic detail that his uncle owned a cement wall and that "his brains were all over that." After killing their uncle, the soldiers came to the family's home searching for their father. The family concealed their father from the soldiers by hiding him in a hole and covering him with blankets. However, the soldiers kicked the family members, including their pregnant mother. Dilshad also testified about the family's struggles while fleeing Iraq in 1988. Dilshad stated the decision to flee came after the family received warning of a chemical weapons attack. The district court characterized this testimony as "very moving."

Abdullah's cousin, Nichivan, also testified. Nichivan recounted the conditions of Turkish refugee camps endured by the family. Nichivan explained that the family lived in tents despite inclement weather conditions. Nichivan stated snowfall could sometimes reach three feet in depth. While surviving in these conditions, the family did not have shoes, jackets, or adequate food. Once a week, soldiers provided them bread. Their other source of food came from vegetables grown within the camp and from leftover scraps from the soldiers. Nichivan detailed one incident in which a fight broke out between the Turkish military and the Kurds inside the camp. Soldiers shot an individual in the head while that individual stood next to Nichivan's brother. Abdullah, present at the scene, guided Nichivan and Nichivan's brother home and instructed them to stay away from the area for the rest of the day. Nichivan also testified to an

episode where he fell into a hole and Abdullah rescued him. Nichivan hypothesized that Abdullah's actions likely saved his life.

Rahan Mustafa, Abdullah's mother, testified as well. Mustafa explained that Abdullah was a critical part of their family and was an honest man. Mustafa also requested mercy for Abdullah.

Finally, the Toryanskis produced witnesses to demonstrate Abdullah's positive community relationships. Pam Lewis assisted Abdullah and his family in adjusting to life in America when they first immigrated here. Lewis testified that Abdullah learned quickly and was always helpful to other individuals. Jim Rogers, a family friend, testified that Abdullah had a loving character and cared about people. Aaron Irish, a deputy sheriff, observed Abdullah in jail and noted how respectful Abdullah was toward jail personnel. Moreover, Michael Shutz, a fellow inmate housed with Abdullah, testified to Abdullah's good behavior and that Abdullah assisted him studying Islam.

b.      Standard of Review

Trial counsel has a duty to conduct a thorough mitigation investigation in preparation for the penalty phase of a capital case. *Porter v. McCollum*, 558 U.S. 30, 40 (2009). Defense counsel must obtain information the State has and plans to use against the defendant. *Rompilla v. Beard*, 545 U.S. 374, 387–90 (2005).

> Presentation of some mitigating evidence, even if strong, is insufficient if other mitigating evidence is available upon reasonable investigation. *Rompilla*, 545 U.S. at 387–93. However, no relief is mandated where counsel's investigation is not as thorough as it could have been because the courts "address not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). This Court held, in *State v. Row*, that counsel is not required to investigate a defendant's "entire life in order to objectively present . . . mitigation evidence" and that decisions regarding mental health and allocution statements are "strictly strategic and shall not be second-guessed by this Court." 131 Idaho 303, 313, 955 P.2d 1082, 1092 (1998).

*State v. Dunlap*, 155 Idaho 345, 388, 313 P.3d 1, 44 (2013) (omission in original).

c.      Analysis

Abdullah's argument consists of three components: (1) the timing of the mitigation investigation; (2) the failure to present additional testimony from family members; and (3) the failure to retain a cultural expert with sufficient background and experience. Each will be addressed in turn.

Abdullah contends that the Toryanskis provided ineffective assistance of counsel by failing to begin a mitigation investigation at the earliest possible stages, by instructing mitigation specialist Rosanne Dapsauski to cease working on the case until a few days before sentencing, and by pursuing a theory of the case that blamed the victim.

In support of this argument, Abdullah relies in large part on the ABA Guidelines and its accompanying commentary. Guideline 4.1 provides in capital cases, "The defense team should consist of no fewer than two attorneys . . . , an investigator, and a mitigation specialist." ABA Guideline 4.1(A)(1). Further, the commentary to ABA Guideline 1.1 provides that the investigation for the mitigation case must begin immediately upon counsel's entry into the case. ABA Guideline 1.1 cmt. As discussed above, the ABA standards provide non-binding guidance to determine the reasonableness standard. Indeed, this Court has previously recognized that mitigation experts are not always required in death penalty cases. *State v. Hairston*, 133 Idaho 496, 516, 988 P.2d 1170, 1190 (1999) (district court did not abuse discretion, or violate United States or Idaho Constitutions, in refusing to appoint mitigation specialist in death penalty case). Counsel does have a duty "to conduct a thorough investigation of the defendant's background," however. *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

During the early stages of this case when Abdullah was still represented by the Ada County Public Defender, Cahill retained mitigation specialist Dapsauski. Dapsauski started to investigate a mitigation strategy. Specifically, she completed a "draft chronology" on Abdullah's life, requested records from Abdullah's past, and met with members of the Boise Muslim community. Dapsauski also traveled to Tennessee and conducted preliminary interviews with Abdullah's family and associates.

The Toryanskis continued to utilize Dapsauski's services when they substituted in as counsel. Initially, Dapsauski participated in some of the defense team meetings. As time progressed, however, the Toryanskis devoted more attention to guilt phase issues and Dapsauski was invited to fewer meetings. At one point, Kim informed Dapsauski her services were no longer needed. As a result, Dapsauski ceased working on Abdullah's case for a number of months. A few days prior to sentencing, Kim approached Dapsauski and requested that she resume work on Abdullah's case.

The foregoing facts, combined with the evidence presented during the penalty phase, demonstrate that the Toryanskis pursued a constitutionally sufficient mitigation investigation on Abdullah's behalf. The period of time where the Toryanskis focused on guilt phase issues was in accord with Abdullah's statements. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. In a letter addressed to Cahill, Abdullah stated the following:

> Now to the death penalty. The State said they will seek the death penalty when they find me guilty. You are so worried about that; you're not focusing on the guilty part. I know you have to do certain things in death penalty cases. I admire you for being so worried about it, but I have told you over and over again, "Don't worry about the death penalty, and please work on the case to make it ready in time for the trial." . . . .
>
> . . . .
>
> . . . All I ask is please work on the case and get it ready for me. . . . As for the death penalty, Allah, or god, is sufficient for me and will protect me. I have put my trust in him, for He is the one who makes the decisions about life and death. My life is in His hands, and not even the state of Idaho will make me worry. . . . If my life is to be gone, neither you nor I, or anybody else, can save me. That is why I'm asking you to do your job, please.
>
> . . . .
>
> Again, I ask you with all due respect to please work on the guilty part of the case. If you have extra time, then go ahead and work on the death penalty part. Know that neither you nor the state can change the time of my death one second earlier or later. Please, Gus, I am not worried about that at all. What I am worried about is going in front of the jury and not having answers, witnesses, evidence, etc., there with us. . . . Let's get ready for the trial, please.

Furthermore, in the Final Amended Petition itself, Abdullah conceded his "objective was to obtain an acquittal, or other form of relief that would not involve prison time. . . . Abdullah made it clear to all who ever represented him that he did not want potential penalty phase outcomes, even the potential of a death sentence, to affect his guilt phase objective." The reasonableness of the Toryanskis' actions should be examined within the context of these instructions from Abdullah. *See Strickland,* 466 U.S. at 691. Given these directions from Abdullah, and considering the efforts the Toryanskis still devoted to the mitigation case, the Toryanskis did not provide deficient performance. For this reason, as well as the lack of prejudice discussed below,

this Court affirms the district court's dismissal of a claim of ineffective assistance of counsel based on mitigation.

        *ii.*     *The Toryanskis did not render ineffective assistance by failing to present additional mitigation testimony from family members.*

Abdullah also contends that the Toryanskis' inadequate investigation and preparation led to their failure to present and prepare meaningful and compelling mitigation evidence through the testimony of family members. We disagree. The evidence that Abdullah contends should have been presented is cumulative of the evidence presented during the sentencing phase. In summary, the proffered evidence consists of the following: violent, horrific incidents Abdullah witnessed and was subjected to as a child; deplorable conditions Abdullah endured while living in refugee camps in Turkey; and the impact of a death sentence on Abdullah's family. This proffered testimony is undoubtedly heartfelt, emotional, vivid, and moving. But, as recounted above, so was the testimony the Toryanskis presented at the penalty phase. The decision to present a fewer number of witnesses than Abdullah would now prefer on appeal is a conceivable tactical decision. Under the deferential *Strickland* standard, this decision is "strongly presumed" to be reasonable. 466 U.S. at 690. Thus, Abdullah has failed to establish deficient performance, and this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

        *iii.*    *The Toryanskis did not render ineffective assistance by failing to retain an adequate cultural expert.*

Abdullah also contends that Dr. Gunter, the expert retained by the Toryanskis, did not have the requisite background and experience to sufficiently convey the experiences Abdullah endured growing up as a Kurd in northern Iraq. A review of the record disproves these assertions. Dr. Gunter testified that he had been a professor in political science at Tennessee Technological University since 1981. His primary area of instruction was international relations, and he also taught courses on international law, international organizations, and American foreign policy. In addition, Dr. Gunter had been a "senior Fulbright lecturer of international relations" at the Middle East Technical University in Turkey during the 1978–79 academic year. Dr. Gunter also testified that he was a leading expert in the world on the "Kurdish situation." He provided detailed testimony about the Anfal campaign, the village of Koreme, and the hardships endured by the Kurdish people. Thus, the Toryanskis did not provide deficient performance in

selecting Dr. Gunter as a cultural expert. This Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

> iv. *The case law relied on by Abdullah does not support his claim of ineffective assistance of counsel.*

The cases Abdullah relies on to assert ineffective assistance of counsel claims regarding mitigation involve situations where counsel completely failed to investigate and present critical mitigating evidence.[42] For example, in *Williams*, the defendant was convicted of robbery and capital murder and sentenced to death. 529 U.S. at 368–70. At sentencing, trial counsel offered the testimony of the defendant's mother, two neighbors, and a recorded statement by a psychiatrist. *Id.* at 369. The testimony from witnesses was brief and described the defendant as a "nice boy" and not violent. *Id.* The recorded statement "did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone." *Id.* The United States Supreme Court held that trial counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395. The United States Supreme Court further held that when this missing mitigation evidence was considered in conjunction with the mitigation evidence presented at sentencing, there was a reasonable probability the result would have been different. *Id.* at 398–99.

Likewise, in *Wiggins*, the defendant was convicted of first-degree murder, robbery, and two counts of theft. 539 U.S. at 515. At sentencing, counsel made a motion to bifurcate the hearing into two phases. *Id.* One phase would focus on whether the defendant acted as a "principal in the first degree." *Id.* In the other phase, counsel would present psychological reports and expert testimony demonstrating the defendant's "limited intellectual capacities and childlike emotional state" and also "the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world." *Id.* at 515–16. The trial court denied the motion. *Id.* at 515. During sentencing, counsel did not introduce any evidence of the defendant's life history and simply challenged the guilt aspect of the case. *Id.* A jury sentenced the defendant to death. *Id.* at 516. During post-conviction proceedings, a social worker prepared a report that

---

[42] Abdullah cites to *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005).

revealed the defendant had undergone extensive sexual and physical abuse as a child at the hands of numerous perpetrators. *Id.* at 516–17.

On habeas corpus review, the United States Supreme Court recognized: "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 524 (quoting ABA Guideline 11.4.1(C)). The Court then explained that trial counsel had departed from these standards and "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* The United States Supreme Court held that the failure to investigate the defendant's upbringing "did not reflect reasonable professional judgment," the evidence counsel failed to discover was powerful, and counsel's deficient performance prejudiced the defendant. *Id.* at 534–36.

Finally, in *Rompilla*, the State indicted the defendant for murder. 545 U.S. at 377. A jury found the defendant guilty of murder and a number of related counts. *Id.* at 377–78. At the sentencing phase, the State argued three aggravating factors justified imposition of a death sentence: "that the murder was committed in the course of another felony; that the murder was committed by torture; and that Rompilla had a significant history of felony convictions indicating the use or threat of violence." *Id.* at 378. "Rompilla's evidence in mitigation consisted of relatively brief testimony: five of his family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was innocent and a good man." *Id.* The jury sentenced the defendant to death. *Id.*

During post-conviction proceedings, it was revealed that trial counsel failed to examine the defendant's prior conviction file before sentencing. *Id.* at 382–84. On federal habeas review, the United States Supreme Court held that counsel provided deficient performance. *Id.* at 393. The Court explained that counsel provided deficient performance "because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case." *Id.* at 389. In such a circumstance, "[i]t flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." *Id.* Addressing the question of prejudice, the Court

summarized the overlooked evidence and recognized that it created "a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury." *Id.* at 393.

In contrast to the roles of counsel in *Williams*, *Wiggins*, and *Rompilla*, the Toryanskis conducted an extensive investigation of Abdullah's background and upbringing. They uncovered mitigation evidence from family members and acquaintances who testified to the oppressive environment in which Abdullah was raised and the hardships he endured while in refugee camps. Further, the Toryanskis elicited testimony regarding atrocities experienced by Abdullah's family members and fellow villagers. The Toryanskis hired an expert on Abdullah's Kurdish heritage who testified in depth about the culture in which Abdullah was raised, the brutal regime of Saddam Hussein, and the persecution of the Kurdish people. In addition, the Toryanskis called witnesses to attest to Abdullah's good character in general and his model behavior as an inmate following his arrest. The mitigation investigation and case presented by the Toryanskis goes far beyond that in *Williams*, *Wiggins*, and *Rompilla*. Thus, this Court affirms the district court's determination that the Toryanskis did not provide deficient performance in mitigation.

### v. Abdullah failed to establish prejudice.

Finally, after examining the evidence that Abdullah contends should have been presented at the mitigation hearing, this Court determines that there is not a reasonable probability the result of the sentencing proceeding would have been different. The mitigation evidence proffered by Abdullah is cumulative to what was provided at sentencing. For additional mitigation evidence to demonstrate prejudice in a post-conviction proceeding, it simply cannot be cumulative of evidence presented at sentencing, but rather must create a substantial likelihood of a different sentence. *Compare Cullen v. Pinholster*, 131 S. Ct. 1388, 1409–10 (2011) (evidence introduced during a collateral proceeding on an ineffective assistance claim that "largely duplicated the mitigation evidence at trial" did not satisfy a showing of prejudice under *Strickland*), *and Cunningham v. Wong*, 704 F.3d 1143, 1161–63 (9th Cir. 2013) (recognizing the cumulative nature of the "new" evidence presented and holding petitioner failed to demonstrate *Strickland* prejudice), *with Foust v. Houk*, 655 F.3d 524, 539 (6th Cir. 2011) (where the new evidence, "[f]ar from being cumulative . . . paints an altogether different picture" of the petitioner's childhood, *Strickland* prejudice prong is met).

In addition, the brutal and callous nature in which Abdullah perpetrated this crime cannot be ignored. *See Bobby v. Van Hook*, 558 U.S. 4, 12–13 (2009) (holding the Sixth Circuit Court of

Appeals erred by focusing on the "*number* of aggravating factors instead of their *weight*" in conducting a *Strickland* prejudice analysis). Abdullah premeditated the murder of his wife, placed a bag over her head to asphyxiate her, poured gasoline throughout their home, and left three children inside a home engulfed in flames to cover up his actions. The brutal nature of this crime is evidenced by the jury's finding of the utter disregard aggravator.

Abdullah contends that "the perceived brutality or egregious nature of a particular crime is never an excuse for counsel to fail to do their job to present a readily-available mitigation case, and is no basis for a court to deem the presentation of a slip-shod mitigation case adequate or effective." In support of this argument, Abdullah cites to *Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2001). In pertinent part, *Gardner* addressed the demonstration of prejudice in the context of a Fifth Amendment *Estelle* violation.[43] *Gardner*, 247 F.3d at 562–63. There, the Fifth Circuit Court of Appeals reasoned:

> Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act.

*Id.* at 563. *Gardner* is distinguishable, however, in that it involved a situation where the defendant was not informed of his constitutional right to remain silent when ordered to undergo a psychiatric evaluation during sentencing. *Id.* at 557–58. The defendant made statements in the evaluation which led the evaluator to conclude the defendant posed a significant risk of future dangerousness. *Id.* at 562. The Fifth Circuit Court of Appeals summarized the evaluator's testimony as follows:

> Dr. Griffith testified, with "one hundred percent certainty," that Gardner would "commit violent acts in the future"; that he was "super dangerous, and [would] kill [again] given any chance at all"; and that he would be a danger to others even if incarcerated. "Would": not "might," not likely "would," but absolutely "would." Dr. Griffith further testified that Gardner exhibited no remorse for his crimes and that any behavior to the contrary should not to be believed [sic].

*Id.* (alterations in original). It was in this context that the Fifth Circuit Court of Appeals rejected the State's argument that the brutality of the crime demonstrated harmless error. *Id.* at 562–63.

---

[43] *Estelle v. Smith*, 451 U.S. 454, 469 (1981), held that where psychological evaluations are used to determine whether the death penalty should be imposed, such evaluations must be preceded by *Miranda* warnings.

By contrast, Abdullah contends that his attorneys should have presented more detailed and vivid testimony during the mitigation phase, even though this testimony was cumulative. This is a far cry from the extremely damaging testimony erroneously admitted in *Gardner* through the defendant's own statements. It is well established that when analyzing the prejudice prong of an ineffective assistance claim, a court should consider the strength of aggravating circumstances associated with the defendant's case. *Strickland*, 466 U.S. at 700 ("Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."). *See also Smith v. Gibson*, 197 F.3d 454, 463–64 (10th Cir. 1999) (holding testimony from family members, friends, employers, and former coaches insufficient to demonstrate jury would have returned a different sentence "in light of the brutal and senseless nature" of the crime and the State's strong evidence supporting the aggravating circumstances); *Dobbs v. Turpin*, 142 F.3d 1383, 1390 (11th Cir. 1998) (analysis of *Strickland* prejudice prong must take into account aggravating circumstances of the case). Accordingly, this Court affirms the district court's determination that Abdullah failed to establish a reasonable probability the result of the sentencing phase would have been different but for any deficient performance. Therefore, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**29.     The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel for failing to present an eyewitness identification expert.**

Abdullah argues that the Toryanskis provided ineffective assistance in failing to retain and call an expert on the reliability of eyewitness testimony at both the pretrial suppression hearing and at trial.

a.     Facts

A key witness in the State's case was Marjorie Wood. She worked as a gas station clerk in Mountain Home and identified Abdullah as having entered the gas station around midnight on the night of the murder. Wood identified Abdullah for law enforcement a week after the crime from a single photograph depicting Abdullah. The detectives asked Wood whether she had seen that individual in the photograph before, and Wood immediately responded that she had seen the individual a week prior. She further indicated that she remembered Abdullah because he had acted rude, which caused him to stand out in her mind.

137

In seeking to challenge the identification made by Wood, among other things, Abdullah requested a memory and identification expert. The district court denied this motion because Abdullah failed to identify a specific expert and budget. Abdullah then requested the appointment of Dr. Elizabeth Loftus, a Washington-based psychologist. The district court denied this request because Abdullah failed to explain why an expert in the local area could not testify and why these issues could not be addressed in pretrial motions. Abdullah then renewed his request, asking that Dr. Charles Honts be appointed. The district court granted this request.

Abdullah filed a motion to suppress Wood's identification. Wood and the detectives involved in the identification testified at the suppression hearing. The district court concluded that there were no due process implications, nor was there a substantial risk of mistaken identification. Even assuming suggestive procedures, the district court examined the relevant factors and concluded Wood's identification was sufficiently reliable to outweigh any potential low-level suggestiveness.

The State then filed a motion in limine, asserting that expert testimony on the topic of eyewitness identifications was not scientific. The State also challenged the qualifications of Dr. Honts. The Toryanskis decided not to oppose the State's motion for the following reasons: (1) they concluded Dr. Honts did not qualify as an expert in eyewitness identification; (2) the topic of eyewitness identifications may not be proper science for expert testimony; and (3) due to strategic choices on where to focus their time and energy. At the evidentiary hearing, Mitch Toryanski confirmed a dispute existed as to whether Dr. Honts qualified as an expert witness in eyewitness identifications and with respect to the scientific field generally. Mitch indicated that he wanted Dr. Honts to testify because he thought it was important to have a witness explain eyewitness identification issues to the jury.

b.    Standard of Review

To determine whether evidence of an out-of-court identification violates due process, this Court applies a two-step test. *See State v. Hoisington*, 104 Idaho 153, 162, 657 P.2d 17, 26 (1983). First, the defendant must establish that the identification procedure was overly suggestive. *United States v. Wade*, 388 U.S. 218, 240 n.31 (1967); *Hoisington*, 104 Idaho at 162, 657 P.2d at 26. Second, if the defendant meets that burden, courts consider whether the identification was nonetheless reliable under the totality of the circumstances. *Hoisington*, 104 Idaho at 162, 657 P.2d at 26. This second step entails considering the witness's opportunity to view the perpetrator, his degree of attention, the accuracy of his description, his level of certainty, and the time between the crime and pretrial confrontation, and then weighing those factors against the "corrupting effect of

the suggestive identification." *Manson v. Brathwaite*, 432 U.S. 98, 108 (1977); *Hoisington*, 104 Idaho at 162, 657 P.2d at 26. Thus, greater indicia of reliability may be necessary the more egregious the suggestive procedures.

*State v. Almaraz*, 154 Idaho 584, 593, 301 P.3d 242, 251 (2013).

      c.        <u>Analysis</u>

Abdullah first argues that the Toryanskis provided ineffective assistance of counsel by failing to have Dr. Honts testify at the suppression hearing. In support of this argument, Abdullah cites to an affidavit of Dr. Honts, an affidavit of Dr. Roy Malpass (an expert retained on post-conviction relief), and a publication by the United States Department of Justice—*Eyewitness Evidence: A Guide for Law Enforcement*.

"Where the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the [*Strickland*] test." *State v. Payne*, 146 Idaho 548, 562, 199 P.3d 123, 137 (2008) (alteration in original) (quoting *Sanchez v. State*, 127 Idaho 709, 713, 905 P.2d 642, 646 (Ct. App. 1995)). In this case, the considerations addressed in the affidavits and attached publication on eyewitness evidence relied on by Abdullah are predominantly covered by factors articulated in Idaho case law. In *Payne*, this Court reaffirmed the factors Idaho courts consider when examining claims involving eyewitness identification procedures:

> For an out-of-court identification to taint an in-court identification, the out-of-court identification must have been "so suggestive that there is a very substantial likelihood of misidentification." *State v. Trevino*, 132 Idaho 888, 892, 980 P.2d 552, 556 (1999). "Due process requires the exclusion of identification evidence if *police suggestiveness* created a substantial risk of mistaken identification, except where the reliability of the identification is sufficient to outweigh the corrupting effect of the suggestive identification." *Id*. (citation omitted) (emphasis added). "[S]ingle subject showups are inherently suspect and generally not condoned . . . ." *State v. Hoisington*, 104 Idaho 153, 162, 657 P.2d 17, 26 (1983). However, "reliability is the linchpin in determining the admissibility of identification testimony." *Id*. at 161, 657 P.2d at 25 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). The question of whether improper suggestiveness exists is determined from a totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 196 (1972). Factors to review in determining whether an identification is reliable include: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification." *Trevino*, 132 Idaho at 893, 980 P.2d at 557.

*Id.* (alteration in original) (omission in original). Given these factors, the proposed expert testimony at the suppression hearing would have been cumulative.

Further, while use of a single photo can create suggestiveness, *Hoisington*, 104 Idaho at 162, 657 P.2d at 26, the situation here was not a traditional line-up or photo array procedure. Wood was neither a victim nor an eyewitness to a crime. In the traditional context, a victim or eyewitness being shown a single photo might suggest that the individual in the photo is the perpetrator. That risk did not exist here. Calling an expert to testify would not have provided any additional information for the district court to consider not already addressed in Idaho's case law.

Moreover, Kim examined witnesses and made arguments regarding many of the topics addressed in the affidavits of Dr. Malpass and Dr. Honts. For example, at the suppression hearing, Kim examined Detective Chip Morgan regarding the suggestiveness of using a single photograph and the procedural safeguards to minimize inherent suggestiveness. On examination by the State, Detective Morgan acknowledged, "In my opinion, any time I'm only showing one photo, the potential exists for a false positive . . . ."

Even assuming the use of a single photograph was impermissibly suggestive, the district court's findings of fact indicate the following: (1) Wood had an opportunity to observe Abdullah; (2) only one week passed between this observation and the identification; (3) Wood was certain of her identification; (4) Abdullah's behavior drew Wood's attention to him and caused Wood to remember him; (5) Wood was focused on Abdullah while he was in the store; and (6) the situation was non-threatening and non-stressful. There was substantial and competent evidence to support the district court's findings. Based on these findings, the identification was reliable even assuming any suggestiveness. Accordingly, this Court concludes that the testimony of Wood would not have been suppressed even if an expert testified at the suppression hearing. This Court affirms the district court's dismissal of this claim.

In addition to the above discussion, Kim testified during the post-conviction evidentiary hearing that the decision not to have an expert testify was strategic. While Kim was considering the testimony of an eyewitness expert, she was also considering a number of medical and scientific issues and was "intensely . . . focused" on scientific evidence. Abdullah has failed to present any evidence that indicates this decision was anything but strategic.[44] "The decision of

---

[44] Abdullah's brief cites to portions of the record that indicate during post-conviction proceedings Kim could not recall why they did not have Dr. Honts testify. Abdullah also cites to testimony from Mitch indicating there were

what witnesses to call 'is an area where we will not second guess counsel without evidence of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation.'" *Payne*, 146 Idaho at 563, 199 P.3d at 138 (quoting *State v. Larkin*, 102 Idaho 231, 234, 628 P.2d 1065, 1068 (1981)). These strategic reasons provide another basis to conclude that the Toryanskis did not render deficient performance at the suppression hearing by failing to call an expert on eyewitness identifications.

Abdullah next argues that the Toryanskis provided ineffective assistance by failing to present an eyewitness expert at trial. Specifically, he contends that "[s]uch testimony would have assisted jurors by helping them understand factors that impact the reliability of an identification and by helping them understand the fallibility of such identifications generally." Abdullah further argues that an expert would have cast doubt on Wood's identification and demonstrated that the techniques used by officers in securing the identification were flawed, thereby rendering the identification unreliable.

Abdullah's challenges to the techniques used by detectives are unfounded. In seeking to locate a potential eyewitness along the route from Salt Lake City to Boise, two detectives drove that route stopping at all gas stations and convenience stores along the freeway. This investigative trip lasted around seventeen hours. Throughout the trip, the detectives asked clerks whether they worked on the night in question. If a clerk responded in the affirmative, the detectives inquired further by showing a picture of Abdullah and asking whether they had seen him. The detectives used special caution not to mention Abdullah's name. While the affidavit of Dr. Honts contends that the detectives should have considered a "double-blind lineup using live persons," this contention ignores the nature of the investigation. During the detectives' seventeen-hour trip, they questioned around 120 potential witnesses without inquiring into any particular incident or mentioning Abdullah's name. The detectives could not have feasibly utilized a double-blind live lineup in this situation, and there is no justification for such a procedure in this context.

---

questions regarding the qualifications of Dr. Honts and the Toryanskis were unsure whether this area of science (eyewitness experts) was legitimate. Finally, Abdullah cites the affidavit of Dr. Honts, which indicates the Toryanskis informed him he could not testify because the district court believed Abdullah to be Caucasian, and thus the district court did not find cross-racial identification issues relevant. However, none of this amounts to evidence demonstrating a misunderstanding or ignorance of Idaho law, nor does it demonstrate any other shortcomings in the Toryanskis' performance. At best, it demonstrates the Toryanskis recognized this was an unsettled and questionable area of expertise and strategically decided to focus their efforts elsewhere.

Moreover, Abdullah has failed to demonstrate that the decision not to call an expert was based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. On the contrary, Kim testified that the decision was strategic and that she and Mitch were focused on other aspects of the trial. Abdullah's argument is similar to an argument this Court addressed in *Payne*. In *Payne*, the defendant was convicted of first-degree murder based in part on eyewitness testimony placing the defendant at a location from which the victim was abducted. *Id.* at 561–62, 199 P.3d at 136–37. The defendant asserted ineffective assistance of counsel based on the failure to present an expert "on the fallibility of eyewitness identifications." *Id.* at 563, 199 P.3d at 138. Rejecting this claim, this Court held:

> Here, Payne has provided no evidence which suggests that this decision resulted from inadequate preparation, ignorance or other shortcomings. Therefore, the presumption that counsel's performance fell within the acceptable range of professional assistance leads the Court to conclude that failing to introduce expert legal testimony did not fall below an objective standard of reasonableness.

*Id.* (footnote omitted). The situation here is analogous to *Payne* as Abdullah has not provided any evidence to indicate that the decision to not call an expert on eyewitness identifications resulted from "inadequate preparation, ignorance, or other shortcomings." *Id.* Accordingly, the Toryanskis did not render deficient performance.

Finally, even if Abdullah established deficient performance in failing to call an expert at trial, he cannot establish prejudice. At trial, Detective Heatherley testified that Wood immediately identified Abdullah from the photograph and stated that Abdullah had been in the store a week prior around midnight. Wood testified that she was one hundred percent sure she had seen Abdullah at the time detectives showed her the photo of him. Other evidence established Abdullah's presence in Boise, such as the cape, gas can, the fuel contaminant and additive in the gas from that can, the DNA evidence, the removal of N.A. from the fire, and the lack of forced entry into the Siesta residence. Based on the evidence in the record, Abdullah has failed to establish a reasonable probability the result would have been different but for any deficiency. This Court affirms the district court's dismissal of this claim.

**30. The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel for failing to present testimony from a forensic pathologist.**

Abdullah argues that the Toryanskis provided ineffective assistance in failing to call a forensic pathologist to testify that Angie's cause of death was undetermined.

a. Facts

142

Before the grand jury, Dr. Glen Groben, a forensic pathologist with the Ada County coroner's office, testified that he determined Angie's cause of death to be "homicide." Dr. Groben explained that he considered the possibility that Angie may have committed suicide, but rejected that theory, in part, because the first toxicology exam revealed no alcohol or drugs in her system. At trial, Dr. Groben reiterated this testimony before the jury. Dr. Groben also testified that he amended his autopsy report because subsequent toxicology testing revealed Angie had a potentially lethal concentration of fluoxetine in her blood when she died. Due to this additional information, Dr. Groben changed the cause of death to "acute fluoxetine poisoning associated with asphyxiation due to a bag over the head." Dr. Groben did not amend the manner of death from homicide.

Before trial, the Toryanskis retained forensic pathologist Dr. Paul Hermann to assist in Abdullah's defense. Dr. Hermann opined the manner of death was undetermined because circumstances existed which weighed in favor of homicide as well as suicide. Specifically, Dr. Hermann pointed to Angie's psychiatric history, the absence of trauma on Angie's body, and the high level of fluoxetine in her system as supporting a finding of suicide. The Toryanskis did not call Dr. Hermann to testify at trial.

Abdullah retained Dr. Clifford Nelson during the post-conviction proceedings to proffer additional information, namely, that an overdose of medication and the placement of a plastic bag over one's head is the recommended method of suicide in the book *Final Exit* and that many circumstances supported a finding of suicide. Dr. Nelson also opined that the manner of death was undetermined.

b.      Standard of Review

"In our view, counsel's choice of witnesses, manner of cross-examination, and lack of objection to testimony fall within the area of tactical, or strategic, decisions, as does counsel's presentation of medical evidence." *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994). "[S]trategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000).

c.      Analysis

143

Abdullah argues that the failure to call Dr. Hermann resulted from the Toryanskis' legal misunderstanding of Idaho Rule of Evidence 410. Specifically, based on Kim's deposition testimony, Abdullah contends that she erroneously believed Dr. Hermann could be impeached with statements from plea negotiations with the State about the circumstances surrounding Angie's death.

Our consideration of Abdullah's argument is unnecessary because the district court properly determined Abdullah could not establish prejudice. Abdullah has not established a reasonable probability of a different result but for any deficient performance in the Toryanskis' failure to call Dr. Hermann to testify at trial. As explained by the United States Supreme Court: "In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011). Here, the Toryanskis inquired into their perceived issues with Dr. Groben's autopsy and testing, highlighting the initially undiscovered fluoxetine and the amended cause of death. Additionally, Dr. Hermann would not have directly contradicted the manner of death, as he would have opined that the manner of death was undetermined, which offers significantly less support to a suicide defense. Finally, the factors Dr. Hermann believed to indicate suicide were addressed by other witnesses—Dr. Clay Ward addressed Angie's psychiatric history and Dr. Groben addressed the absence of trauma and high concentration of fluoxetine. Thus, Dr. Hermann's testimony would have been cumulative and its addition does not establish a reasonable probability of a different result based on our review of the record. This Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

## 31. The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel for failing to consult and present a gasoline expert.

Abdullah argues that the Toryanskis provided ineffective assistance by failing to present expert testimony that the additive HiTEC 6423 found in the gasoline from the gas can at the Siesta residence could be purchased in Boise.

### a.    Facts

The Toryanskis conferred with a forensic science consultant, Dr. John Thornton, early on in their case. The Toryanskis utilized Dr. Thornton as an arson expert. Dr. Thornton informed the Toryanskis that an arson accelerant, likely gasoline, was applied inside the Siesta residence and garage. Dr. Thornton was not able to determine whether the gasoline contained the marker in

144

question because he had not received the relevant discovery materials. Dr. Thornton explained to Kim that he needed "Chevron laboratory's discovery material concerning the identification of geographic markers introduced into the gasoline," the underlying database of proprietary information, and "[b]ench notes pertaining to the Idaho State Crime Lab's analysis of the gasoline." Kim eventually responded, informing Dr. Thornton that no report was required and he would not be called to testify at trial.

        b.       Standard of Review

"[C]ounsel's choice of witnesses, manner of cross-examination, and lack of objection to testimony fall within the area of tactical, or strategic, decisions, as does counsel's presentation of medical evidence." *Giles*, 125 Idaho at 924, 877 P.2d at 368. "[S]trategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Pratt*, 134 Idaho at 584, 6 P.3d at 834.

        c.       Analysis

At the post-conviction evidentiary hearing, Kim testified that Dr. Thornton's testimony would not aid their case because he agreed with the State's theory that the fire was a result of arson. Kim also testified that calling Dr. Thornton as a witness was not "particularly helpful to us." Additionally, Kim recognized the discovery problems associated with the requested underlying data from Ethyl being proprietary information neither the Toryanskis nor the State had in its possession. Thus, the decision not to call Dr. Thornton was strategic to avoid presenting a weakness in Abdullah's case.

Additionally, the essence of the information that Abdullah contends should have been presented to the jury by an expert was covered by Mitch's cross-examination of Dr. Colucci. Specifically, Dr. Colucci testified that the Ethyl additives are present in other areas of the country, Ethyl supplies forty percent of the fuel additives used in America, and the probability of purchasing gas with one of the Ethyl additives ranges from ten percent to eighty percent, depending on the location. While Dr. Colucci did not expressly testify that his additives are available in Boise, the jury could have reasonably inferred that from his testimony. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. . . . In many instances

cross-examination will be sufficient to expose defects in an expert's presentation." *See Harrington v. Richter*, 131 S. Ct. 770, 791 (2011). The decision to elicit this information on cross-examination as opposed to calling an additional expert did not constitute deficient performance.

Abdullah also failed to demonstrate prejudice. As noted above, the jury could reasonably infer that HiTEC 6423 was available in Boise. Furthermore, the State did not exclusively focus on the additive to link the gas recovered at the Siesta residence to the 7-Eleven in Salt Lake City. Rather, the State also focused on an overlap the testing revealed with an unknown fuel component. This component was located in the sample from the 7-Eleven in Salt Lake City as well as in the sample from the Siesta residence when determining the lowest additive concentration.[45] The State also emphasized that Abdullah had purchased more fuel at the 7-Eleven than was able to fit inside his vehicle's gas tank. Given the totality of this evidence, Abdullah failed to establish a reasonable probability of a different result. Thus, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**32.    The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel for failing to object to the admission of the defense's letter to the prosecutors requesting additional testing of Angie's blood.**

Abdullah argues that the Toryanskis provided ineffective assistance by failing to object to the admission of Mitch's letter to the State requesting additional testing of Angie's blood for certain prescription drugs. Abdullah contends that the jury could infer that the request was made because the defense team knew substances should have been in Angie's blood at the time of her death.

a.    Facts

In December of 2003, Mitch sent the State a letter requesting further testing on Angie's blood. As a result of this letter, Dr. Groben requested additional testing, which revealed a potentially lethal concentration of fluoxetine in Angie's blood. During Dr. Groben's testimony at trial, the State asked about the letter before asking about the additional testing. The Toryanskis did not object to the admission of the letter or the testimony about it.

During closing argument, the State argued:

---

[45] Dr. Colucci explained this is the lowest concentration of an additive that the law requires be present in gasoline at "[forty] pounds per thousand barrels of fuel."

I want to talk to you about fluoxetine and Prozac. A lot of things have been said by the defendant's attorneys about that. You will recall that we learned about that when the defendant's lawyers wrote us and asked us to check for that. Dr. Groben thought it had been determined [sic] he was wrong. The check had been for tricyclic antidepressants, not for SSRIs. We did it and I will tell you that everyone connected with the prosecution of the defendant from myself, Dr. Groben, the police agency were just shocked to find out about the extreme level of Prozac in the blood of Angie Abdullah.

The district court then requested a side bar with the State and subsequently struck the prosecutor's last statement.

b.       Standard of Review

"A trial court has 'broad discretion' in determining whether to admit or exclude evidence, 'and *its judgment in the fact finding role* will only be disturbed on appeal when there has been a clear abuse of discretion.'" *State v. Joy*, 155 Idaho 1, 6, 304 P.3d 276, 281 (2013) (quoting *State v. Watkins*, 148 Idaho 418, 421, 224 P.3d 485, 488 (2009)). "[T]he trial court's conclusion that the probative value of the evidence is not outweighed by its unfair prejudice is reviewed under an abuse of discretion standard." *State v. Tapia*, 127 Idaho 249, 254, 899 P.2d 959, 964 (1995).

c.       Analysis

Abdullah's argument hinges on Idaho Rules of Evidence (I.R.E.) 401, 402, and 403.[46] I.R.E. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 402 states the general rule: "All relevant evidence is admissible." I.R.E. 403 requires the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

Assuming deficient performance, Abdullah cannot establish a reasonable probability of a different result absent the admission of the letter. The letter simply explained why Dr. Groben performed additional testing after he completed the autopsy and accompanying report. Abdullah's speculations about what the jury may have inferred are unwarranted and, even if

---

[46] Abdullah also contends the Toryanskis were ineffective "for failing to move to have an independent lab conduct the testing." Abdullah fails to support this contention with any argument or authority, and thus it is waived. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) (issues on appeal not supported by argument or authority will not be considered).

accepted, do not undermine confidence in the outcome.[47] Assuming but for the Toryanskis' failure to object to the admission of the letter, and further assuming the district court would have excluded any reference to the letter, there is not a reasonable probability of a different result. Thus, Abdullah failed to establish prejudice.

This Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**33. The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel by delaying opening statement.**

Abdullah argues that the Toryanskis provided ineffective assistance by delaying opening statement until after the State's case-in-chief.

a.     Facts

The Toryanskis decided to delay opening statement until the close of the State's case. During the delayed opening statement, Mitch highlighted Angie's emotional, mental, and physical struggles. The theme of the defense opening statement centered on Angie's depression and laid a further foundation for the suicide defense.

b.     Standard of Review

The decision on when, and if, to present an opening statement is a matter of trial strategy that will not be second-guessed absent evidence of inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *State v. Kraft*, 96 Idaho 901, 905, 539 P.2d 254, 258 (1975). *See also United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("[T]he decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel."); *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1985) ("The attorneys' decision to waive opening argument at the guilty phase was one of reasonable trial strategy."); *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985) ("The timing of an opening statement, and even the decision on whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel.").

c.     Analysis

---

[47] While Abdullah contends the State used this letter to create an improper inference during closing argument, Abdullah does not attribute error to that portion of the closing argument. The State's closing argument has no bearing on whether the Toryanskis provided ineffective assistance in failing to object when the letter was admitted during trial.

Abdullah first contends that the district court erred by finding some of his statements credible, but finding other statements incredible. Abdullah asserts that if he is not to be believed, "he is not to be believed with respect to anything he told the Toryanskis and anything he said in his affidavit." This argument is contrary to our long-standing and well-settled law: "The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court." *State v. Dunlap*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004). We conclude this argument is meritless.

Next, Abdullah argues that the decision to defer opening statement until after the State's case-in-chief was not strategic, but based on a desire to not make a decision. At the evidentiary hearing, however, Kim testified that she weighed the advantages and disadvantages of delaying their opening statement and concluded the delay would allow them to retain flexibility in terms of the theory of the defense's case. Likewise, Mitch testified that they thought it would be to Abdullah's advantage because they would be able to listen to the State's evidence and would gain a better perspective on the State's presentation of evidence. Mitch further indicated that he did not want to make promises to the jury they would not be able to keep. Although Abdullah suggests that there was no reason the opening statement given could not have been presented prior to the State's case without compromising any possible defenses, this is not the correct context in which courts assess an ineffective assistance of counsel claim. The inquiry is whether, at the time of the decision, counsel's actions were objectively reasonable. *Strickland*, 466 U.S. at 688–89. Given the tactical and strategic reasons provided by both Mitch and Kim, and the failure of Abdullah to provide any evidence of ignorance of relevant law, inadequate preparation, or other evidence of shortcomings capable of objective evaluation, Abdullah has failed to demonstrate deficient performance. Further, this Court concludes that there was no prejudice because there is not a reasonable probability of a different result but for any error in the delayed opening statement based on the overwhelming evidence at trial establishing guilt. *Id.* at 694. Accordingly, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**34.    The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel for failing to present an alibi defense.**

Abdullah contends that the Toryanskis provided ineffective assistance by failing to pursue a defense that he was not in Boise at the time of Angie's death.

a.    Facts

149

Abdullah identifies the following witnesses as supporting a potential alibi defense. None were called to testify at trial.

### i. Michael Quintana

Before trial, law enforcement interviewed Michael Quintana[48] and a defense investigator interviewed Quintana's girlfriend, Molly Thompson. Quintana and Thompson indicated that they stayed in the motel room adjacent to Abdullah's in Salt Lake City on October 4–5, 2002. Quintana stated that he heard voices intermittently and the television all night in the room next to his. Quintana later clarified that he was sure he heard the TV and may have heard voices coming from the room next to his. Quintana also stated that he saw a short, dark-skinned man with curly hair smoking a cigarette outside the motel, but was unsure of where this man went.

### ii. Lance Donnelson

Lance Donnelson was a gas station attendant working in Farr West, Utah, the night of Angie's death. Donnelson estimated that around 2:30 a.m. to 3:30 a.m. two men of Middle Eastern descent entered his store. Donnelson, who had a law enforcement background, paid close attention to the men because he suspected they may attempt to shoplift or rob the store. Donnelson indicated that he heard one man speak English with a foreign accent and that they spent approximately fifteen to twenty minutes in the store. A week after this encounter, two detectives interviewed Donnelson. The detectives showed Donnelson a picture of Abdullah, and Donnelson positively identified Abdullah as one of the men who had been in his store the prior week. Donnelson also told detectives that the store's security cameras would have footage from the incident, but he personally did not have access to it. Donnelson informed the detectives that the store's manager could access it for them and that the video footage would be retained only for a limited period of time, approximately two weeks.[49] Donnelson also provided the detectives with a written statement.

### iii. Shad Mohammad

Shad Mohammad was in attendance at the mosque in Salt Lake City on the morning of October 5, 2002. According to Mohammad, Abdullah arrived at the mosque around 6:55 a.m. to 7:00 a.m., was late for the morning prayer, and did not smell of gasoline, fire or smoke. Mohammad also noted that Abdullah did not look tired, but rather looked "fresh."

---

[48] Quintana was scheduled to be deported before trial, but his testimony was preserved by deposition.
[49] The video footage had been erased by the time the police requested it.

150

*iv.      Abdul Afridi*

Abdul Afridi owns a car dealership in Salt Lake City. Afridi saw Abdullah and R.A. at his car lot on October 5, 2002, around 12:30 p.m. to 1:00 p.m. Afridi did not smell gasoline or smoke coming from Abdullah. Nor did Afridi see any singed or burned hair on Abdullah's body. Afridi also indicated that Abdullah did not look sleepy, but rather looked "fresh."

b.      Standard of Review

"[T]he accused has the ultimate authority to make certain fundamental decisions regarding" his case, including the decision on "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). However, "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." *Faretta v. California*, 422 U.S. 806, 820 (1975). Tactical decisions made by counsel will not be second-guessed on post-conviction relief, unless made upon the basis of inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008).

The choice of defenses to pursue is a strategic decision left to the judgment of counsel. *State v. Osborne*, 130 Idaho 365, 344–45, 941 P.2d 337, 372–73 (Ct. App. 1997). Likewise, the decision to present an alibi defense is also a strategic choice left to the judgment of counsel. *See, e.g.*, *People v. Tackett*, 742 P.2d 957, 961 (Colo. App. 1987) ("[W]here, as here, defendant's alibi is to be established by testimony of witnesses other than defendant, the decision whether to present such defense is a strategic and tactical decision within the exclusive province of defense counsel."); *Bradley v. State*, 33 So. 3d 664, 675 (Fla. 2010) ("[T]rial counsel made a reasonable strategic decision to utilize an alibi defense as the main defense . . . ."); *Reeves v. State*, 705 S.E.2d 159, 162 (Ga. 2011) ("[W]hether to present an alibi defense is a strategic and tactical decision that, after thorough investigation and client consultation, is virtually unchallengeable and does not require a finding of ineffective assistance of counsel." (alteration in original) (citation omitted)).

c.      Analysis

Abdullah contends that he received ineffective assistance of counsel because the Toryanskis failed to pursue an alibi defense.[50] Contrary to Abdullah's argument, a review of the record demonstrates that the Toryanskis carefully considered an alibi defense, weighed the benefits and risks of presenting such a defense, and made the strategic decision to forego such a defense. Each relevant witness will be addressed in turn.

### i. Michael Quintana

Quintana's deposition testimony demonstrates his memory to be unclear, unsure, and of little value in support of an alibi defense. As noted above, Quintana stated he heard voices intermittently and the television all night in the room next to his. Quintana later clarified, however, that he was sure he heard a TV and *may* have heard voices coming from the room. This generalized, non-committal description of his observations provided little, if any, support for an alibi defense. Further, Quintana's girlfriend, Molly Thompson, was interviewed by defense investigator Ted Cilwick, and she indicated that she never saw anyone near the room next to theirs and she did not hear any voices other than the TV. Thompson further stated that Quintana consumed a few beers that night and she was prescribed and taking methadone at that time as well. Thompson also stated that Quintana was not impaired and the methadone did not affect her memory, hearing, or general cognitive abilities. Given Quintana's nondescript, vague, and ambiguous deposition testimony, coupled with Thompson's statements that she did not hear any voices other than the TV, the Toryanskis' decision not to introduce such testimony was objectively reasonable.

### ii. Lance Donnelson

Abdullah contends that the Toryanskis should have called Lance Donnelson as a witness or, at the very least, should have brought him to Boise to assess whether he could identify Abdullah. We disagree. Donnelson had previously provided two descriptions of Abdullah, neither of which correlated with Abdullah's actual appearance. First, when interviewed October 11, 2002, Donnelson described the man in his store as "being heavy set, with a mustache, speaking broken English." Second, when interviewed by defense investigator Steve Clark in October 2003, Donnelson described the man as being in his late thirties, having a large belly, a

---

[50] Abdullah also contends the district court erroneously concluded the testimony of Donnelson and Quintana was perjured or counsel believed it was. This conclusion appears to be an alternate basis for the district court's decision. Given our conclusion that Abdullah failed to demonstrate deficient performance or prejudice, this claim need not be addressed further.

beard, and between 5'8" and 5'9". On this occasion, Donnelson also indicated that the man in his store spoke broken English with a foreign accent. In contrast to these descriptions, the jail booking sheet for Abdullah indicates that he was twenty-five years of age, 5'7", and 155 pounds at the time of his arrest. Further, Clark testified at the evidentiary hearing that Abdullah was not heavy set, had a beard rather than mustache, and spoke fluent English, albeit with an accent. Therefore, as recognized by the district court, Donnelson's possible identification in court was problematic.

Further, Donnelson's timeline could have played to the State's advantage. At the evidentiary hearing, Murphy explained that the State could have attacked the timing of Donnelson's identification. Murphy recognized that if the State revealed Donnelson identified Abdullah in the gas station somewhere around 4:30 a.m. to 5:00 a.m., Donnelson would have become a very favorable State's witness. Kim recognized this risk as well because "the timelines [sic] were not nailed down." Kim also testified that it seemed to her Abdullah agreed the prospect of presenting an alibi defense was ill-advised.

Combined with other substantial evidence that Abdullah was in Boise, including the cape, the gas can, the DNA evidence, and Wood's testimony, the presentation of Donnelson's testimony plainly was a strategic decision. Besides the problematic identification and the time line issue, the defense team also recognized that it could lose credibility with the jury. Defense investigator Terry Murphy noted the risk associated with Donnelson's testimony in an email to Mitch on October 15, 2004. In this email, Murphy states:

> The only problem I see is, now we have to maintain that [Abdullah] wasn't up here and that hurts our credibility. It's a catch 22. I think [Donnelson's] testimony has to be very tight but he may not be willing or may be unable to say, "That was him, and I'm positive." I think we have to know exactly what he is going to say.

Moreover, Donnelson's potential testimony was inconsistent with the version of events Abdullah told law enforcement—that he remained in the Dream Inn sleeping the entire night of the crime. His testimony was also inconsistent with the version of events Abdullah told his counsel. Based on the evidence in the record regarding the Toryanskis' assessment of value and risk of Donnelson's testimony at trial, the Toryanskis carefully considered presenting an alibi defense via Donnelson's testimony and rejected this defense for sound strategic and tactical reasons.

       *iii.*    *Shad Mohammad & Abdul Afridi*

Abdullah argues that Shad Mohammad and Abdul Afridi would have supported an alibi defense because they met with Abdullah in Salt Lake City on October 5, 2002, and did not smell any gasoline or smoke coming from his person. Testimony from Mohammad and Afridi would have been cumulative because Imam Din from the mosque in Salt Lake City testified to similar facts. Imam Din indicated that he saw Abdullah at around 7:00 a.m. on the morning of October 5, 2002, that he was only four feet away from Abdullah, and that he did not smell gasoline on Abdullah. Mohammad's and Afridi's testimony would have been of little evidentiary value. Furthermore, given the previously mentioned challenges with an alibi defense, the Toryanskis made an objectively reasonable decision to forego such a defense. There was no deficient performance.

### iv. State's Evidence

Lastly, Abdullah argues that the State's evidence weighed heavily in favor of presenting an alibi defense. The State's evidence demonstrated that Angie had an acute overdose of fluoxetine in her blood that contributed to her death. At the time of her death, Angie had a full stomach with a partially digested meal, but her gastric contents contained very little fluoxetine. According to the State's experts Dr. Barbieri and Dr. Backer, Angie would have ingested the fluoxetine before her last meal sometime between 10:00 p.m. and midnight. Marjorie Wood placed Abdullah in Mountain Home a little after midnight, however. This evidence indicates Abdullah did not administer the fluoxetine to Angie in person.

Although the State's evidence did present a question as to how, and if, Abdullah personally administered the fluoxetine to Angie, this question did not mandate an alibi defense. Instead, the Toryanskis made the strategic decision to utilize this evidence to pursue a suicide defense. Focusing on this point in closing argument, Mitch stated, "So whatever reason that toxicology reads like it does, there's one overriding fact, and that is that there is no fact in evidence connecting Azad to Prozac. None." The choice to pursue a suicide defense comported with the State's evidence *and* Abdullah's concession that he was in Boise the night of the crime. This was an objectively reasonable decision at the time of trial.

### v. Summary

The proposed alibi testimony lacked coherence and presented an implausible story. When considered in light of Abdullah's concession that he was in Boise in the early morning hours of October 5, 2002, the Toryanskis' decision to pursue a suicide defense instead of an alibi defense

was objectively reasonable. *See Wright v. United States*, 979 A.2d 26, 30 (D.C. 2009) (where potential alibi witnesses would present conflicting versions of events, an attorney's decision not to call them is reasonable); *Gilmore v. State*, 712 S.W.2d 438, 441 (Mo. Ct. App. 1986) (where potential alibi witnesses' testimony is inconsistent and contradicts defendant's testimony, counsel does not provide ineffective assistance in failing to call such witnesses). Abdullah failed to present evidence of inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective review and thus failed to establish deficient performance. Likewise, Abdullah has failed to demonstrate a reasonable likelihood of a different result based the overwhelming evidence of guilt and the attenuated, improbable facts that allegedly would support the alibi defense. Thus, he has failed to demonstrate prejudice. Accordingly, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**35. The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel due to counsel conceding Abdullah's presence in Boise the night of the murder.**

Abdullah argues that the Toryanskis provided ineffective assistance of counsel by conceding his presence in Boise in the early morning hours of October 5, 2002.

a. Facts

In closing argument, Mitch conceded Abdullah's presence in Boise. Specifically, Mitch stated as follows:

> Now, let me tell you right up front we are not going to be arguing that Azad did not drive to Boise on the morning of 5 October, 2002. We're not going to do that. Obviously there's evidence he did. But the essential thing you've got to know when deciding if the government's [sic] proved their charge here in this case is what happened inside that house because it is inside that house that Angela Abdullah died before the fire and it is in the garage of that house where the accidental ignition occurred. What happened inside that house and who beyond any reasonable doubt is responsible, that is the fundamental question that you'll have to decide.

The remainder of the Toryanskis' argument focused on a suicide defense, disputed the State's theories of motive, and generally called into question the State's evidence.

b. Standard of Review

> The right to effective assistance extends to closing arguments. *See Bell v. Cone*, 535 U.S. 685, 701–02 (2002); *Herring v. New York*, 422 U.S. 853, 865 (1975). Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at

155

that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," *Herring*, 422 U.S. at 862, but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. *See Bell*, 535 U.S. at 701–02. Judicial review of a defense attorney's summation is therefore highly deferential . . . .

*Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003).

c.    Analysis

Abdullah first argues that the concession that he was in Boise reduced the State's burden of proof and was tantamount to a confession. This is a mischaracterization of Mitch's argument. Mitch's concession that Abdullah was in Boise did not amount to a concession of guilt for the crimes charged.[51] Mitch maintained that there was no evidence connecting Abdullah to the fluoxetine found in Angie's blood. Mitch also attempted to focus the jury on the lack of evidence regarding what occurred *inside* the Siesta residence the night of the crime. At this point in the case, the State had presented the following evidence to establish Abdullah's presence in Boise: a cape at the scene was identical in appearance to the one purchased by Abdullah in Salt Lake City; a gas can at the scene was identical in appearance to the one purchased by Abdullah in Salt Lake City; DNA evidence on the cape from which Abdullah could not be excluded as a minor contributor; Wood placed Abdullah in Mountain Home at approximately midnight on the night of the crime; only Abdullah's favorite child N.A. was removed from the burning home; there was no forced entry into the Siesta residence; no one saw Abdullah in Salt Lake City from approximately 8:00 p.m. on October 4, 2002, to 7:00 a.m. on October 5, 2002; Abdullah purchased more gasoline than could fit into the tank of his vehicle; and the expert testing of the

---

[51] We recognize that such concessions (or partial concessions) of guilt in opening statement or closing argument have been upheld by federal appellate courts. *See Haynes v. Cain*, 272 F.3d 757, 762 (5th Cir. 2001) ("Where counsel acknowledges, in closing argument, the overwhelming weight of evidence that has been admitted against his client, even conceding his client's guilt, we have found that such an acknowledgment of the obvious may be a trial tactic that does not reach the level of ineffective assistance."); *Trice v. Ward*, 196 F.3d 1151, 1161–62 (10th Cir. 1999) (court held counsel pursued a reasonable strategy in conceding guilt to a rape charge defendant had confessed to in an attempt to persuade the jury defendant was not guilty of first-degree murder charge or to spare defendant's life); *United States v. Short*, 181 F.3d 620, 624–25 (5th Cir. 1999) (where defense counsel implicated his client in the drug trade during closing argument, court held such action was a "reasonable strategic approach of trying to establish his credibility with the jury and enhance his chances that the jury would accept his arguments on the more serious counts," in light of overwhelming evidence of guilt adduced at trial); *United States v. Tabares*, 951 F.2d 405, 409 (1st Cir. 1991) (counsel's concession to jury that defendant was guilty of one of three offenses "was a tactical decision, designed to lead the jury towards leniency on the other charges and to provide a basis for a later argument . . . for a lighter sentence"); *Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991) (acknowledging guilt can be an effectual tactic when evidence of guilt is overwhelming and there is advantage to be gained by making such acknowledgment).

156

gasoline additives and fuel components. Further, the State presented ample evidence of motive and intent. Based on the overwhelming nature of this evidence establishing Abdullah's presence in Boise, the defense investigator Terry Murphy testified that Mitch felt he would lose the jury if he attempted to argue otherwise. The fact that this strategy proved unsuccessful is not the standard by which an ineffective assistance claim is reviewed; rather, counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. Given the wide discretion afforded counsel in closing arguments, the Toryanskis made an objectively reasonable tactical decision to concede Abdullah's presence in Boise.

Next, Abdullah contends that the district court's finding that counsel pursued a strategy of trying to avoid death was not supported by substantial and competent evidence. A review of the record proves otherwise. First, we note that the district court did not find that Mitch conceded guilt or abandoned the guilt phase arguments. The district court simply found due to the overwhelming evidence that Abdullah was in Boise counsel made the strategic choice to concede his presence, which would aid Abdullah in avoiding a potential death sentence. At the evidentiary hearing, Murphy testified that he felt one reason for making the concession was he did not want to lose the jury. Such a factor is important not only to the guilt phase, but also the sentencing phase. The district court's finding was supported by substantial and competent evidence.[52]

Abdullah also contends that the concession was against his express instructions to counsel. In addition to the concession being a strategic decision made by counsel, the district court found Abdullah acquiesced to this strategy and Abdullah's assertion that he objected was not credible. There was substantial and competent evidence to support this finding. For example, Kim testified that Abdullah was advised they would make the concession and she and Mitch believed doing so "would really help his case and resonate with the jury." Mitch also testified that he or Kim would have presented Abdullah with a document explaining the plan to concede his presence in Boise. Thus, there was substantial and competent evidence to support the district court's finding that Abdullah acquiesced to the strategy of conceding his presence in Boise.

---

[52] Even if the district court's finding on this point was not supported by substantial and competent evidence, where the lower court reaches the correct result by an erroneous theory, this Court will affirm the order on the correct theory. *Row v. State*, 135 Idaho 573, 579, 21 P.3d 895, 901 (2001). For the reasons set forth, the district court reached the correct result.

Finally, Abdullah failed to demonstrate a reasonable probability of a different result had the Toryanskis not made the concession he was in Boise. Again, the State presented overwhelming evidence of Abdullah's presence in Boise. Accordingly, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**36.** **The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel regarding the right to testify in the guilt and penalty phases and to allocute.**

Abdullah asserts that the district court erred by dismissing his claims regarding ineffective assistance of counsel on his right to testify and allocution. He argues that the Toryanskis deficiently advised him that he would have to testify in the narrative form during the guilt phase because his testimony would be false. Abdullah also maintains that the Toryanskis deficiently advised him on his right to allocution, which caused him to waive his right to testify and allocute in the penalty phase. He submits that both deficient performances prejudiced him because there is a reasonable probability the outcome of the guilt phase and penalty phase would have been different had he testified.

Abdullah also states in a footnote that this Court must determine whether he "was denied his fundamental right to testify" in the guilt phase. He submits that this Court must "evaluat[e] whether Azad proved he was deprived of his right to testify, and if so, whether the State proved beyond a reasonable doubt that deprivation was harmless." For this issue to differ from his ineffective assistance of counsel claim, we assume that Abdullah is alleging he was somehow coerced or forced to waive his right to testify. This allegation, however, is unsupported by the record. The district court found that "trial counsel and their investigator credibly testified that they believed testifying held potential dangers for Abdullah but that it was his decision." Abdullah's defense team informed him that he was the only one who could make the decision to testify. The district court also found that it engaged in a colloquy with Abdullah on his right to testify. Abdullah then waived his right to testify. Thus, the district court properly found no one intentionally deprived Abdullah of his right to testify based on the record (excluding any deprivation of his right to testify based on ineffective assistance of counsel). Therefore, this Court rejects Abdullah's argument that he was deprived the fundamental right to testify through means other than ineffective assistance of counsel.

a. Abdullah did not receive ineffective assistance of counsel regarding his right to testify in the guilt phase.

158

Abdullah argues that the Toryanskis were deficient because they improperly advised him on his right to testify at the guilt phase. He asserts that he would have offered exculpatory testimony on his activities on October 4 and 5, 2002, such as an explanation of his purchase of the gas can and cape and the phone call to Imam Din. He further suggests that he was prejudiced because, but for the Toryanskis' deficient performance, there is a reasonable probability his exculpatory testimony would have changed the outcome at trial.

The district court found that the defense team knew Abdullah intended to testify falsely based on the "firm factual basis" standard. Due to the Toryanskis' knowledge that Abdullah intended to testify falsely, the district court found that they advised him of the dangers of testifying and also that he would have to testify in the narrative form. The district court determined that this advice was proper because a criminal defendant has no constitutional right to present false testimony. Further, the district court recognized that the Idaho Rules of Professional Conduct barred the Toryanskis from presenting false testimony as officers of the court. Therefore, the district court ruled that the Toryanskis were not deficient in advising Abdullah of the scope of his right to testify. Further, the district court ruled, "Abdullah has not shown how he was prejudiced even assuming he was prevented from testifying during the guilt phase." Based on Abdullah's letter to the Toryanskis reflecting his intended testimony, the district court found that "there is no way it would have changed the outcome of the trial."

> i. *The district court adopted and applied the correct standard to determine the Toryanskis knew Abdullah would testify falsely at his trial.*

We first review the district court's factual findings regarding this claim. The district court explicitly found: "Abdullah is not a credible witness." The district court explained, "Abdullah irrefutably misled and lied to his trial counsel and investigator from the very beginning of their representation in several material aspects." For example, Abdullah informed his counsel about a potential alibi witness, which he later confessed did not exist. Similarly, Abdullah consistently informed his counsel he was present at the scene of the crime—even stating "he actually moved the body" and describing "the body's condition"—but later informed his counsel he was in Salt Lake City the night of the crime. The district court stated, "Since December 2003, Abdullah had been telling his counsel and their investigator that he had been at the scene and had moved the body. . . . Prior to his admission in December 2003, he lied to them about potential witnesses and evidence." His defense team would investigate these leads, learn that the witness or evidence did not exist, and then Abdullah would admit that he lied to them.

159

The district court recognized, "While it is true that as they approached trial, Abdullah told [his defense team] he wanted to testify that he was in Salt Lake City and gave various versions of what that testimony might look like, there is no credible evidence that he ever indicated that he wanted to testify that way because it was the truth." The district court found, "Abdullah constantly modified his story that he told his trial counsel and his investigator in an effort to fit the evidence and to put himself in a more favorable light." The district court also found, "It is clear from all of the evidence that Abdullah did not want to testify unless trial counsel affirmatively elicited testimony from him that they understood was false. It is clear from the evidence, Abdullah wanted them to lead him through stories that were constantly evolving."

On the day before Abdullah waived his right to testify, November 15, 2004, "he wrote down a new story that involved him being in Salt Lake City . . . . [that] contained elements that his trial counsel had actually investigated and knew were demonstrably false." In this letter, he informed his counsel:

> This is why I want to testify. After we came back from Tennesse [sic] someone told my wife that Azad and another girl went to a trip in Las Vagas [sic] while you were in the Hospital/Nashville. This is when my wife asked did you go to S. Africa and if you did tell me about it what was it like. I did not tell her directly No I didn't go Nor did I say yes I did go. I did not need to go to S. Africa period because of what I found about it. It was a place of crime & dangerous for family and kids and my wife went it [sic] to go there over Saudi Arabia. I didn't give her any straight answer so she automaticaly [sic] thought I realy [sic] did go to Las Vagas [sic] with a girl. After she checked my worked [sic] & it showed that I was in town [and] working but it was to [sic] late and her trust & feelings were unstable. So when I was going to Salt Lack [sic] City she wanted me to take [A.H.] & I refused to take [A.H.] & [R.A.] both so she became suspicious again.
>
> So she had her Plann [sic] to have someone follow me or spy on me. I notice at the time of this when I was in hotel. After I went to hotel from 7 eleven about 10–11 p.m. I have forgotten the side rice that I bought in the car/van so I went to get it between the commercial. As I opened the van I found the middle door open. It was not big deal at first. So I went and closed it & went back to the room. Ate rice watch t.v. and started thinking about the door for long time because I know me or [R.A.] were not exited it from that door so I did start to be syspicious [sic]. [R.A.] was a sleep [sic] I put him in the van and went down to the gas station next to the 6 motel and called with cash because the phone card was not working at that time as you know. I did called [sic] I know it was after 11:30 and may be before 12:30 or after little bit not 100% sure. When she answered the phone [N.A.] & [M.A.] were both crying and I said "was someone following me?" she said "yes, I know don't tell me I'm crazy". And she begin crying on the phone "I said when will you trust me Honey"? she said "Please be

160

patient with me for little while" Also she said "Please don't ever take any trip without us".

I said "I have to go [R.A.] is sleeping see you tomorrow" That is when I hanged up. I did not check any of the items I bought weather [sic] they were in the van or not in fact I did not know what has happened to them or where they went till I came to Boise few days after that and the media. I did had [sic] one can of gas in the van I thought that was the only thing missing I didn't know the cape & mask were missing also.

My wife has done this in the past after [N.A.] was Born in the help of Wally's [sic] her stepfather and I know of one time at work Also she has done this. Can you ask me questions if I do testify please?

As recognized by the district court, "Not only was this an entirely new and very elaborate story diametrically opposed to the story he had been telling them consistently for over nine months, at least some of the story trial counsel knew was false."[53]

Based on the evidence in the record, the district court concluded the Toryanskis had a "firm factual basis" that Abdullah would testify falsely. Abdullah argues that the district court applied the incorrect standard. He asserts that the ethical rules require "actual knowledge of a client's perjury before an attorney's ethical obligation to take remedial action is triggered." Applying this standard, Abdullah alleges that there is no evidence to indicate that his counsel actually knew he would commit perjury.

"It is well established that a criminal defendant's right to testify does not include the right to commit perjury." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). "Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying falsely." *Nix v. Whiteside*, 475 U.S. 157, 173 (1986). In *Whiteside*, the defendant informed his counsel he would testify falsely at his trial. *Id.* at 166. In response, counsel warned the defendant that it was his duty to inform the court if the defendant committed perjury, he "probably would be allowed to attempt to impeach that particular testimony," and he would seek to withdraw if the defendant "insisted on committing perjury." *Id.* at 161. The defendant did not commit perjury on the stand, but subsequently claimed ineffective assistance of counsel for his counsel's refusal to cooperate with the defendant's intention of presenting perjured testimony as a defense at trial. *Id.* at 159, 162–63, 166. The United States Supreme Court rejected the defendant's assertion of error. The United States Supreme Court explained:

---

[53] Even Abdullah's affidavit in the post-conviction record is inconsistent with the November 15, 2004, letter. In this affidavit, Abdullah alleges that he decided to return to Boise the night of October 4, 2002, because Angie was upset on the phone, but he changed his mind after making it as far as Ogden, Utah, and returned to the Dream Inn.

In *Strickland*, we recognized counsel's duty of loyalty and his overarching duty to advocate the defendant's cause. Plainly, that duty is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth. Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law. . . . [T]he legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence.

*Whiteside*, 475 U.S. at 166–68 (citation omitted) (internal quotation marks omitted). Therefore, the United States Supreme Court held that the defendant's counsel's actions fell "well within accepted standards of professional conduct and the range of reasonable professional conduct acceptable under *Strickland*." *Whiteside*, 465 U.S. at 171.

As explored in *Whiteside*, counsel does not engage in deficient performance by advising against or preventing the defendant from committing perjury. Yet *Whiteside* provides little guidance on the standard to determine whether counsel "knows" his client will commit perjury. The Idaho Rules of Professional Conduct (I.R.P.C.) fail to offer a definite standard as well. I.R.P.C. 3.3(a)(3) prohibits a lawyer from "knowingly" offering evidence that "the lawyer knows to be false," including the testimony of his client. I.R.P.C. 3.3(a)(3). The commentary to I.R.P.C. 3.3 elaborates that the rule "requires that the lawyer refuse to offer evidence that the lawyer knows to be false, regardless of the client's wishes. This duty is premised on the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence." I.R.P.C. 3.3 cmt. [5]. This prohibition on the presentation of false evidence applies "to all lawyers, including defense counsel in criminal cases." I.R.P.C. 3.3 cmt. [7]. Comment 8 discusses the standard for "knowingly":

The prohibition against offering false evidence only applies if the lawyer knows that the evidence is false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact. A lawyer's knowledge that evidence is false, however, can be inferred from the circumstances. Thus, although a lawyer should resolve doubts about the veracity of testimony or other evidence in favor of the client, the lawyer cannot ignore an obvious falsehood.

I.R.P.C. 3.3 cmt. [8]. I.R.P.C. 3.3 and the commentary provided above are identical to the American Bar Association's model rule and comments. *See* MODEL RULES OF PROF'L CONDUCT R. 3.3(a)(3) & cmts. [5], [7], [8] (1983).

The appropriate standard to determine a lawyer's "knowledge" that his client's testimony will be false is a matter of first impression for this Court. Other jurisdictions have addressed the issue, however, and come to various conclusions on the appropriate standard. As noted by the district court in this case, "Not unexpectedly, courts have adopted differing standards to determine what an attorney must 'know' before concluding that his client's testimony will be perjurious." The Honorable Raymond J. McKoski explained:

> [M]ost courts either refine or ignore the ABA's actual knowledge standard and establish their own test to determine the sufficiency of the factual information supporting counsel's belief that a defendant is about to lie on the stand.
> . . . Some courts interpret the ABA's standard to require a "firm factual basis that the testimony will be false." Other courts equate the firm factual basis test with "good cause to believe the defendant's proposed testimony would be deliberately untruthful" or a good faith determination of untruthfulness "based on objective circumstances firmly rooted in fact." Yet other courts describe the firm factual basis standard as no standard at all. Declining to adopt the firm factual basis test, Illinois established its own unique standard which affords defense counsel "great discretion" in making a good faith determination that the defendant will commit perjury. A few jurisdictions require that counsel possess proof beyond a reasonable doubt that a client will testify falsely.[54] Another test requires "compelling support" for a conclusion that perjury is about to be committed.

Raymond J. McKoski, *Prospective Perjury by a Criminal Defendant: It's All About the Lawyer*, 44 ARIZ. ST. L.J. 1575, 1615–16 (2012) (footnotes omitted); *see also* Edward L. Wilkinson, *"That's a Damn Lie!": Ethical Obligations of Counsel When a Witness Offers False Testimony in a Criminal Trial*, 31 ST. MARY'S L.J. 407, 412–13 (2000) (reciting various standards for "knowledge").

Although some standards are more stringent than others, the courts generally agree on what will not suffice as "knowledge":

> All tests require a belief based on articulable facts and not upon mere conjecture, speculation, or a "gut-level belief" that the defendant will lie. The fact that the accused's version of events has internal inconsistencies or discrepancies has varied from time to time, or conflicts with other more convincing evidence is

---

[54] For example, Wisconsin has adopted the one of the strictest standards:

> [W]e determine that an attorney may not substitute narrative questioning for the traditional question and answer format unless counsel knows that the client intends to testify falsely. Absent the most extraordinary circumstances, such knowledge must be based on the client's expressed admission of intent to testify untruthfully. While we recognize that the defendant's admission need not be phrased in "magic words," it must be unambiguous and directly made to the attorney.

*State v. McDowell*, 681 N.W.2d 500, 514 (Wis. 2004).

insufficient. Indeed, even a "manifestly incredible" or "absurd" story does not mean that the defendant may not present it.

McKoski, *supra*, at 1616 (footnotes omitted).

In this case, the district court adopted the "firm factual basis" standard. This test has been used by the Third, Eighth, and Ninth Circuit Courts of Appeals. *See, e.g.*, *Lord v. Wood*, 184 F.3d 1083, 1095 n.9 (9th Cir. 1999), *cert. denied*, 528 U.S. 1198 (2000); *United States v. Omene*, 143 F.3d 1167, 1171 (9th Cir. 1998); *United States v. Long*, 857 F.2d 436, 445–46 (8th Cir. 1988); *United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 122 (3d Cir. 1977). The *Restatement of the Law Governing Lawyers* also recommends the firm factual basis standard:

> A lawyer's knowledge may be inferred from the circumstances. Actual knowledge does not include unknown information, even if a reasonable lawyer would have discovered it through inquiry. However, a lawyer may not ignore what is plainly apparent, for example, by refusing to read a document. A lawyer should not conclude that testimony is or will be false unless there is a firm factual basis for doing so. Such a basis exists when facts known to the lawyer or the client's own statements indicate to the lawyer that the testimony or other evidence is false.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 120 cmt. c (2000) (citation omitted). In addition, the firm factual basis standard has been adopted in California, *People v. Riel*, 998 P.2d 969, 1013 (Cal. 2000), Washington, *State v. James*, 739 P.2d 1161, 1169 (Wash. Ct. App. 1987), and Massachusetts, *Commonwealth v. Mitchell*, 781 N.E.2d 1237, 1247 (Mass. 2003).

We hold that the firm factual basis standard is appropriate to determine whether counsel knows his client will testify falsely. The firm factual basis standard "satisfies constitutional concerns because it requires more than mere suspicion or conjecture on the part of counsel, more than a belief and more information than inconsistencies in statements by the defendant or in the evidence." *Mitchell*, 781 N.E.2d at 1247 (footnote omitted). This standard also permits counsel to "act on the information he or she possesses" and does not "impose an independent duty on the part of counsel to investigate," which would be "incompatible" with the fiduciary nature of the attorney-client relationship and "is unnecessary when an attorney relies, in significant part, on incriminating admissions made by the client." *Id.* In contrast to the firm factual basis standard, we are persuaded that a standard of "actual knowledge" or knowledge beyond a reasonable doubt is "unworkable, as it will be all but impossible, particularly in the crucible of a trial where the evidence is often conflicting and counsel is under enormous stress, for counsel to ever know

164

beyond a reasonable doubt that a defendant's proposed testimony is false." *Commonwealth v. Mitchell*, No. CRIM. A. 9673CR0312, 2000 WL 33119695, at *20 (Mass. Dist. Ct., Super. Ct. Dec. 18, 2000), *aff'd*, *Mitchell*, 781 N.E.2d 1237. Such a stringent standard "would be virtually impossible to satisfy unless the lawyer had a direct confession from his or her client or personally witnessed the event in question. Consequently, the standard of actual knowledge would eviscerate the rules of professional responsibility forbidding a lawyer from presenting perjured testimony." *State v. Hischke*, 639 N.W.2d 6, 10 (Iowa 2002). The firm factual basis standard strikes a balance between the competing interests of the defendant's constitutional right to testify and the attorney's ethical obligation as an officer of the court.

As explored above, the district court applied the firm factual basis standard to find that the Toryanskis knew Abdullah would testify falsely. The district court found:

> In this case, Abdullah's trial counsel were not faced with mere discrepancies in details told to them by Abdullah at various times. Trial counsel were faced with direct and repeated admissions from Abdullah's own lips that he had been present at the scene and even moved the body. Those admissions, combined with the substantial evidence produced by the State, corroborated his presence, producing a firm factual basis for their belief. The Court finds the record amply supports a finding that trial counsel had a firm basis in objective fact for their good faith determination that Abdullah intended to commit perjury.

In light of the fact that Abdullah merely challenges the district court's use of the firm factual basis standard, this assignment of error is rejected. The district court's factual findings were not clearly erroneous. *Murray v. State*, 156 Idaho 159, 164, 321 P.3d 709, 714 (2014). In fact, the district court's findings were supported by substantial and competent evidence in the record. Therefore, the district court adopted and applied the correct standard to determine the Toryanskis knew Abdullah would testify falsely at his trial.

> ii.     *Abdullah's ineffective assistance of counsel claim fails on the prejudice prong.*

We resolve Abdullah's ineffective assistance of counsel claim based on his right to testify in the guilt phase on the prejudice prong from *Strickland*.

In *Whiteside*, the majority opinion examined both the deficiency and prejudice prongs of *Strickland* to hold that the defendant did not receive ineffective assistance of counsel based on his counsel's refusal to assist his client with a defense based on false testimony. *Whiteside*, 475 U.S. at 171, 175–76. The United States Supreme Court explained in its prejudice analysis:

> Whether he was persuaded or compelled to desist from perjury, Whiteside has no valid claim that confidence in the result of his trial has been diminished by his desisting from the contemplated perjury. Even if we were to assume that the jury might have believed his perjury, it does not follow that Whiteside was prejudiced.

*Id.* at 175–76. Thus, the United States Supreme Court held that, "as a matter of law, counsel's conduct complained of here cannot establish the prejudice." *Id.* at 175. In other words, there was no reasonable probability the result of the proceeding would have been different based on false testimony.

Justice Blackmun, joined by Justices Brennan, Marshall, and Stevens, concurred in the judgment in *Whiteside* and stated that the defendant's ineffective assistance of counsel claim should be resolved on the prejudice prong only—without "attempting to resolve this thorny problem" of "[h]ow a defense attorney ought to act when faced with a client who intends to commit perjury at trial." *Id.* at 177–78 (Blackmun, J., concurring in the judgment). Justice Blackmun explained:

> This Court long ago noted: "All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial." When the Court has been faced with a claim by a defendant concerning prosecutorial use of such evidence, it has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Similarly, the Court has viewed a defendant's use of such testimony as so antithetical to our system of justice that it has permitted the prosecution to introduce otherwise inadmissible evidence to combat it. *The proposition that presenting false evidence could contribute to (or that withholding such evidence could detract from) the reliability of a criminal trial is simply untenable.*
>
> . . . .
>
> *. . . To the extent that Whiteside's claim rests on the assertion that he would have been acquitted had he been able to testify falsely, Whiteside claims a right the law simply does not recognize.* "A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed." Since Whiteside was deprived of neither a fair trial nor any of the specific constitutional rights designed to guarantee a fair trial, he has suffered no prejudice.

*Id.* at 185–87 (emphasis added) (citations omitted). The same reasoning expressed in the majority opinion and Justice Blackmun's concurrence in *Whiteside* applies here. Abdullah cannot establish prejudice because as a matter of law the presentation of false testimony has no

reasonable probability of a different outcome at trial. Assuming the Toryanskis were deficient in advising Abdullah to testify in the narrative form and further assuming but for their deficient advice Abdullah would have testified in his defense, the Toryanskis nonetheless would have elicited false testimony. A claim that Abdullah "would have been acquitted" based on false testimony is a claim "the law simply does not recognize." *Id.* at 186. For this reason, Abdullah did not receive ineffective assistance of counsel by the Toryanskis' advice on Abdullah's right to testify in the guilt phase. This Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

      b.      <u>Abdullah did not receive ineffective assistance of counsel regarding his right to testify and allocute in the penalty phase.</u>

Abdullah argues that the district court did not have substantial and competent evidence to find that the Toryanskis properly advised Abdullah of the scope of allocution during the penalty phase. Abdullah relies on the defense investigator's testimony to demonstrate that the Toryanskis "told Azad if he waived his right to testify, he would be able to address the jury on a broad range of topics through allocution." Based on this testimony, Abdullah asserts that the Toryanskis misinformed Abdullah about the scope of allocution, which caused him to waive his right to testify and allocute in the penalty phase. Abdullah further argues that he was prejudiced by the Toryanskis' deficient performance because Abdullah would have testified during the penalty phase or made a statement of allocution but for the Toryanskis' "interference."[55] According to Abdullah, there is a reasonable probability the outcome of the penalty phase would have been different had he testified or offered a statement of allocution.

The district court determined that the Toryanskis were not deficient. Based on the evidence in the record, the district court found:

> [Abdullah's] trial counsel properly advised him and encouraged him to allocute; they did not tell him he could dispute guilt phase evidence during allocution. Indeed, trial counsel, Mitch Toryanski, credibly testified that they did not advise Abdullah to waive his right to testify during the guilt phase because he would be able to challenge guilt phase evidence during allocution and not be subject to cross examination. In fact, trial counsel credibly testified he would not have told him anything like that. The Court finds that his testimony is credible.

---

[55] Abdullah again states in his brief that the parties and the district court discussed outside Abdullah's presence that the district court would allow the defense to reopen the mitigation phase so Abdullah could testify. Abdullah contends the record "fails to reflect the court or counsel told Azad of the court's decision" to allow for the defense to reopen its case. This statement is untrue. The record plainly shows that Abdullah was present and discussed with the district court that he could reopen the mitigation phase if he wished to testify.

The Court further finds that Abdullah's trial counsel were prepared to help Abdullah present proper mitigation during allocution including helping him display photographs and going over material. Trial counsel credibly recalled explaining to Abdullah the allocution rules described by the Court.

Turning to prejudice, the district court determined that "there is no evidence that [Abdullah's] failure to allocute affected the jury's decision in the penalty phase."

The district court also noted that Abdullah primarily sought to raise issues pertaining to the guilt phase of trial, rather than address the issues relevant to sentencing and mitigation. The district court explained:

Abdullah was well aware that he had the right to allocute to present any information in mitigation of punishment and that it was his decision to decide whether to allocute. His trial counsel did not misinform him.

Abdullah, however, indicated to the Court that he wanted to make statements directly challenging his guilt and to introduce evidence to be considered by the jury. Moreover, he wanted to do it without being under oath or subject to cross-examination. As the Court informed him, he could no longer challenge his guilt once the jury had found him guilty and his unsworn statements regarding evidence introduced in the guilt phase was simply not allowed; they were irrelevant and did not constitute mitigation.

. . . .

. . . Moreover, at the end of the penalty phase after the defense had rested, the Court unmistakably offered Abdullah the opportunity to re-open the sentencing phase and take the stand and testify, but he refused.

> i.       *The Toryanskis were not deficient in their advice on the scope of allocution.*

Abdullah argues that the district court erroneously discounted the credible testimony of defense investigator Murphy in order to find that the Toryanskis did not deficiently advise Abdullah of the scope of allocution. Abdullah contends that the district court should have given weight to Murphy's testimony over the vague testimony of Mitch Toryanski. He submits that the evidence shows he was misinformed that he could "tell his story."

The district court's factual findings will not be disturbed unless clearly erroneous. *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004). "A factual finding is clearly erroneous only if it is not supported by 'substantial and competent evidence in the record.'" *Stuart v. State*, 127 Idaho 806, 813, 907 P.2d 783, 790 (1995) (quoting *Pace v. Hymas*, 111 Idaho 581, 589, 726 P.2d 693, 701 (1986)). "The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court." *Dunlap*, 141 Idaho at 56, 106 P.3d at 382. "There is a

'strong presumption that counsel's performance fell within the wide range of professional assistance.'" *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999) (quoting *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988)).

Abdullah's argument is meritless because this Court will not disturb the district court's well-supported factual findings. Further, Abdullah misconstrues investigator Murphy's testimony on appeal. Based on the evidence in the record, the district court had substantial and competent evidence to find that the Toryanskis did not advise Abdullah he could "tell his story" in allocution without any limitations on the scope.

Abdullah misrepresents Murphy's testimony on appeal. At the evidentiary hearing, Murphy first testified that he did not "recall specifically" any discussions with the Toryanskis and Abdullah concerning allocution. Murphy subsequently recalled that he had received a letter from Abdullah and had met with Mitch to discuss the letter. In this letter, Abdullah wrote to Murphy:

> There is something that I need to talk to you about. Something very important. I don't want to talk to Kim & Mitch because we are starting the trail [sic] & I don't want them to be mad or get their mind off of the trial or for picking the Jorrs [sic].
> So I know that you also will be angry & mad but I feel strongly about this and must know and you decide if I should tell Kim & Mitch.
> I decited [sic] to tell you this after hearing the Jorrs [sic] and the seriousness of this case. *Also I want to testify in trial* and want Kim & Mitch to help me for that so I feel they should know and also I don't want to hide any things from Kim and Mitch.
> They are for me and my kids for that reson [sic] I don't want to keep any secrets from them. It's not easy for me to be fully opened [sic] person that easy but I must be so that Kim & Mitch can get me fair trial. It's going to harm my case and may be help me I don't know. I have being [sic] unfair to you & Kim & Mitch wich [sic] I don't want to have any of that from now on.
> To give you a heads up It's about me coming to Boise from Salt Lack [sic] City that night.
> . . . Also I hope that this will not create any more troubles. My intentions are only to do what is right. I know It's little bit too late sorry for that.

In the margin near the italicized language, Murphy had written during his meeting with Mitch, "Mitch will have himself removed. No way. Do it at sentencing. No Cross."

During Murphy and Mitch's discussion of this letter from Abdullah, Murphy testified that Mitch brought up allocution, which was the first time Murphy had heard the term. Murphy testified that Mitch "was explaining to me that at that time that it had to do with the defendant

getting up prior to sentencing and saying whatever he wanted to to the Court." Murphy explained, "And we were talking about Mr. Abdullah wanting to tell his story, he wanted to say something to the Court. And Mr. Toryanski said that if Mr. Abdullah chooses not to testify at the trial, that he could still tell his story at allocution." Murphy later met with Abdullah and he testified that he did not think that he talked about allocution, but also that he did not recall the allocution issue. Upon questioning by the district court, Murphy clarified, "[A]ll I understood was that if Mr. Abdullah had been found guilty, there would be some time prior to his sentencing that he would be able to stand before the Court. And that was reference to his allocution." Murphy testified that he did not know whether Mitch "was talking about the traditional allocution" before the Court or "about something that occurred during the sentencing phase" with the jury. He also explained that he was "just the investigator and this was in passing as a brief explanation to me as an investigator, not being an attorney, to explain allocution to me."

Abdullah argues that this testimony supports a finding that his counsel told him he could tell his story during allocution. Abdullah's argument is misplaced for more than one reason. First, the evidence he relies on reflects a conversation between Mitch and Murphy wherein Mitch briefly explained in passing the term allocution. Murphy's testimony shed no light on the Toryanskis' understanding of what Abdullah's "story" at sentencing would entail. Along the same lines, this conversation has little to no influence on the determination of the legal advice given to Abdullah by the Toryanskis. Hence, it was reasonable for the district court to base its factual finding on the testimony of Mitch, rather than Murphy. Mitch's testimony provides:

> Q. [by the State] Now, with regard to allocution, did you inform Mr. Abdullah that it was his decision whether or not he would make an allocution to the jury?
>
> A. [by Mitch Toryanski] Yes.
>
> Q. And did you inform him that he had that right?
>
> A. Yes.
>
> Q. Did you make the decision for him about allocution?
>
> A. No.
>
> Q. And then -- and I think you said earlier, did you, in fact, encourage him that he should allocute?
>
> A. I did. I remember offering to display pictures on an overhead for him which he could then discuss to talk about his family and -- and other various things that he wanted to talk about.
>
> . . . .

170

THE COURT: Let me ask you two questions. What did you tell him he could say during allocation? And what's the time frame that you would have had this discussion?

THE WITNESS: Judge, it would have been -- I remember many -- many conversations and -- and I think some were held in the -- in chambers. I seem to remember Mr. Abdullah being -- being brought back. There were conversations in the courtroom. And there was discussions [sic] between counsel and the Court. And I -- I remember encouraging him to -- to allocute. As far as we told him what he could and could not say, I recall making notes when the Court set out the -- the rules and -- and explaining as best as I could what those rules were to him.

Similar to Mitch's testimony, Kim explained, "I -- I think that Mitch and I together with Azad were trying to convey that this was an important opportunity for him and that it was different. And -- and we -- I remember Mitch very much wanting to help to elicit that -- that allocution testimony." Kim testified, "I think there may have been a conversation in court on that, too, about the differences" between allocution and testimony. Kim did not remember the differences, but she testified, "I believe, it went beyond just the conversations that Mitch and I would have had directly with Mr. Abdullah, the scope of an allocution and -- that's parameter -- the parameters of that, I think, was something that was considered in court." Kim testified that she "[p]robably" discussed with Abdullah the subject matters of allocution, but she did not "really remember." She did remember some photographs, however. Kim also testified, "I think we were interpreting [the areas Abdullah could cover in allocution] very broadly, that he would be able to -- he would be able to say what he wanted to say. But I also remember that we had a hearing in court and -- on the -- on the scope."

Based on this evidence in the record, the district court had substantial and competent evidence in the record to find: "Abdullah's trial counsel were prepared to help Abdullah present proper mitigation during allocution including helping him display photographs and going over material. Trial counsel credibly recalled explaining to Abdullah the allocution rules described by the Court." It was "solely within the province of the district court" to give weight to Kim's, Mitch's, and Murphy's testimony on the scope of allocution and to draw inferences from their testimony. *Dunlap*, 141 Idaho at 56, 106 P.3d at 382. Abdullah has identified no evidence to overcome the presumption of competent counsel and disturb the district court's findings. *Strickland*, 466 U.S. at 690 ("counsel is strongly presumed to have rendered adequate assistance"). Therefore, this Court rejects Abdullah's assertion that this Court should reweigh the evidence and infer from Murphy's testimony that the Toryanskis misinformed Abdullah on the

scope of allocution. Based on the evidence in the record, this Court affirms the district court's determination that the Toryanskis were not deficient.

ii.  *Even assuming the Toryanskis deficiently advised Abdullah on the scope of allocution, Abdullah was not prejudiced by their deficient performance.*

Abdullah argues that there a reasonable probability the outcome at sentencing would have been different had he presented mitigating evidence through testimony or allocution. This Court concludes that Abdullah has failed to demonstrate prejudice.

Any error in Abdullah's counsel's deficient performance on the scope of allocution was cured by the district court's multiple colloquies with Abdullah on his right to testify and allocute in the penalty phase and the scope of such testimony and allocution. *Murray v. State*, 156 Idaho 159, 167–68, 321 P.3d 709, 717–18 (2014). In *Murray*, the Court stated that "the district court's efforts" to inform the defendant of his *Estrada* rights, which counsel had deficiently failed to advise on, "bear on the prejudice prong of *Strickland*." *Murray*, 156 Idaho at 167, 321 P.3d at 717. The Court explained that the record conclusively established that the defendant fully understood his *Estrada* rights and voluntarily waived them after the district court informed the defendant of his *Estrada* rights. *Murray*, 156 Idaho at 167–68, 321 P.3d at 717–18. The Court held that the defendant failed to show prejudice because there was not a substantial likelihood or reasonable probability of a different result had the defendant's counsel not been deficient. *Id.* at 168, 321 P.3d at 718. In this case, the district court advised Abdullah multiple times of his right to testify and allocute. The district court described to Abdullah the differences between testimony and allocution numerous times. The district court explained to Abdullah that he could reopen mitigation and testify and that he could allocute. The district court also explained in great detail the permissible scope of allocution. At one point, the district court went through Abdullah's written allocution statement subject by subject and examined which subjects were admissible. Even with counsel's assumed deficient performance, Abdullah still chose not to testify or allocute after receiving the proper advisements from the district court many times. Therefore, there is not a reasonable probability the result would have been any different but for his counsel's deficient performance.

Our conclusion on the prejudice prong is further bolstered by Abdullah's proposed testimony and allocution in the penalty phase. Abdullah submits that he

wanted to testify at the penalty phase about a number of issues, including his relationship with Angie and their children, Angie's conversion to Islam, the affair,

his discussions with Angie about moving out of the country and selling the home, the vending machine business, the financial situation of their house, and the fact he never asked Steven Bankhead to kill Angie.

He also asserts:

Mitigating evidence has the ability to tip the scales in favor of life. Azad's testimony was mitigating evidence that would have demonstrated to the jury he loved Angie, he loved his children, he regretted having the affair but believed Angie forgave him, his feelings about divorce, his Kurdish cultural beliefs, his experiences in Kurdistan, and his family's journey to Turkey and the United States.

We recognize that simply because Abdullah wanted to testify about a certain subject does not mean that he would have been permitted to do so. The district court repeatedly explained to Abdullah that he could not use his penalty phase testimony to address issues pertaining to the guilt phase, including his overseas trips and the family's plan to move overseas. The district court also explained that Abdullah could not use allocution to raise factual issues or address non-mitigation subjects, including his contact with Bankhead, Angie's wish for her family to accept her as Muslim, his frustrations about his lack of participation in his case, and extensive discussion on his denial of guilt. In addition, the defense presented mitigating evidence on Abdullah's experiences in Kurdistan and his family's journey to Turkey and the United States through an expert of the Kurdish situation and Abdullah's family. Thus, much of Abdullah's proposed testimony or allocution would have been cumulative or irrelevant.[56] Based on the evidence presented at trial, there is not a reasonable probability the jury would not have sentenced Abdullah to death but for his counsel's deficient performance regarding his right to testify or allocute in the penalty phase. *Strickland*, 466 U.S. at 700 ("Given the overwhelming aggravating factors, there is no reasonable probability the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed.") This Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

---

[56] At sentencing for the remaining charges, the district court also recognized Abdullah's lack of remorse:

Mr. Abdullah in his writing appears to suggest that somehow his life is justified. He did not appear to recognize or acknowledge the impact his actions have had on others and instead wrapped himself in his beliefs not acknowledging the pain the victims feel until today in court. In his writing he talks about his piety and own loss. But until today in court throughout his more than 40-page [sentencing] statement, he did not express any empathy for the victims, his own children or family, including his own immediate family. Finally today he acknowledged for the first time that the children may have been hurt by this.

**37. The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel during jury selection.**

Abdullah argues that the Toryanskis provided ineffective assistance in conducting voir dire and selecting a jury, which led to the empaneling of a biased jury.

      a.     <u>Facts</u>

Prospective jurors were each provided a forty-five page questionnaire that included inquiries about general background, knowledge of the law, facts of the case, and views of the death penalty. The portion addressing views about the death penalty was extensive. After reviewing the completed questionnaires from jurors, the parties stipulated to the dismissal of a number of jurors for cause. The remaining jurors were brought in for voir dire and a petit jury was selected.

      b.     <u>Standard of Review</u>

The right to due process encompasses the opportunity to question jurors in order to disclose grounds for removal for cause during voir dire. The United States Supreme Court has said:

> The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171–72 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

*Morgan v. Illinois*, 504 U.S. 719, 729–30 (1992) (alterations in original).

In a capital case, a prospective juror may be excluded for cause when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). "[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728. Conversely, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and

mitigating circumstances as the instructions require him to do" and must also be removed for cause. *Id.* at 729.

"The choice of questions to ask prospective jurors during voir dire is largely a matter of trial tactics." *Milton v. State*, 126 Idaho 638, 641, 888 P.2d 812, 815 (Ct. App. 1995). These tactical decisions made by counsel will not be second-guessed on post-conviction relief, unless made upon the basis of inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008); *Milton*, 126 Idaho at 641, 888 P.2d at 815. *See also State v. Porter*, 130 Idaho 772, 793, 948 P.2d 127, 148 (1997) (tactical decisions not to remove jurors will not be questioned by the Court on appeal).

Other jurisdictions employ an equally deferential approach. *See, e.g.*, *Echols v. State*, 127 S.W.3d 486, 502 (Ark. 2003) ("This court will not label counsel ineffective merely because of *possible* bad tactics or strategy in selecting a jury."); *People v. Reese*, 460 N.E.2d 446, 451 (Ill. App. Ct. 1984) (the review of counsel's performance in an ineffective assistance claim does not extend to areas involving trial tactics or strategy, such as jury selection); *State v. Adams*, 576 S.E.2d 377, 382 (N.C. Ct. App. 2003) ("[T]rial counsel are necessarily given wide latitude in matters involving strategic and tactical decisions such as which jurors to accept or strike."); *State v. Lindsey*, 721 N.E.2d 995, 1007 (Ohio 2000) ("[C]ounsel's failure to rehabilitate jurors does not render trial counsel ineffective, as counsel is in a better position to determine whether the jurors merited in-depth examination.").

c.     Analysis

Abdullah's argument consists of three parts: (1) the stipulation to excuse jurors for cause; (2) inadequate voir dire of the venire; and (3) inadequate voir dire of the panel.

> i.     *The decision to stipulate to excuse certain jurors for cause before voir dire did not constitute ineffective assistance of counsel.*

Prior to voir dire, the district court requested that the parties review the completed juror questionnaires to determine whether individual jurors should be excused for cause without requiring those jurors to come to court. The district court explained that these jurors would be excused for cause only by stipulation and it would not grant any for cause challenges without voir dire. The Toryanskis emailed the State a list of thirteen jurors which they believed should be struck for cause. The Toryanskis contended that these jurors had already judged Abdullah's guilt, could not consider mitigating evidence, or would hold it against Abdullah if he did not testify.

175

The State refused to stipulate to strike any of the jurors requested.[57] The State also emailed the Toryanskis a list of seventeen jurors which they proposed be struck by stipulation. The Toryanskis stipulated to twelve of these jurors being struck for cause, including the following jurors: 12, 15, 64, 75, 82, 117, and 154.

Abdullah contends that the Toryanskis' stipulation was attributable to fatigue and a desire to appear reasonable to the State in order to procure a favorable plea deal.[58] A review of the questionnaires, however, reveals that sound strategic and tactical reasons support the Toryanskis' decision to stipulate.

Initially, we note that every juror challenged by Abdullah in this section chose the following statement as most accurately representing their view on the death penalty: "I am personally, morally, or religiously opposed to the death penalty, and would never vote to impose it, regardless of the facts and the law in the case." Harboring this view of the death penalty is sufficient reason in and of itself to stipulate to the removal of such jurors. *See Morgan*, 504 U.S. at 728 ("[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."). In the discussion below, we review additional information in each juror's questionnaire that demonstrates further tactical and strategic reasons for the Toryanskis' stipulation.

### (1)    *Jurors 12, 15, 82, and 154*[59]

Abdullah submits the same argument with respect to Jurors 12, 15, 82 and 154. He argues that these jurors were not per se excludable for cause. He explains that these jurors provided a potential inconsistency in their responses in that the jurors indicated their views would not prevent or impair their impartiality, but the jurors also stated that they could not impose the death penalty regardless of the facts and law. Abdullah also argues that these jurors' position on the death penalty was unclear because they may have opposed the death penalty based only on the belief that innocent people have been wrongly executed.

---

[57] While Kim could not recall the outcome of this email at deposition, both parties agree the State refused to stipulate.

[58] Abdullah attempts to incorporate by reference his detailed argument regarding each one of these jurors from his final amended petition. This Court declines to address these specific challenges, as this would allow Abdullah to subvert the page limit he has been allotted on appeal. I.A.R. 35(a)(6); *see also Norfleet v. Walker,* 684 F.3d 688, 690 (2012) ("The incorporation of arguments by reference in an appellate brief is forbidden."). Accordingly, only the arguments actually set forth in Abdullah's appellate brief are addressed herein.

[59] Again, we refer to an individual juror with the pronouns "he" or "him," but we recognize that some of the jurors were female.

We disagree with Abdullah's argument. As discussed below, the Toryanskis had legitimate strategic and tactical reasons to stipulate to remove these jurors for cause.

Juror 12's questionnaire indicated that Juror 12 had been the victim of robbery three times. The questionnaire further revealed Juror 12 had a history of depression and Juror 12 was taking antidepressants. In describing Juror 12's feelings towards antidepressants, Juror 12 indicated that they "can greatly improve quality of life." This view potentially posed a threat to the suicide defense as Juror 12 could have connected with Angie and been reluctant to believe the story that an individual utilizing antidepressants under the care of a physician would commit suicide. A valid strategic basis existed for stipulating to removing this juror for cause.

Juror 15's questionnaire indicated that Juror 15 felt "a defendant should be required to testify" and "a defendant who does not testify is probably guilty or has something to hide," and Juror 15 would "hold it against" Abdullah if he did not testify. Juror 15 further indicated that Juror 15 would consider the failure to testify as an indication of guilt and that "only a guilty person would not want to tell his side of the story." The Toryanskis did not provide deficient performance in stipulating to remove this juror for cause.

Juror 82's questionnaire indicated a belief that "a defendant should be required to testify." Juror 82 further indicated that Juror 82 held "religious, philosophical or moral belief[s]" that would not permit Juror 82 to sit as a juror and reach a final verdict. Juror 82 also stated, "The life and death should be left to God." Finally, Juror 82 indicated having trouble with the English language. Thus, multiple reasons existed for the Toryanskis to stipulate to remove this juror for cause.

Juror 154 provided that the best argument against the death penalty was "moral grounds." Juror 154 also indicated that Juror 154 strongly disagreed with imposition of the death penalty on only the worst murderers and strongly disagreed that society would be stronger if the death penalty were imposed more often. Juror 154 strongly agreed that, "Matters of life and death should be left to God." Juror 154 agreed with the statement that, "It doesn't matter what kind of childhood a murderer had." Juror 154 also indicated that Juror 154 strongly disagreed with the statement, "I could vote for the death penalty in some cases if I were on a jury" and the statement

"I support the use of the death penalty." These responses demonstrate sufficient strategic reasons to stipulate to Juror 154's removal for cause.[60]

### (2)    *Jurors 64, 75, and 117*

Abdullah submits a similar argument with respect to Jurors 64, 75, and 117. He argues that these jurors expressed strong opinions against the death penalty, but these jurors did not indicate that their attitude would prevent or impair their impartiality.

We again disagree. The Toryanskis had legitimate strategic and tactical reasons to stipulate to remove these jurors for cause.

Juror 64 expressed the following beliefs: "that a defendant should be required to testify," "that a defendant who does not testify is probably guilty or has something to hide," and that if Abdullah exercised the right to remain silent, that Juror 64 would "hold that against him and consider it as an indication of guilt." Juror 64 also indicated that Juror 64 held a "religious, philosophical or moral belief" that would not permit him "to serve as a juror and reach a final verdict." This was because, "As a Jehovah's witness, [Juror 64] could not decide if a persons [sic] life is involved – or capitol [sic] punishment." Further, Juror 64 provided that Juror 64 could not judge whether Abdullah was guilty because, "If it is a capital case – if the death penalty were involved I could not in good conscience decide." Finally, Juror 64 indicated that Juror 64 would not "follow the instructions upon the law given by the Judge" because Juror 64 "cannot decide on a death penalty case." Adequate strategic reasons existed for the stipulation to remove this juror for cause.

Juror 75 indicated "a defendant who does not testify is probably guilty or has something to hide," and that "only a guilty person would not want to tell his side of the story." Juror 75 also indicated his "views on the death penalty would prevent or substantially impair [his] ability to view the facts impartially," and that his "views on the death penalty would prevent or substantially impair [his] ability to return a guilty verdict of First Degree Murder against the Defendant even if the State had proven its case beyond a reasonable doubt." Juror 75 stated, "I have strong emotional feelings about personally imposing the death penalty on another human." Moreover, Juror 75 indicated "I am familiar with this case and I am personally acquainted with

---

[60] Furthermore, jurors in the pool for preemptory challenges only went through Juror 116. The last seated juror was Juror 103. Thus, any juror further down the roster would not have been considered for the jury regardless of whether the defense agreed to strike them from the panel. Accordingly, no prejudice can be established for the dismissal of any jurors past Juror 103.

someone who knows the defendant and his deceased wife and kids." Juror 75 further explained that Juror 75 knew one of the witnesses and that Juror 75's spouse "went to school with Angie." Finally, Juror 75 stated, "I have heard and currently believe that Azad Haji Abdullah committed murder." Again, adequate strategic reasons existed for the stipulation to remove this juror for cause.

Juror 117 indicated "a defendant who does not testify is probably guilty or has something to hide." Further, Juror 117 strongly agreed that, "Matters of life and death should be left to God" and also indicated his "views on the death penalty would prevent or substantially impair [his] ability to view the facts impartially." The Toryanskis had sufficient strategic reasons for stipulating to remove this juror for cause

### (3) *Summary*

Based on the information provided by these jurors in the questionnaires, the Toryanskis did not provide deficient performance by stipulating to the dismissal of these jurors prior to voir dire. There is no evidence that any of these decisions were based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *See Payne*, 146 Idaho at 561, 199 P.3d at 136; *Milton*, 126 Idaho at 641, 888 P.2d at 815. Moreover, dismissal of these jurors did not prevent the empaneling of an impartial jury. *See Hill v. Brigano*, 199 F.3d 833, 844 (6th Cir. 1999) (relevant inquiry in assessing court's dismissal of jurors for cause is whether the trial court's decision prevented the empaneling of an impartial jury).

Finally, with respect to Abdullah's contention that the decision to stipulate was driven by a desire to secure a favorable plea deal, Mitch explained that he was not very focused on pursuing a plea deal at that time, but rather was "very focused on preparing and trying to pick the very best jury possible." Likewise, Mitch indicated his approach to jury selection was not tempered in an effort to pursue a favorable plea deal. Moreover, Kim's perception was simply: "We were not aggressive in our response on that." This does not evince deficient performance, but rather demonstrates Kim utilized a tactical choice in responding to the State. Thus, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

### ii. *The Toryanskis' voir dire of the venire did not constitute ineffective assistance.*

Abdullah next argues that the Toryanskis conducted inadequate voir dire of the venire and the inadequate voir dire led to the seating of two biased jurors: Juror 59 and Juror 83. However, as discussed in the guilt phase section, these jurors were not biased. Moreover, the

record provides legitimate strategic and tactical reasons for the Toryanskis' decision not to strike Juror 59 and Juror 83.

Abdullah's remaining argument hinges on the Toryanskis' failure to exclusively follow the Colorado Method of jury selection.[61] Abdullah contends that the Colorado Method is grounded in well-established Supreme Court jurisprudence and implicitly asserts that the failure to adhere to this method was deficient performance. He references case law such as *Morgan*, in which the United States Supreme Court held that "a capital defendant may challenge for cause any prospective juror" who will automatically vote for the death penalty in each case and will not consider aggravating and mitigating evidence as the instructions require. 504 U.S. at 729. Based on this law, Abdullah contends that the failure to move to strike these jurors for cause constituted ineffective assistance of counsel because certain jurors were "automatic killers" under the Colorado Method.

Abdullah's argument assumes that the Colorado Method is an infallible method for identifying such jurors and is not over-inclusive. This Court is not persuaded that the Colorado Method is the only mechanism for counsel to evaluate prospective jurors. For one, the Colorado Method could incidentally or incorrectly identify jurors that would not automatically impose the death penalty (without considering aggravating and mitigating evidence), and such jurors would not necessarily be required to be struck for cause. Abdullah failed to present any evidence on the efficacy of the Colorado Method in these particular respects. Second, Abdullah failed to cite to any legal authority demonstrating that the Colorado Method is the prevailing professional norm in capital cases. Third, as *Strickland* has unequivocally stated:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

466 U.S. at 688–89. Accordingly, we assess the Toryanskis' performance in voir dire by examining the objective reasonableness of their actions at the time of voir dire. *See id. See also Phillips v. State*, 587 S.E.2d 45, 47 (Ga. 2003) (in assessing ineffective assistance of counsel

---

[61] In support of this argument, Abdullah filed an affidavit by David Lane, a criminal defense attorney with significant capital litigation experience. Lane explained that the Colorado Method of jury selection is a strategy that involves rating jurors on a scale of one to seven, taking into account solely the likelihood each juror would vote to impose the death penalty.

claim, inquiry is whether the failure to strike jurors for cause, from perspective of voir dire, was objectively unreasonable); *In re Yates*, 296 P.3d 872, 896 (Wash. 2013) ("Yates's presumption that the Colorado method is the only approach to jury selection that is constitutionally adequate lacks any support.").

While the Colorado Method focuses solely on prospective jurors' views on the death penalty, the Toryanskis focused on both the guilt phase and the sentencing phase in accordance with Abdullah's desires. For example, at the evidentiary hearing, Kim testified that the Colorado Method was not in perfect harmony with their goals because they desired success in the guilt phase as well. Likewise, Mitch testified that the Toryanskis utilized the Colorado Method to an extent, but it was only one part of their voir dire strategy. Mitch further stated that it is necessary to take the totality of the circumstances into account when choosing a jury.

An examination of voir dire demonstrates that the Toryanskis spent considerable time exploring a multitude of aspects regarding each juror. Counsel questioned prospective jurors on their views of the death penalty, mitigation, and their disposition towards individuals from different cultures. In addition to the forty-five page questionnaire, the Toryanskis also utilized a "preempt matrix" to keep notes on every juror (including ratings assigned under the Colorado Method) during voir dire.

Further, the district court found both Mitch and Kim testified credibly at the evidentiary hearing, where Mitch explained, "it's not only what a -- prospective juror says, but also how they carry themselves, their attitude, the feeling that you get from them." Likewise, Mitch testified, "what somebody says and it's reduced to writing can be different from the impression that they leave when you're watching their body language, watching the tone of their voice." Thus, in addition to the questions and answers revealed in the voir dire transcripts and questionnaires, the Toryanskis based their decisions on intangibles as well—a commonly recognized approach to jury selection. *See, e.g.*, *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir. 2001) ("Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors."); *State v. Mammone*, 13 N.E.3d 1051, 1085 (Ohio 2014) ("Decisions about voir dire are highly subjective and prone to individual attorney strategy because they are often based on intangible factors."). The techniques employed by the Toryanskis and the decision to only utilize the Colorado Method as a part of their overall strategy

in conducting voir dire was an objectively reasonable approach. Accordingly, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

### iii. The Toryanskis' voir dire of the panel did not constitute ineffective assistance.

Finally, Abdullah asserts that the Toryanskis conducted inadequate voir dire with respect to jurors that composed the panel. Each juror Abdullah challenges will be addressed in turn.

### (1) Juror 28

Abdullah argues that Juror 28 may have been substantially impaired in his ability to meaningfully consider mitigation and a sentence other than death. Abdullah also argues that counsel should have "stripped" Juror 28 under the Colorado Method to determine if he would automatically impose the death penalty in every case,[62] and because Juror 28 indicated that he would believe law enforcement officers more than other witnesses, that Juror 28 was a better juror for the State. However, Juror 28 explained that his preference for law enforcement testimony was because law enforcement officers are trained to observe, which arguably had no bearing on the law enforcement testimony in this case because no law enforcement officer observed the crimes. Also, when asked about his feelings regarding the death penalty as an appropriate punishment for first-degree murder, Juror 28 responded by stating:

> That is a deep philosophical question that you are asking me, how I feel about it. This isn't the movies. This is a real-life situation. It's going to be -- I would just have to look at it at the time I was going through it after I learned everything. . . . [T]he death penalty in some cases in society to protect society would probably be the correct way to go.

Counsel then asked whether there are other ways of protecting society and Juror 28 responded, "Yes, there are other alternatives."

Juror 28 explained there are circumstances where he could consider the death penalty as an appropriate punishment, for instance:

> It depends on the case . . . if it was a mass murder or murder where it was just violently done and destruction of another human being with forethought. . . .

---

[62] Lane's affidavit explained stripping as follows:

> The Colorado Method instructs counsel to "strip" the juror by asking a question along the lines, "Okay, I want you to assume that we're talking about a guy who wanted to kill, planned the killing, deliberated on it, thought about it, wanted to do it for weeks in advance, and did it without any self-defense, no insanity, no excuses. Now what about the death penalty for someone like that?" It is essential that jurors be "stripped" of any reasons not to impose a death penalty to ascertain their true feelings.

> There's so much to go into this I really can't speak upon it until I worked on it, being -- the material being given to me and I have a chance to assimilate it.

Counsel then inquired as to whether in a case of premeditated first-degree murder, Juror 28 could consider mitigating evidence, such as a lack of criminal record and being a good employee. Juror 28 responded that he could take into account such mitigating evidence. Lastly, Juror 28 appropriately committed to following the district court's instructions to both consider imposing and not imposing the death penalty. Thus, there was no evidence this juror was biased or subject to be struck for cause.

### (2)　*Juror 36*

Abdullah argues that the answers provided by Juror 36 demonstrate Juror 36 decided to vote for the death penalty before the trial. In support of this argument, Abdullah cites to a portion of the juror's voir dire where Juror 36 stated as follows:

> Quite honestly, I was thinking about this. I would -- I would with great remorse go for it. I would vote for the death penalty, but I would also want to be there with the person to pray right before they died. I don't think that's fair. I don't think that would be allowed, but I would be praying for that person also if that was something that had to be done.

Abdullah fails to mention the follow-up question by counsel: "And when you say you would go for it, that would be after weighing the laws and the facts and all of the circumstances?" Juror 36 responded, "Yes, absolutely." Further, in responding to the district court's voir dire, Juror 36 agreed he would weigh aggravating and mitigating circumstances, listen to arguments by the parties, and apply the law as instructed by the district court. Juror 36 also responded he would consider not imposing the death penalty. Moreover, Juror 36 indicated that he could give value to an individual's lack of criminal record, good history of providing financial support to his family, and community service—all mitigating circumstances in Abdullah's case. Thus, there was no evidence this juror was biased or subject to be struck for cause.

### (3)　*Juror 44*

Abdullah contends that, while counsel inquired whether Juror 44 could "give value" to mitigation evidence, this question was inadequate and further inquiry was necessary. Yet Kim also inquired whether Juror 44 could "give value to the fact that a person maybe has a long history of good relationships with their friends or family members." Juror 44 responded that he could. Juror 44 also explained that he worked with individuals of Middle Eastern ancestry while in the military, had "no problems at all," and thought they were "good people." Counsel did not

183

perform deficiently in conducting voir dire of this juror, and there was no evidence this juror was biased or subject to be struck for cause.

(4) *Juror 45*

Abdullah argues that the Toryanskis were ineffective for failing to ask Juror 45 single question about the death penalty or about Juror 45's willingness to listen and give meaningful consideration to mitigation evidence. This argument ignores the forty-five page questionnaire completed by Juror 45, which provided a plethora of information regarding his views on the death penalty. Furthermore, Juror 45 indicated that he would consider imposing and not imposing the death penalty, and would weigh both aggravating and mitigating circumstances in coming to that decision. There was no evidence this juror was biased or subject to be struck for cause.

(5) *Juror 68*

Abdullah argues that Juror 68 was "an example of someone who would likely be moved by mitigation and would be inclined to vote for a life sentence," but counsel made no effort to educate Juror 68 about preserving "personal moral integrity through a jury verdict." Under the Colorado Method, this is known as "empowering" a juror. Abdullah fails to cite any authority to support the notion that counsel can render deficient performance by failing to "empower" a juror. This argument is waived. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) (issues on appeal not supported by adequate authority will not be considered).

Even if the Court were to consider this argument, Juror 68 indicated that he would consider imposing and not imposing the death penalty. There was no evidence this juror was biased or subject to be struck for cause.

(6) *Juror 81*

During voir dire, Juror 81 stated:

What I feel is, like I told the Judge, I believe in the death penalty, but I also believe that it depends on the case. I personally believe that there are two types of murderers; one where somebody gets hot headed and loses it for a moment; they do something stupid. And then there are people who think it through. I think everybody feels they are going to get away with it or they wouldn't do it in the first place.

Based on this statement, Abdullah contends that counsel had a duty to ask follow-up questions about the death penalty.

However, when the State asked Juror 81 whether he could apply the law during the penalty phase, Juror 81 responded:

> I will be very deliberate now that it's done. The way I see it is I try to put myself in that man's position. If that was me sitting there, I would want people to look at everything and weigh it very carefully. I figure at the very least, the man has the potential of the death penalty hanging over his head. And I know if that was me, I would want everybody to look at everything very hard.

Further, Juror 81 committed to follow the district court's instructions and indicated that he would consider imposing and not imposing the death penalty. There was no evidence this juror was biased or subject to be struck for cause.

### (7)    *Juror 96*

Abdullah contends that Juror 96 was amenable to considering mitigating evidence and that the Toryanskis provided ineffective assistance in failing to "empower" the juror. Abdullah fails to cite any authority indicating counsel can render deficient performance by failing to "empower" a juror, and thus this argument is waived. *Zichko*, 129 Idaho at 263, 923 P.2d at 970.

Even if the Court were to consider this argument, Juror 96 indicated that he would consider imposing and not imposing the death penalty. There was no evidence this juror was biased or subject to be struck for cause.

### (8)    *Juror 98*

Abdullah contends that Juror 98 was emotionally invested in the case, believed Abdullah's arrest was sufficient to demonstrate some level of guilt, and should have been challenged. Abdullah also argues that counsel provided deficient performance by failing to reveal this juror as someone who would automatically impose the death penalty and was substantially impaired in his ability to give meaningful consideration to mitigation.

When the district court inquired whether Juror 98 was "of the opinion that death is the only appropriate penalty for murder in the first degree," Juror 98 responded, "Absolutely not." Juror 98 also indicated that he would consider both imposing and not imposing the death penalty. Moreover, the "emotional investment" to which Abdullah refers is based on this juror's statement that Juror 98 was a parent like Angie and that the death was tragic. This does not demonstrate a unique emotional connection to cause the juror to be biased. Moreover, after Juror 98 indicated that he thought Abdullah's arrest demonstrated some level of guilt, counsel further inquired whether he could base his decision solely on the evidence in court and whether he could

disregard information from the media. Juror 98 responded appropriately to both inquiries. There was no evidence this juror was biased or subject to be struck for cause.

*(9)    Summary*

Abdullah failed to articulate or present any evidence that any of the jurors on the panel were biased or subject to be struck for cause. All jurors on the panel appropriately indicated that they would consider imposing and not imposing the death penalty. Likewise, they all committed to following the district court's instructions. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Here, the decisions made by the Toryanskis in conducting voir dire were strategic, and Abdullah has failed to proffer any evidence of inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. Abdullah failed to demonstrate deficient performance or prejudice. Thus, this Court affirms the district court's dismissal of this claim of ineffective assistance of counsel.

**38. The district court did not err by dismissing Abdullah's claim of ineffective assistance of counsel by failing to object to defective guilt and penalty phase jury instructions.**

Abdullah argues that his counsel was ineffective for failing to object to erroneous jury instructions or to request proper jury instructions. Abdullah does not identify these flawed instructions, however. Rather, he submits that the "pervasive problems with the jury instructions in Azad's case have been identified and analyzed previously and are incorporated by reference." Based on Abdullah's arguments in the guilt and penalty phase sections of his brief, we must assume Abdullah is referring to the following six jury instructions: (1) the definition of "willful" for arson in the guilt phase; (2) the definition of "many persons" for the great risk aggravator in the penalty phase; (3) judge sentencing in the penalty phase; (4) double-counting aggravator evidence in the penalty phase; (5) the jury's duty to consult and unanimity in the penalty phase; and (6) the lack of a definition for "sufficiently compelling" in the penalty phase.

a.    Abdullah cannot establish ineffective assistance of counsel in four of the six jury instructions because the instructions were not erroneous.

The same analysis applies to four of the jury instructions challenged by Abdullah in the post-conviction phase: (1) the definition of "willful" for arson; (2) judge sentencing; (3) double-counting aggravator evidence; and (4) duty to consult and unanimous verdict.

186

As discussed in guilt and penalty phase sections, there was no error in these four instructions. For the willful instruction, there was no error because the district court provided the definition of willful at the request of the jury, and it was unreasonable to assume the jury went beyond the scope of the instruction to apply the definition of willful to offenses other than arson. For the judge sentencing instruction, Abdullah was not entitled to an instruction detailing the possible penalty options based on the United States Supreme Court's holding in *Simmons v. South Carolina*, 512 U.S. 154 (1994), that the jury must be informed the defendant would be sentenced to a fixed life sentence if the jury did not recommend execution. This rule applies only when those two sentencing options exist, which was not the case here. For the double-counting instruction, there was no error because the instruction mirrored the exact language provided by this Court on the issue. For the duty to consult and unanimity instructions, there was no error because the instructions as a whole informed the jurors to reach an individual decision and that they did not have to unanimously agree on mitigating circumstances or reach a unanimous decision. Because these four instructions were not erroneous, Abdullah cannot establish deficient performance. *See Brown v. State*, 533, 50 P.3d 1024, 1028 (Ct. App. 2002) ("Whether [the petitioner's] attorneys were deficient for failing to object to the instructions depends upon whether the instructions contained errors."). Therefore, Abdullah has not shown ineffective assistance of counsel.

  b. <u>Abdullah cannot establish ineffective assistance of counsel in the two remaining jury instructions.</u>

The two remaining jury instructions at issue here are: (1) the lack of a definition for "sufficiently compelling" and (2) the definition of "many persons" for the great risk aggravator.

As discussed in the penalty phase section, there was no error in the omission of an instruction on the definition of "sufficiently compelling." In that section, we concluded Abdullah's argument was foreclosed due to our holding in *State v. Dunlap* that "sufficiently compelling" was a phrase "of ordinary words that do not require definition." 155 Idaho 345, 365, 313 P.3d 1, 21 (2013). Abdullah now argues in the post-conviction phase that his counsel should have objected to the lack of a definition for "sufficiently compelling." Abdullah cannot satisfy the first prong of *Strickland* of deficient performance because a definition of "sufficiently compelling" was not necessary to properly instruct the jury.

In a related context, "[w]here the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is

generally determinative of both prongs of the [*Strickland*] test." *State v. Payne*, 146 Idaho 548, 562, 199 P.3d 123, 137 (2008) (second alteration in original) (quoting *Sanchez v. State*, 127 Idaho 709, 713, 905 P.2d 642, 646 (Ct. App. 1995)); *see also State v. Youngblood*, 117 Idaho 160, 165, 786 P.2d 551, 556 (1989) (no basis for claim of ineffective assistance of counsel for failure to file motion to suppress evidence when no unlawful search occurred). Applying that concept here, it is not deficient performance for counsel to fail to request a jury instruction if that instruction had no legal basis and was unnecessary. Therefore, Abdullah has not established ineffective assistance of counsel for failing to request a jury instruction on the definition of "sufficiently compelling."

Abdullah also contends that his counsel was ineffective for proposing an improper instruction on the definition of "many persons" for the great risk aggravator. The district court instructed the jury: "The phrase 'great risk of death to many persons' means more than a showing of some degree of risk of bodily harm to a few persons. 'Great risk' means not a mere possibility but a likelihood or high probability. 'Many persons' means more than four people." In the penalty phase section, we determined that any error in the jury instruction on the definition of "many persons" was invited because Abdullah's counsel submitted the instruction. In addition, we concluded that any unconstitutional vagueness in the instruction was harmless because the jury's decision to impose death may be based solely on the utter disregard aggravator. Therefore, even assuming deficient performance, any improper instruction did not prejudice Abdullah. "To demonstrate prejudice, the appellant 'must show a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different.'" *Dunlap*, 155 Idaho at 383, 313 P.3d at 39 (quoting *Dunlap v. State*, 141 Idaho 50, 59, 106 P.3d 376, 385 (2004)). In this case, even if the great risk aggravator instruction was invalid, the death sentence remains valid because the jury also determined the utter disregard factor standing alone justifies the death penalty. *See State v. Hairston*, 133 Idaho 496, 509–10, 988 P.2d 1170, 1183–84 (1999); *State v. Wood*, 132 Idaho 88, 105–06, 967 P.2d 702, 719–20 (1998). Therefore, Abdullah cannot show a reasonable probability the outcome of the penalty phase would have been different but for Abdullah's counsel's alleged deficient performance regarding the great risk aggravator jury instruction.

In summary, Abdullah received effective assistance of counsel with regard to the jury instructions in the guilt and penalty phase. This Court affirms the district court's dismissal of this claim.

## V. Conclusion

The judgments of conviction and sentences pronounced by the district court, including the death penalty based on the utter disregard aggravating circumstance found by the jury, are affirmed. The judgment dismissing Abdullah's petition for post-conviction relief also is affirmed.

Chief Justice BURDICK, Justices EISMANN, J. JONES and HORTON, **CONCUR**